UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT SEATTLE

───────────────────────────────────────────────────────

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) CASE NO. CR23-011-TL |
| | ) |
| v. | ) Seattle, Washington |
| | ) |
| MUNIR WALJI, | ) September 10, 2024 |
| | ) 9:21 a.m. |
| Defendant. | ) |
| | ) JURY TRIAL, Day 2 of 4 |
| | ) |
| | ) |

───────────────────────────────────────────────────────

VERBATIM REPORT OF PROCEEDINGS
BEFORE THE HONORABLE TANA LIN
UNITED STATES DISTRICT JUDGE

───────────────────────────────────────────────────────

APPEARANCES:


  For the Plaintiff:          LAURA HARMON
                              BRIAN WYNNE
                              United States Attorney's Office
                              700 Stewart Street, Suite 5220
                              Seattle, WA 98101



  For the Defendant:          TIMOTHY CARROLL RUSK
                              Tim Rusk Attorneys PLLC
                              1102 A Street, Suite 300-51
                              Tacoma, WA 98402



  Reported by:                NANCY L. BAUER, CCR, RPR
                              Federal Court Reporter
                              700 Stewart Street, Suite 17205
                              Seattle, WA 98101
                              nancy_bauer@wawd.uscourts.gov

1          PROCEEDINGS

2    _____

3          THE COURT:  All right.  So I just have two quick things

4    to put on the record before we start.

5          I realized that I forgot to read the actual peremptory

6    challenges that you-all made into the record, so I'll do that

7    really quickly.

8          The government challenged Juror Nos. 30, 20, 21, 25, 35,

9    and 45.

10          Mr. Walji challenged Juror Nos. 17, 23, 24, 28, 14, 32, 18,

11    and 19.

12          And then I also wanted to let you know that one of the

13    jurors contacted Ms. Peter last night to let her know that

14    they'd received a scam call, from somebody that was saying they

15    were the marshal, about missing jury duty -- it just so happens,

16    yesterday, timing wise -- and told her not to come today because

17    she had a warrant.  And she did the right thing by calling

18    Ms. Peter, so I'm going to give the jurors a heads-up when they

19    come in.

20          Are we ready to proceed?

21              MS. HARMON:  Yes, Your Honor.

22              MR. RUSK:  Yes.

23              THE COURT:  All right.  Bring the jury in.

24              THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:
25

1          THE COURT:  Good morning, everyone.  I just have three

2    quick matters to address with you before we begin trial.

3          The first, I'm just going to remind you that we do expect

4    to start at 9:00 a.m., promptly, each morning, especially if we

5    have any hope of getting done by Friday and not have this go

6    into next week.  So just make sure to be here before 9:00 so we

7    can be here at 9:00 in the morning.  That would be great.

8          Secondly, I understand that, yesterday evening, a juror

9    received a call from somebody saying that they were a marshal

10   and about missing jury duty yesterday, when you all know,

11   obviously, you were here.  And when the person called back, they

12   were told they shouldn't come to trial today, there was a

13   warrant out.  So, unfortunately, these scams are out there.

14         The juror did exactly the right thing, which was to call

15   Ms. Peter and check.  So if you get a call like that, at all,

16   please do check with Ms. Peter about your jury service, if

17   there's any question.  Thank you.

18         Third, as we discussed yesterday, and you'll hear many

19   times throughout this trial, it's important that you decide the

20   case base solely on the evidence and the law presented here.  So

21   you must not learn any new, additional information about the

22   case from sources outside the courtroom.

23         To ensure fairness to all the parties in this trial, I'm

24   now going to ask each of you whether you learned anything about

25   or shared information about this case outside this courtroom,

1  even if it was accidental.  If you think you might have done so,

2  can you please raise your hand?

3      Seeing no raised hands.  If you would prefer to talk

4  privately with the court in response to this question, ever,

5  just notify Ms. Peter.  And thank you for your careful adherence

6  to my instructions.

7      Next, I'm going to read you your 12 preliminary

8  instructions.  We'll have them handed out, so you'll have these

9  in front of you.  These are just instructions at the beginning

10 of the case to give you an idea of what your duties are during

11 the trial, and also to give you an overview of the law that

12 you're going to be following while you render a verdict.

13      Before you deliberate, I'll give you a copy of the final

14 instructions for this case, and then I'll take these preliminary

15 ones back, but just so you'll have the reference.

16      If I misread something, the written words in the

17 instructions you have before you control.

18      Please pass them out.

19          (Preliminary instructions are read.)

20      THE COURT:  With that, we'll now proceed with opening

21 statements, starting with the government, and then the

22 defendant.

23      Counsel for the government?

24      MR. WYNNE:  Thank you, Your Honor.

25          GOVERNMENT'S OPENING STATEMENT

1              MR. WYNNE:   Good morning.

2          November 10th, 2021, a 15-year-old girl named Gabby got on

3      a plane in Atlanta, heading for home.   It should have been an

4      uneventful flight.   It was anything but, because on that plane

5      ride, she was repeatedly groped against her will and without her

6      consent by the man who was seated to her right.   That man,

7      Mr. Walji.

8          Gabby, she was 15 at the time when she got on this plane.

9      She had been vacationing with her mother, a health care

10     professional, a midwife.   Her mother and Gabby had been in

11     Maryland earlier that day.   They had been vacationing with her

12     extended family, her mother's extended family.

13         Early that morning, they got on a flight from Baltimore;

14     went down to Atlanta.   They were going to catch a connection to

15     SeaTac, and then on to Anchorage.

16         Gabby and her mom got on that flight in Atlanta.   Her mom

17     got into the row and seated herself next to the window.   Gabby

18     took the center seat, and seated right next to her was

19     Mr. Walji.

20         Almost immediately, Mr. Walji started talking to her; took

21     an interest in them.   He, in fact, took an interest in Gabby, in

22     particular.   He tried to encourage her; said that she should

23     dream big with her life; that if she had discipline and effort,

24     that she could attain any goal.

25         During that conversation, he talked about himself, and,

1    according to Gabby and to her mother, this conversation was very

2    uplifting, very positive.  They didn't know him, but he was very

3    positive in talking to Gabby and about Gabby's future.

4         An while that was happening, Gabby noticed that he got a

5    little close to her, leaned into her, and she felt a little

6    uncomfortable, but, again, he was making them feel comfortable,

7    so she didn't think too much of it.

8         They settled in, Gabby put in her headphones, and the

9    flight took off.  Eventually, the food service came through, the

10   flight attendants came through, and it was at this point that

11   Mr. Walji offered to buy Gabby's mother a glass of wine.  She

12   declined, but Mr. Walji decided to have a couple of drinks; two

13   bourbon, at least.

14        Gabby and her mother settled in as the flight was

15   proceeding to SeaTac, and because they felt comfortable, they

16   fell asleep.

17        And as the plane was somewhere closing in on SeaTac, things

18   changed.  Things changed drastically.  Because, at this point,

19   she had been asleep, Gabby woke up, she woke up to a feeling on

20   her leg.  She looked down, and she saw that Mr. Walji had put

21   his left hand onto her leg.

22        Now, initially, she didn't think anything of it.  These are

23   tight quarters, it's an airplane.  But it wasn't just that he

24   had his left hand and his left pinky on her leg at that point;

25   in fact, he moved his hand onto her thigh.  He started moving

1    his hand further up her thigh, further into her inner thigh.

2         Gabby didn't know what to do.  She tried to wake up her

3    mom, but her mom was still asleep.  Gabby had no idea what to do

4    at that point, and she froze.

5         The defendant, Mr. Walji, kept touching her leg, moved his

6    hand towards her inner thigh, and moved his hand towards her

7    vagina, and then he moved his hand over towards her hip, and

8    that's when things went from bad to worse.

9         Gabby was seated there, and Mr. Walji adjusted himself.  He

10   moved his head toward her and removed his left hand.  He moved

11   his right hand over, and unbuckled her seat belt.  He then

12   shoved his 69-year-old hand into that 15-year-old girl's pants,

13   shoved his hand under her shirt, inside of her waistband, and

14   shoved it down inside of her underwear.  And Mr. Walji molested

15   her, touched her vagina there, seated next to her.

16        Fortunately, Gabby said something at this point, and that

17   caused Mr. Walji to remove his hand.  He removed his hand, kind

18   of moved over into his seat, and acted as if he was sleeping at

19   this point.

20        Finally, Gabby was able to get her mother awake, and when

21   she was able to do that, her mother saw that she was

22   hyperventilating.  She was crying.  She had tears.  And it was

23   at this point that Gabby's mother -- again, a health care

24   professional -- had to calm her down.  Being used to dealing

25   with stressful situations, had to calm her down.

1      Eventually, Gabby told her that the man seated next to her,

2   Mr. Walji, had been touching her leg and had put his hand inside

3   of her pants.

4      Gabby's mom didn't know what to do, so she tried to

5   confront Munir Walji, confront him with what had happened, and

6   Mr. Walji initially said something like, "No, no, no."  So at

7   that point in time, that's when Gabby's mother signaled for the

8   flight attendant, signaled for a flight attendant to come up,

9   and a flight attendant did, in fact, come up; came up, leaned

10  over Mr. Walji, and talked to Gabby's mother, and Gabby's mother

11  told the flight attendant what had happened.  And Mr. Walji

12  didn't do anything; didn't react at all.

13     But before that flight attendant actually came up,

14  Mr. Walji turned to Gabby, and although he said, "I wouldn't do

15  that," he also said something to the effect of "I was tired" and

16  "I'm sorry."  In fact, he said "I'm sorry" repeatedly.

17     But the flight attendant there saw Mr. Walji didn't react

18  at all as Gabby's mom told her what had just happened on this

19  flight.  The flight attendant, not knowing what to do, removed

20  herself to the back of the plane, talked to her colleagues, and

21  eventually decided they needed to get Gabby and her mother out

22  of that row, and that's what they did.

23     They went back up -- one of the flight attendants went back

24  up and asked them to come out of the row.  And as they did that,

25  Mr. Walji said to the flight attendant, "She told me what I

1    did."  "She told me what I did."

2        Gabby and her mom went to the back of the plane, and it was

3    there that Gabby told the flight attendants and her mother, in

4    more detail now, exactly what Mr. Walji had done to her just

5    minutes beforehand.

6        The flight attendants quickly moved them into different

7    seats and talked to the flight crew as well, communicated with

8    the flight crew, the team up there, the pilot and copilots,

9    advised them as to what was going on.

10       Eventually, the plane started to land, and after it landed,

11   there was an announcement that came over the intercom.  The

12   announcement said something to the effect of, "We know

13   passengers need to catch other flights, but we need you to be

14   patient because law enforcement is eventually going to join us,

15   going to board this plane."

16       And it was at this point everyone else on the airplane

17   stayed seated, except for one person:  Mr. Walji.  Mr. Walji got

18   up, and he went back to the back of the plane, tried to talk to

19   one of the flight attendants; said, "Where are those girls who

20   were near me," and said something to the effect of, "We've

21   already discussed this."

22       Eventually, the flight attendant, who saw that Mr. Walji

23   appeared agitated, anxious -- and the other passengers on the

24   plane saw the same thing, saw that same emotion in Mr. Walji --

25   eventually, Mr. Walji did, in fact, sit down.

1      Law enforcement did, in fact, meet that flight.  Officer

2  Leavengood spoke with Gabby and her mother, while another

3  officer, Officer Chartrand, spoke with Mr. Walji.  And,

4  eventually, Mr. Walji was taken into custody, he was arrested,

5  and he was afforded the opportunity to call his wife, who,

6  apparently, was picking him up at the airplane; got on the call

7  and said he needed 30 minutes to take care of something.  When

8  he hung up the phone and the officer told him, "You're not going

9  to be free in 30 minutes, this is going to be more of a process

10  than that," the officer gave him the opportunity to call his

11  wife again and tell her that he wasn't going to be free in 30

12  minutes.  Mr. Walji declined to make that phone call.

13      Now, Mr. Walji is charged with two offenses, as you've

14  heard from Judge Lin.  He's charged in Count 1 with sexual abuse

15  of a minor in special aircraft jurisdiction, and in Count 2, the

16  abuse of sexual contact in special aircraft jurisdiction.

17      Judge Lin has given you what are commonly called the

18  elements of the crime.  These are, essentially -- this is what

19  the government has to show, what the evidence has to show in

20  order for Mr. Walji to be guilty of these two offenses.  I'm not

21  going to go through the elements with you again.  She already

22  read them to you.  You'll see them in closing as well.  But I

23  just want to point out the difference between these two

24  offenses.

25      In Count 1, that's for the act of putting his hand inside

1    of the pants, under her underwear, and Count 2 is for his act of

2    touching her inner thigh and her vagina, over her clothes.

3         Now, during the course of this trial, you're going to hear

4    from a number of different witnesses.  Of course, Gabby and her

5    mother; flight attendants; the police officers who responded, as

6    well as other investigators who were involved, including a

7    forensic interviewer who interviewed Gabby during the course of

8    this investigation.

9         I'd ask you to keep in mind all of those various factors

10   that we talked about that you consider when you're evaluating

11   the credibility of someone, the credibility of someone's

12   testimony.  Keep those various factors that we talked about in

13   voir dire in mind as you're considering all of the evidence

14   during this trial.

15        But I'm also going to ask you to keep in mind another fact

16   as well.  You see, when Gabby was interviewed, briefly, by the

17   police officers at the airport, the police officers, actually,

18   took her pants and her underwear into evidence.  Her pants and

19   underwear were eventually sent off to the FBI crime lab, where

20   the DNA analysis was performed.  And although there was no male

21   DNA that was found inside of her underwear, you'll hear

22   testimony about how there was a mixed profile of male and female

23   DNA on the outside in the crotch region of Gabby's pants.

24        You'll hear there was a search warrant for Mr. Walji's DNA

25   and that Mr. Walji's DNA was compared to the profile that was

1    developed from the outside crotch region of Gabby's pants.

2        And I want to make sure I got this right, but you're also

3    going to hear from the forensic scientist, Amanda Bakker, and

4    she'll tell you that she rendered an opinion that the highest

5    level of support existed for the inclusion of Mr. Walji's DNA on

6    that outside, front region of Gabby's pants.

7        I'll ask you to consider that fact, the DNA evidence along

8    with the testimony of all these witnesses, when you're making a

9    decision in this case.

10       At the end of this trial, my colleague, Ms. Harmon, will

11   stand before you and ask you to find him guilty of these two

12   offenses.

13       Thank you.

14           THE COURT:  Mr. Rusk?

15           MR. RUSK:  Thank you, Your Honor.

16                   DEFENDANT'S CLOSING ARGUMENT

17           MR. RUSK:  Thankfully for Mr. Walji, you will be

18   deciding the facts in this case, not the government.

19       Yesterday, we all agreed that you would stay open-minded,

20   curious, impartial, fact-based, logical, and that you would have

21   integrity in this process and follow the law.  If you embrace

22   those qualities, you will see, clearly, at the end of this case,

23   that my client is not guilty.

24       Mr. Walji has denied these allegations from the outset.

25   The government is asking you to rush to judgment and see this

1   case through a lens of guilt.  But the only appropriate

2   presumption is that my client is innocent.  He is presumed

3   innocent, and the evidence will show that he is not guilty.

4       Now, on November 10th, 2021, Mr. Walji was on a plane.

5   It's not disputed that he was sitting next to Gabrielle, who was

6   sitting next to her mother who was in the window seat.  The

7   evidence will show that my client is a man now in his 70s, he's

8   a total gentleman, and that he has a reputation for being moral

9   and decent, and that these allegations are completely

10  inconsistent with his character.

11      Now, you will hear from several witnesses that the

12  government will be calling in this case.  You will hear from

13  employees, flight attendants; you'll hear from Jordan Dimick,

14  Nicole Betson, and Mackenzie Thornquist.  They'll tell you the

15  parties were jubilant, they were having a positive conversation.

16  They were laughing together.  None of them saw any of the

17  alleged touching, and they won't testify to it.

18      The government has also chosen to call two civilian

19  witnesses.  You will hear from Renee Miner, who was seated in

20  Seat 26D, and you will hear from Alexa Morales, who was seated

21  in Seat 25F.  The evidence will show that neither of these

22  witnesses observed my client touching Gabrielle, nor did they

23  observe any of Gabrielle's reaction.  And those are for

24  interviews that they did with the government.

25      The seating diagram that you will see in evidence will show

1  that they were not in the best position to make those

2  observations.  But the evidence will also show that the

3  government has chosen not to call six witnesses that were seated

4  directly in front of and directly behind my client.

5       The evidence will show that Special Agent Highley

6  interviewed those witnesses.  She interviewed Melissa Wilson on

7  January 4th, 2022.  She interviewed Halley Gagnon on November

8  29th, 2021.  She interviewed Rebekah Gagnon on November 11,

9  2021.  All seated directly in front of my client, Gabrielle, and

10  her mother.

11       Now, she also interviewed Carl Hall on January 13th, 2022.

12  She interviewed David Anderson on January 3rd, 2022.  And she

13  interviewed Rodriquez Redding on January 13, 2022.  They were

14  all seated directly behind Mr. Walji, Gabrielle, and her mother.

15       The evidence will show that they would have been in the

16  best position to observe these events and that there were

17  several other witnesses that Special Agent Highley interviewed,

18  but you're not going to hear from any of them.

19       And this is important, because Gabrielle is going to

20  testify that my client was bold and brazen.  She will testify

21  that, in fact, he kept his hand on her leg during a second drink

22  service.  She heard the flight attendant coming, and she will

23  testify that Mr. Walji did not move his hand.

24       Gabrielle will tell you she knows what he ordered.  He

25  ordered a clear drink.  It was Sprite.  She saw him interacting

1    with the flight attendant.  And she will claim that she doesn't

2    know how the flight attendant could have missed it.  Those are

3    her words.  She was very clear, in her second interview, that

4    there was no blanket.  There was nothing obstructing the view of

5    the flight attendant.  There was no reason she wouldn't have

6    seen it.  And the forensic interviewer, Ms. Stromme, clarified

7    these points in her forensic interview.

8         Gabrielle will testify that this event was happening for up

9    to an hour and a half, yet no one saw any of the alleged

10   touching.

11        And she will claim that my client turned and put his hand

12   down her pants.  Yet those six witnesses I just mentioned, none

13   of them are going to be called and corroborate any of those

14   allegations, nor will Renee Miner or Alexa Morales.

15        The evidence will show that Mr. Walji denied these

16   allegations from the moment that they were raised.  Any man

17   facing allegations like this would be alarmed.  And the evidence

18   will show that Mr. Walji attempted to address this directly.  He

19   tried to talk to the flight attendant, and willingly spoke to

20   law enforcement after this flight.

21        Now, there was a subsequent forensic interview.  And

22   Special Agent Highley requested a hair and fiber examination.

23   It produced no evidence against my client.

24        The evidence will show that the government does agree,

25   beyond a reasonable doubt, that swabs of the inside of

1   Gabrielle's underwear revealed only female DNA, and that swabs

2   of the outside of Gabrielle's underwear revealed only female

3   DNA, and that swabs of the inside of Gabrielle's pants revealed

4   only female DNA.

5        Now, there was a mixture of female and male DNA on the

6   exterior of Gabrielle's pants, and the evidence will show that

7   we -- we agree with the government on that point.  We're not

8   hiding from that fact.  But there are three contributors to that

9   sample.

10       We are all currently contaminating this room with our DNA.

11  And that sample is not dispositive or proof or corroborating any

12  of the allegations in this case.  More on that in closing.

13       In the end, there is no objective evidence that

14  corroborates the claims in this case.

15       And there's a concept that I want you to consider as you

16  listen to the evidence.  It's found in the Bible, the last

17  section of the Book of Moses, Deuteronomy, 19:15, and it says,

18  "A single witness shall not suffice against a person.  Only on

19  the evidence of two or three witnesses.  This is how the

20  allegations be established."

21       The evidence will show there were not two or three

22  witnesses that can establish these allegations, and that's

23  because Mr. Walji didn't do it.  He's not guilty.

24            THE COURT:  Are you ready for your first witness?

25            MR. WYNNE:  Yes, Your Honor.  The government will call

1  Mackenzie Thornquist.

2                      MACKENZIE THORNQUIST,
        having been first duly sworn, testified as follows:
3

4                       DIRECT EXAMINATION

5  BY MR. WYNNE:

6  Q.   Good morning.

7  A.   Hi.

8  Q.   Can you give the court your full name, spelling both your

9  first and last names for the record?

10  A.   Mackenzie Thornquist; M-a-c-k-e-n-z-i-e;

11  T-h-o-r-n-q-u-i-s-t.

12  Q.   What is it that you do for a living?

13  A.   I am a flight attendant for Delta Airlines.

14  Q.   How long have you been a flight attendant for Delta

15  Airlines?

16  A.   Eight and a half years.

17  Q.   How'd you get involved in this career?

18  A.   One of my best friends, she's a flight attendant and

19  referred me for the job.

20  Q.   You've worked for Delta for that entire time?

21  A.   Yes.

22  Q.   And I wonder if you could tell us some of the stations that

23  you've been at, some of the different airports that you've been

24  stationed at along this eight-and-a-half-year journey?

25  A.   For the first two and a half years, I was based in New York

City, and then transferred to the Seattle base and have been there since 2018.

Q.   Very different experiences working out of Seattle versus New York?

A.   Yes.

Q.   And how so?

A.   Different crowds of people.  New York City, the culture is just very different; yeah, different routes and a lot of international routes compared to Seattle.

Q.   I wonder if you could tell us a little bit about the duties of a flight attendant.  I think we've all been on a plane, but we might not know what you're really doing all the time.  So if you could outline for us the different duties of a flight attendant.

A.   Yeah.  So our main priority is the safety of the crew and the passengers.  So, in training, we do weeks of medical emergencies, how to evacuate every door on an aircraft in our fleet, getting passengers off of any situations that might come about on our flights.

     And then the second is the comfort of the passengers, obviously; like, providing drinks and snacks and making sure you're comfortable during the flight.

Q.   You call that the comfort of your passengers; is that what you said?

A.   Yes.

1  Q.   Going back to safety, evacuations being one, but are there

2  other components of safety that you, as a flight attendant, are

3  engaged in?

4  A.   Other than evacuations?

5  Q.   Yeah, other issues.

6  A.   Yeah.  We have training on how to handle certain

7  situations, like any conflicts that come on that could happen on

8  board.  Like I said, medical emergencies, things of that

9  aspects, yeah.

10 Q.   "Conflicts" maybe being a very broad term to deal with

11 anything that's out of the ordinary on a flight?

12 A.   Yeah.  Passenger conflicts, any types of abuse, any

13 violence, things like that, we're kind of trained how to

14 approach the situation.

15 Q.   I wonder if you can now tell us a little bit about how

16 planes are organized with respect to the employees?  Like, we

17 know that there are flight attendants, and we also know that

18 there's, obviously, a pilot up there.  I wonder if you could

19 tell us about how those two groups are interfacing?

20 A.   Yeah.  So it depends what aircraft you're on, how many

21 crewmen there's on board.  But usually there's two pilots,

22 obviously, in the cockpit.  And on this flight, there was two

23 flight attendants in the jump seats up front, and another two in

24 the back, and we have different positions.

25 Q.   Tell us about the different positions of flight attendants.

1  A.    So the A is the flight leader, and they are in charge,

2  basically, of the front.  They stay in the front the majority of

3  the time.  They're in charge of first class.  They communicate,

4  mostly, with the pilots, if they need breaks or not.  They do

5  all the announcements, first-class meals.

6       And then there's an assist, and so they sit up there with

7  the flight leader, and they assist with boarding and everything

8  that happens in first class, the meal service, and then they go

9  back and assist the other two with drink and food service for

10 main cabin.

11 Q.    And is it kind of a hierarchy?  So you've got the flight

12 leader, and they're, kind of, the supervisor; is that fair?

13 A.    Yes.  They get paid a little more, and they're technically

14 in charge, yeah.

15 Q.    And when it comes to Delta Airlines, are you always working

16 with the same people, or does that kind of cycle through and you

17 work with different crews?

18 A.    No.  It's different every time you go to work, for the most

19 part.

20 Q.    Is it often you find yourself working with new people or

21 people you really don't know at all?

22 A.    Yeah.  Every shift, there can be either three to ten people

23 on a crew, depending on the plane.  But every shift, I'm meeting

24 someone new.

25 Q.    So you talked a little bit about this flight, so I want to

1   direct your attention now to this flight.

2       Were you working November 10th, 2021?

3   A.   Yes.

4   Q.   Were you working for Delta at that time?

5   A.   Yes.

6   Q.   Were you on a particular flight, or were you assigned to a

7   particular flight from Atlanta to Seattle, Flight 339?

8   A.   Yes.

9   Q.   That particular flight, is that a nonstop flight, or a

10  direct flight?

11  A.   Yeah, it was direct from Atlanta to Seattle.

12  Q.   In this type of a flight, how long is it?  What's the

13  duration of the flight?

14  A.   It depends, but usually it's anywhere from four and a half

15  to six hours, depending on the wind.

16  Q.   "Wind," if you have a headwind, it might be six hours --

17  A.   Yeah.

18  Q.   -- and if you have a tailwind, you might get there in four

19  and a half?

20  A.   Yeah.

21  Q.   This particular flight, Flight 339, do you recall when it

22  departed?

23  A.   I believe it was at 5:55 out of Atlanta.

24  Q.   a.m. or p.m.?

25  A.   p.m.

1  Q.   And this was in November, so could you tell us, was it dark

2  at the time of takeoff?

3  A.   Yeah.  So I don't necessarily remember if it was dark

4  outside, but during boarding, and we get everyone on the plane,

5  the cabin is fully bright, and then we dim them for service.

6  And since it's a later flight at night, we'll turn the lights

7  off when we're done doing service.

8  Q.   Tell us more about that.  You'll turn the lights off during

9  certain times and on during others.  So just broadly speaking,

10  how does that work when it comes to Delta Airlines?

11  A.   Yeah.  So when we do boarding, lights are full blast.

12  Obviously, people have to put their luggage up and get seated

13  and know where they're going.  And then we dim the lights for

14  takeoff.  And sometimes we'll turn on the brightness for

15  service, depending on how light it is outside and if window

16  shades are open, so we'll have a little bit of light so we can

17  see what we're doing.  And when service is done, we'll turn the

18  lights off so people could sleep.

19  Q.   Would this be considered a night flight?

20  A.   Yes.

21  Q.   Then when it's down or off, is it fairly dark on a plane?

22  A.   It's fairly dark.  We have entertainment screens, so

23  sometimes people are watching movies, and the light shines from

24  that.  But, yeah, it's fairly dark.  You can still see where

25  you're going, but it's dark.

1  Q.   So on this particular flight, the lights would have been on

2  during boarding, then dimmed during takeoff, and it would have

3  been dimmed otherwise -- other than when there was a service; is

4  that right?

5  A.   Yeah.

6  Q.   And we'll get to -- well, actually, we'll get to that in a

7  second.

8       You were working on this flight.  You told us about these

9  different positions.  What position were you working on this

10  flight?

11 A.   I was the assist, so I assisted with the flight leader with

12 first class.  So my jump seat was in the front of the aircraft.

13 Q.   Do you recall the names of the other flight attendants that

14 were working this particular flight?

15 A.   Yes.  I remember two.

16 Q.   And what are those names that you recall?

17 A.   Jordan Dimick and Nicole Betson were the two flight

18 attendants in the back.

19 Q.   Jordan Dimick, had you worked with Jordan Dimick before, as

20 best you recall?

21 A.   Yes.  I believe I worked with both of them once or twice

22 before.

23 Q.   But not someone that you'd worked with more than that, I

24 guess?

25 A.   No.

1  Q.    Not very frequently?

2  A.    No.

3  Q.    So I want to ask you about something that occurred towards

4  the end of the flight.

5        Did anything unusual occur toward the end of this

6  particular flight from Atlanta to Seattle?

7  A.    Yes.

8  Q.    Tell us about that.

9  A.    So we had done our two services, and I went up to the front

10 of the aircraft to see if the flight leader needed anything.  So

11 we were just up there in our jump seats, and I got a call from

12 Nicole, who was in the back of the aircraft.

13 Q.    We'll talk about that a little bit more, but I want to make

14 sure I understand the timing of this.

15       Roughly speaking, when was this particular call that you

16 received from Nicole?

17 A.    I would say about an hour before landing, we were done with

18 both services, but we usually hit initial descent 30 minutes

19 out.  The captain will make an announcement.  He hadn't made

20 that yet.  So I'd say anywhere between 30 minutes to an hour

21 before we landed.

22 Q.    While the plane was still in flight?

23 A.    Yes.

24 Q.    Okay.  So you said that you received a call from Nicole

25 Betson.  What was that call about?

A.    She had asked me if I noticed anything unusual happening in Row 25, because I had served them during the first service.  And I said no, and then she asked if I could come to the back of the aircraft because an incident had occurred.

Q.    And this call, what was this call over?  Was this over cell phone?  Was she calling your cell phone or some other device?

A.    No.  We have phones on the aircraft so we can contact -- like, an intercom.  We can contacted the pilots.  It's the phone we make announcements with.  We can call each other from the front to back, or have all of us on the line at once with the pilots, too.

Q.    After you received this call from Ms. Betson and she asked if you could come to the back of the plane, did you do that?

A.    Yes.

Q.    Tell us about that.  What happened when you got to the back of the plane?

A.    So I got to the back of the plane, and she had asked me the same question; kind of, like, Hey, have you seen anything unusual?  What was your conversation like with this row?

      And she told me that the mother in that row had rang the call light and told her about an incident in the row, and asked, again, if I saw anything unusual.

      Do you want me to go on and tell what happened, or...?

Q.    We'll get to that in just a second.

      But was it just you and Ms. Betson at this point in time,

1    or were there other people in this conversation?

2    A.   It was Nicole, Jordan, and I in the back galley, the three

3    flight attendants.

4    Q.   Jordan Dimick?

5    A.   Yeah.

6    Q.   Okay.

7         And you had said that you hadn't seen anything unusual at

8    this point; is that correct?  You told Ms. Betson that?

9    A.   Yes.

10   Q.   And what was it that you, then, did, or what did you all

11   discuss doing at that point?

12   A.   She had told me that the mother is 25A --

13             MR. RUSK:  Objection; Your Honor, hearsay.

14             MR. WYNNE:  I'll rephrase that question, Your Honor.

15             THE COURT:  Okay.

16   Q.   (By Mr. Wynne)  I'm not going to ask you to get into what

17   Ms. Betson said the mother had said.

18   A.   Okay.

19   Q.   And, in fact, we'll get to that in a second.

20   A.   Okay.

21   Q.   I'd like to go back.

22        You said that you had had some interactions with people in

23   this row; is that correct?

24   A.   Yes.

25   Q.   I wonder if you could tell us about the interactions that

1   you had had with the people in this row prior to Ms. Betson's

2   call?

3   A.    Yeah.  So during the first service, I remember serving this

4   row.  I didn't remember anything unusual.  It, actually, seemed

5   like they were all getting along.

6        I served the row, and I remember asking if they needed

7   snacks with the drinks that I served.  And I remember a

8   conversation about how he had been at the Delta lounge and

9   didn't need snacks because he had cookies, and I believe he gave

10  a cookie to 25B, and so it seemed like everyone was getting

11  along.

12  Q.    Let me just stop you there, because I think you went into

13  Delta speak or something.

14  A.    Oh, sorry.

15  Q.    "25B," what do you mean by "25B"?

16  A.    So I don't remember the names, but the mother is 25A, and I

17  remember her daughter being in 25B.

18  Q.    Now, why don't we just do this:  I'm going to show you

19  what's been marked as Government's Exhibit 2.

20        MR. WYNNE:  Your Honor, at this time -- actually, let

21  me just ask a couple of questions.

22  Q.    (By Mr. Wynne)  So Delta Airlines, does Delta Airlines keep

23  records of where passengers are seated on the planes?

24  A.    Yes.

25  Q.    It's an important part of the process, making sure people

1    are in the right seats and things of that sort; is that correct?

2    A.    Yes.

3    Q.    Okay.

4          MR. WYNNE:  Your Honor, at this time, the government

5    is going to offer Government's Exhibit 2, pursuant to the

6    stipulation of the parties identified as Government's

7    Exhibit 8.

8          THE COURT:  It's admitted.

9          (Government Exhibit 2 admitted.)

10         MR. WYNNE:  And, Your Honor, With the court's

11   permission, may I read the stipulation the parties identified as

12   Government's Exhibit 8?

13         THE COURT:  Yes.

14         MR. WYNNE:  Thank you.

15   "The United States of America, by Tessa M. Gordon, United

16   States Attorney for the Western District of Washington, and

17   Laura Harmon, Special Assistant United States Attorny for said

18   district, and Defendant Munir Walji, by and through his attorney

19   of record, Timothy Rusk, stipulate as follows:

20   "First, the exhibits containing Delta Airlines' records

21   contained in Government's Exhibit 41 were provided by the

22   records custodian for Delta Airlines and are authentic records

23   from Delta Airlines Flight No. 339, from Hartsfield-Jackson

24   Atlanta International Airport in Atlanta, Georgia, to

25   Seattle-Tacoma International Airport in SeaTac, Washington, on

1    November 10th of 2021.

2         "Second, Government Exhibit 2 is a seating diagram, which

3    shows the seats some passengers occupied on Delta Airlines

4    Flight 339 from Hartsfield-Jackson Atlanta International Airport

5    in Atlanta, Georgia, to Seattle-Tacoma International Airport in

6    SeaTac, Washington, on November 10th of 2021.

7         "Third, the government and the defense stipulate to the

8    admissibility of Government Exhibit 2.  This stipulation is

9    admissible in evidence at trial as Government's Exhibit 8.

10         "The parties have agreed to these facts and the admission

11    of evidence and, therefore, agree these facts and evidence have

12    been proven beyond a reasonable doubt."

13         And, Your Honor, with the court's permission, would the

14    court read the supplemental instruction on this issue?

15              THE COURT:  Yes.

16              MR. WYNNE:  Thank you.

17              THE COURT:  So, members of the jury, the parties have

18    agreed to certain facts that have been stated to you, and those

19    facts are now conclusively established.

20              MR. WYNNE:  Move to publish, Your Honor?

21              THE COURT:  Granted.

22              MR. WYNNE:  Thank you.

23    Q.   (By Mr. Wynne)  So, Ms. Thornquist, showing you what is now

24    up on the screen, which the jurors can also see, is this a

25    diagram of a portion of the plane or representation of the

1  seating of a portion of the plane that you were on from Atlanta

2  to Seattle on November 10th of 2021?

3  A.    Yes.

4  Q.    And we got on this conversation because you identified that

5  there was somebody -- you identified someone by position.  I

6  believe you said 25B; is that correct?

7  A.    Yes.

8  Q.    What does 25B mean to you?  And we'll get back to the

9  diagram in just a second.

10  A.    She was a 15-year-old.

11  Q.    Sorry.  Poorly worded question.

12  A.    Okay.

13  Q.    What I mean by that is, do you frequently, as a flight

14  attendant, talk about people not by who they are, their names,

15  but their positions in the flight in their seat?

16  A.    Yes.  With crew members, we often just refer to what seat

17  they're in.

18  Q.    You might not ever see this person again, but you need to

19  communicate to someone else, like, Hey, someone in 25A needs

20  something?

21  A.    Yes.

22  Q.    All right.

23        So returning your attention to this particular diagram, I

24  just want to walk through it with you.

25        We're seeing just, kind of, two rows of this particular

1    airplane?

2    A.    Yes.

3    Q.    And as you're working from left to right, you can, kind of,

4    see where it says "window" for each of these rows; is that

5    correct?

6    A.    Yes.

7    Q.    And this is one of those planes where there is three seats,

8    then there's an aisle, and then three seats, and then windows on

9    the right; is that accurate?

10   A.    Yes.

11   Q.    And for orientation purposes, this particular flight, the

12   diagram showing the front of the plane at the top of the page.

13   So where the pilots are is at the top of the page, and the back

14   of the plane is at the bottom of the page?

15   A.    Yes.

16   Q.    And you were working in a jump seat towards the top of the

17   page?

18   A.    Yes.

19   Q.    Now we'll go back to where we are.

20         You, actually, had a service of this particular row, the

21   first service; is that correct?

22   A.    Yes.

23   Q.    And this particular service, you, actually, covered the

24   people who were in Row 25; is that accurate?

25   A.    Yes.

1  Q.   And the people who were in Row 25 were Wendy Manumalo in

2  25A; is that right?

3  A.   Yes.

4  Q.   And the MV1 in 25B?

5  A.   Yes.

6  Q.   And Munir Walji in 25C?

7  A.   Yes.

8  Q.   Okay.  So now that we've got that all covered, I want to go

9  back in time to that first food service or drink service.

10        You said you remembered, kind of, the tone of this

11  conversation of the people in this row when you got there; is

12  that correct?

13  A.   Yes.

14  Q.   And what was the tone of the conversation?

15  A.   Honestly, it seemed like everybody was getting along.

16  Everyone seemed happy, and it looked like they were, kind of,

17  communicating with each other.

18  Q.   They were talking to each other?

19  A.   Yeah.  I believe Munir, like, offered them cookies from the

20  Delta lounge, and it seemed like everyone was getting along,

21  from my perspective, yeah.

22  Q.   You just said the name "Munir"; is that right?

23  A.   Yes.

24  Q.   The man sitting in 25C?

25  A.   Yes.

1    Q.    Okay.  Do you recognize anyone in the courtroom here today

2    from this particular flight?

3    A.    Yes.

4    Q.    And can you identify that person in the courtroom by an

5    article of clothing and where they're located?

6    A.    Yes.

7    Q.    Go ahead and do so.

8    A.    The gray jacket.

9    Q.    And could you identify, like, where you're identifying this

10   individual in the gray jacket?

11   A.    To my right.

12   Q.    Okay.  Seated at the table?

13   A.    Yeah.

14   Q.    There are two, kind of, gray jackets.  Is it the lighter or

15   the darker jacket?

16   A.    The lighter.

17         MR. WYNNE:  Let the record reflect the witness has

18   identified this individual.

19   Q.    (By Mr. Wynne)  You said you had this interaction.  Was it

20   a very brief interaction, or a longer interaction?

21   A.    It was pretty brief, yeah.

22   Q.    And you were serving just drinks, or was that meals as

23   well?

24   A.    I was on a drink cart just with drinks and snacks.

25   Q.    And you had said that this individual in 25C, who you

1  identified as Munir, had cookies; is that right?

2  A.    Yes.  I remember he said he was at the Delta lounge in the

3  airport, and I overheard him just offering the two ladies in

4  that row -- if they'd like a cookie.

5  Q.    And did you see either of them take a cookie?

6  A.    I believe MV1 took one, yes.

7  Q.    Did the man talk about how he got these cookies or anything

8  about his flight status or anything like that?

9  A.    Not the flight status.  I could see on my SkyPro -- I

10  believe he was some sort of Medallion Member.  I remember we had

11  a brief conversation about how he was supposed to be in Delta

12  Comfort and he was moved back, but he wasn't mad or complaining

13  per se.  We just had a brief conversation about that.

14  Q.    What is a Medallion Member?

15  A.    It means that you're a frequent flyer.  So you have certain

16  status with us by how much you fly.

17  Q.    Do you remember if you served any drinks to anyone in this

18  particular row?

19  A.    Yes.  I remember Munir asked for two scotch, but we didn't

20  have it because it was COVID.  We only had a certain amount of

21  liquor, and I gave him two Woodford Reserve.

22  Q.    What are Woodford Reserve?

23  A.    It's a type of bourbon.  It's a little, mini bottle that we

24  have.

25  Q.    Do you recall if you eventually served them again?  Because

1   I understand there are two food or beverage services.  Do you

2   recall if you served them again in this row?

3   A.    No, I don't.  Just the first service, I served them.  And

4   it could have been my coworkers got to that row first and they

5   were asleep, but I didn't interact with the row after that.

6   Q.    So I want to go back to that time when you were talking to

7   Ms. Betson and Mr. Dimick in the back.  You were asked if you

8   had seen any unusual interactions in that row, and you said that

9   it was, actually, a very positive interaction you had seen

10  between the occupants in that row; is that right?

11  A.    Yes.

12  Q.    So as you shared that with Ms. Betson, did you and

13  Ms. Betson and Mr. Dimick decide what actions needed to be taken

14  at this point, based on what Ms. Betson knew?  And I'm not going

15  to ask what Ms. Betson told you, but --

16  A.    Yes.

17  Q.    -- did you decide on something?

18  A.    Yes.

19  Q.    And what is it you decided to do?

20  A.    I was going to pull Wendy and MV1 out of that row and bring

21  them to the back galley to discuss an incident that had

22  happened.

23  Q.    Did you do that?

24  A.    Yes.

25  Q.    Tell us about that.

1   A.   I went to the row, and I wanted to make things discreet,

2   and so I asked if they'd want to see our snack options, and they

3   kind of looked at me confused, and then I asked, "Can you two

4   please come to the back of the aircraft with me?"

5   Q.   You were trying to come up with an excuse to get them --

6   A.   Yes.  I didn't want to draw attention to the scene.

7   Q.   And where were they when you came up to the row?

8   A.   They were seated in 25A and 25B.

9   Q.   And was the man, Mr. Walji, in his seat in 25C?

10  A.   Yes.  All three of them were in the row.

11  Q.   Did the woman in 25A and the girl in 25B get out of that

12  row?

13  A.   Yes.  They came with me to the back.

14  Q.   Tell us a little bit about what that looked like and what

15  Mr. Walji did at that point.

16  A.   So I asked them to come to the back with me after offering

17  snack options, and he turned to me before he got out of the row

18  and said, "She told me what I did."  And I just asked if he

19  could please stand up and let these two ladies out, and he did,

20  and they came to the back with me.

21  Q.   Did he say anything else to you?

22  A.   No.

23  Q.   So did, in fact, they come to the back of the plane with

24  you, the mom and the daughter?

25  A.   Yes.

1    Q.    Tell us what happened at the back of the plane.

2    A.    The daughter, MV1, was crying, and I asked her if she could

3    just -- even though it's hard to talk about, if she could just

4    tell me what happened, and she could take her time telling me.

5    And they told me -- she told me that she noticed a hand on her

6    thigh and that it proceeded to go down --

7              MR. WYNNE:  Hold on one second.

8              THE COURT:  What's the objection?

9              MR. RUSK:  Hearsay.

10             MR. WYNNE:  Excited utterance, Your Honor.

11             THE COURT:  Yeah.  Overruled.

12   Q.    (By Mr. Wynne)  So we'll get into that, in a little bit,

13   more here, but I want to make sure that this is clear.

14   A.    Okay.

15   Q.    When MV1 came to the back of the plane, you said that she

16   was crying; is that right?

17   A.    Yes.

18   Q.    I wonder if you could just further describe her demeanor,

19   other than crying?

20   A.    She had her hands over her face, and her sentences were

21   really broken, trying to talk about what happened.  It was kind

22   of a process for her to talk about what happened.  You could

23   tell that she was definitely crying.

24   Q.    And what was it that she said to you, at that point, had

25   happened?

1  A.   She told me that 25C, Mr. Munir, she had noticed that his

2  hand was on her thigh and it proceeded to go down her leggings,

3  and that she started crying and woke her mom up.

4  Q.   Do you remember if she said anything else?

5  A.   I don't recall.

6  Q.   The statements that she went into -- well, actually, let me

7  just ask you:  You don't recall if she said anything else.

8  Would referring back to anything help refresh your recollection

9  as to anything else that she might have said?

10  A.   She was very broken --

11  Q.   Sorry.  Maybe it's poorly worded question.

12  A.   Okay.

13  Q.   This was a long time ago; is that fair?

14  A.   Yes.

15  Q.   Several years ago.  And I can see you shaking your head

16  "yes," but the court reporter is, actually, taking it --

17  A.   Yes.

18  Q.   Okay.  Do you remember that you -- well, actually, let's

19  just talk about it this way:  I'm jumping ahead a little bit.

20  A.   Okay.

21  Q.   Did you document your involvement in this particular case

22  with Delta Airlines?

23  A.   Yes.  We all wrote a report.

24  Q.   And did you eventually also speak with an investigator to

25  document what you recall as happening here?

1    A.    Yes.

2    Q.    Would looking at a transcript of your statement to the

3    investigator help to refresh your recollection as to other

4    statements that this girl made to you at the back of the plane?

5    A.    Yes.

6    Q.    Okay.

7          I'm going to ask you to look at this particular page that

8    we have up here.  If I can just have one second.

9          I'm going to ask you to look on line 5, and if you could

10   read to yourself line 5, down through line 19, and tell me if

11   that helps reflect the recollection as to what she told you in

12   the back of the plane.

13   A.    Okay.  Read it out loud?

14   Q.    No, not out loud; just to yourself to just refresh your

15   memory.  And once you've done that, look at me.

16   A.    Yes, it does.

17   Q.    Okay.

18         So without just reading it from what was taken down, what

19   all do you recall MV1 telling you had happened when you were at

20   the back of that plane?

21   A.    Sorry.  I thought you meant the initial statement.

22         But, yes, I did I ask her.  She told me the hand on her

23   thigh and that it went down her leggings and that she shook her

24   mom awake and she was crying, and he proceeded to take his hand

25   out.  And then I asked her, "How long was this?  Was this a

1  couple seconds?"  And she didn't give me a timeframe.

2  Q.    When you say "down her leggings," what do you mean by "down

3  her leggings"?

4  A.    Inside the inseam of her leggings --

5  Q.    Did she --

6  A.    -- into her pants.

7  Q.    And did she, specifically -- and I'm going to ask you to

8  draw your attention, again, to Exhibit 34 at line 10 through 12.

9  Did she say whether or not his hand went inside of her pants, or

10  just outside of her pants?

11  A.    Inside.

12  Q.    So she said that his hand actually went inside of her

13  pants?

14  A.    Yes.

15  Q.    So she described both inside and outside?

16  A.    Yes.  She -- in the beginning, she said she noticed a hand

17  on her thigh and then proceeded to put it down her pants, and

18  then she started crying and shook her mom awake.

19  Q.    Did she say what he did as she shook her mom awake?

20  A.    That he took his hand out.

21  Q.    And didn't you, in fact, ask her about the duration of this

22  as well?

23  A.    Yeah.  I asked her if it was a couple of seconds, and she

24  didn't give me a timeframe, but she said it was longer than a

25  couple of seconds.

1    Q.    Now, while you were talking to her, who else was around?

2    A.    Jordan, Nicole, the two other flight attendants; and then

3    Wendy and MV1 in the back of the aircraft, and myself.

4    Q.    "Wendy" being her mother?

5    A.    Yes.

6    Q.    In this particular incident, did you want to ask many

7    follow-up questions with her at this point?

8    A.    Yeah.  I asked if they would like to bring -- get law

9    enforcement to meet the flight.  We couldn't give them legal

10   advice, but if that's something they'd want to do, and they said

11   yes.

12        And I also suggested that they don't go back to that row

13   for landing.  I suggested that we move two other males into that

14   row, and I'll reseat them somewhere else.

15   Q.    Is that what you actually did?

16   A.    Yes.

17   Q.    Were they willing to participate with law enforcement at

18   that time?

19   A.    Yes.

20   Q.    So I want to talk to you now about what happened after you

21   moved them.  Or, actually, maybe it was while you moved them, if

22   you're not entirely sure.

23        Can you tell us a little bit about the communication that

24   you had with other Delta employees on the flight?

25   A.    Yeah.  So I stayed in the back of aircraft with Wendy and

1   MV1 while my coworker, Jordan, found two males -- I'm unsure of

2   the row -- and moved them into 25A and B, to replace their

3   seats.  And we called the flight deck on our interphone, and we

4   informed the flight deck of what was happening on the aircraft,

5   in the back, and we also contacted the flight leader, because

6   she was in the front while us three other flight attendants were

7   in the back.  We informed her of what was going on.  And we have

8   a work phone, which is an iPhone, and we were able to write Crew

9   Assist, which, basically, contacts people on the ground, letting

10  them know the situation.

11  Q.   You said you "contacted."  I want to specify one term

12  there.  You contacted the flight deck.  Who is the flight deck?

13  A.   The two pilots.

14  Q.   And spoke to them about what was going on?

15  A.   Yes.

16  Q.   And were you in communication about any kind of law

17  enforcement response that might occur?

18  A.   I wasn't in contact when it was in flight, but on the

19  ground I was in contact with law enforcement, yes.

20  Q.   So all of this action is taking place while the plane is

21  still flying?

22  A.   Yes.

23  Q.   After you conducted all of those steps and as your

24  colleagues worked to reseat MV1 -- Gabby -- and her mother, what

25  was it that you then ended up doing?

1    A.    I was in the back, talking to them, and then the initial

2    ascent [sic] announcement came on.  So the pilots, basically,

3    make an announcement that we're going to be landing, and so we

4    have to prepare the plane for landing and walk-through.  So we

5    reseated Wendy and MV1 and asked them to just stay on the

6    aircraft, and we'll walk them off after we land.  And I went to

7    the front of the aircraft and performed the end-of-flight

8    duties.

9    Q.    At some point in time, was there an announcement that was

10   read, or -- I guess maybe not read, but given over the PA system

11   or the intercom regarding the flight being delayed?

12   A.    Yes.  It was after we landed on the ground.

13   Q.    Tell us about that announcement.

14   A.    So it was probably a minute or two after we landed, the

15   pilots came on the PA system, the announcement system, and just

16   announced that they were sorry that people had connections, but

17   they needed everyone to remain seated because law enforcement

18   was coming on board.

19   Q.    And you were at the front of the plane at this point?

20   A.    Yes.

21   Q.    More towards the first-class area, as I understand it?

22   A.    The head of first class, yes.

23   Q.    Did you have any interactions with law enforcement after

24   the plane eventually did come into the terminal?

25   A.    Yes.

1    Q.    Tell us a little bit about that.

2    A.    So when the plane landed and we were at the gate and the

3    door was opened, law enforcement, actually, pulled me off and

4    just asked me about the incident, what I knew what had happened.

5    And they asked -- they said they didn't want to just walk on and

6    pull Munir off.  They wanted me to point him out as he deplaned.

7    And so they made an announcement that everyone can get up and

8    start deplaning, and when he came to the front and was getting

9    off the plane, I pointed him out to law enforcement, and they

10   took him aside.

11   Q.    Finally -- I just want to make sure I've got this -- you

12   testified that you actually did document your involvement in

13   this in a report with Delta; is that correct?

14   A.    I wrote my report the next morning.

15   Q.    And then you spoke with the investigators a short time

16   after that; is that correct?

17   A.    Yes.  We talked to -- yeah.

18   Q.    Just a couple of follow-ups here, really quick.

19         The airplane was flying out of Atlanta.  What's the name of

20   the airport it was flying out of?

21   A.    Atlanta Hartsfield-Jackson.

22   Q.    Okay.  And the flight was coming into?

23   A.    Seattle-Tacoma.

24   Q.    Okay.  And that's in SeaTac, Washington?

25   A.    Yes.

1    Q.    Two other issues --

2            MR. WYNNE:  Your Honor, the government will be

3    offering Government's Exhibit 8, the stipulation, at this time,

4    as well.

5            THE COURT:  It's admitted.

6            MR. WYNNE:  Thank you.

7                    (Government Exhibit 8 admitted.)

8    Q.    (By Mr. Wynne)  And, finally, I wonder if you could -- you

9    said that MV1 was crying when she talked about what had

10   happened.  I wonder if you could describe for us what you mean

11   by that, because there are various forms of crying.  Could you

12   describe that?

13   A.    Yeah.  She was almost, like, hyperventilating.  Like, it

14   was very hard -- it was broken-up sentences.  This was also at a

15   time when we had to wear masks on the plane, so I could

16   definitely see tears, but I couldn't see all the facial

17   expressions.  But it was very apparent that she was traumatized

18   and crying and had her face, like, in her hands.

19           MR. WYNNE:  No further questions, Your Honor.

20           THE COURT:  I assume you'll be doing cross for more

21   than 15 minutes or so?

22           MR. RUSK:  I hope so.

23           THE COURT:  Okay.  So why don't we take a quick break,

24   just given how long we've been going.  I'm going to give you a

25   shorter break this morning, just because we started later, to

1   try and move things along.  So 10 minutes.  My watch says 10:42,

2   but be back in the jury room at 10:52.  Thank you.

3                (Court in recess 10:43 a.m. to 10:55 a.m.)

4                THE COURT:  Just a reminder that you're still under

5   oath.

6        Mr. Rusk?

7                MR. RUSK:  Your Honor, I know that Government's

8   Exhibit 2 has already been published.  I'd like to display it

9   again for the jury.

10       Can you see that?

11               THE WITNESS:  Yes.

12               THE COURT:  Were you trying to publish it to the jury,

13   or just the witness?

14                          CROSS-EXAMINATION

15  BY MR. RUSK:

16  Q.   Ms. Thornquist, so this is a diagram of the seats on the

17  plane, correct?

18  A.   Yes.

19  Q.   And just to be clear, Row 25 is not on a bulkhead, is it?

20  A.   No.

21  Q.   So there would be three seats in front of Row 25?

22  A.   Yes.

23  Q.   Okay.  Thank you.

24       Now, before you testified today, you reviewed your

25  transcript?

1    A.    Yes.

2    Q.    And did you discuss your potential testimony with the

3    government?

4    A.    Like, on the phone call?

5    Q.    Yes.

6    A.    Like, when I first -- yes.  Three years ago?

7    Q.    Okay.

8    A.    Yeah.

9    Q.    And is that the last time you spoke with somebody from the

10   prosecution?

11   A.    We had one meeting.

12   Q.    Okay.  And are you going to be on a flight later today?

13   A.    No.

14   Q.    Okay.  Did somebody ask you to wear your uniform?

15   A.    They just said I could wear a uniform or I could wear

16   business clothes.

17   Q.    Okay.  And who was that?  Who is "they"?

18   A.    The U.S. attorneys.

19   Q.    Okay.  And when was that?

20   A.    About two weeks ago.

21   Q.    Okay.  So two weeks ago is, actually, the last time you

22   spoke with them?

23   A.    Oh, yes.

24   Q.    Thank you.

25         Now, you mentioned on your direct examination that

1    Mr. Walji was a Medallion Member?

2    A.    He had some sort of status.  It was three years ago.  But I

3    believe he was one of the statuses of a Medallion Member, yes.

4    Q.    Okay.  Is there a Diamond Medallion Member?

5    A.    Yeah, there's Diamond, Platinum, yeah.

6    Q.    How many levels are there?

7    A.    I believe there is three, and Diamond Medallion is the

8    highest, yes.

9    Q.    So if somebody is a Diamond Medallion Member, that means

10   they fly quite a bit?

11   A.    Yes.

12   Q.    About how many miles would they have to fly?

13   A.    I believe it's in the millions.

14   Q.    In the millions?  Is that -- that's a lot of miles?

15   A.    Yes.

16   Q.    Okay.  And do you recall that you said that Mr. Walji is a

17   Diamond Medallion Member?

18   A.    From what I remember, yes.  From our SkyPro, it shows us

19   different statuses.

20   Q.    And you were able to see he was a Diamond Medallion?

21   A.    Yes.

22   Q.    Meaning that he's flown millions of miles?

23   A.    Yes.

24   Q.    Okay.  You were, at one point, asked by your coworkers if

25   you noticed anything weird about the row that my client was

1  seated in?

2  A.    Yes.  Nicole asked me.

3  Q.    And you said he was very nice?

4  A.    Yes.

5  Q.    And he was friendly to you?

6  A.    Yes.

7  Q.    And you didn't mention having any unpleasant interactions

8  with him?

9  A.    I didn't personally have an unpleasant interaction, no.

10 Q.    And you saw him talking to the women in the seats next to

11 him?

12 A.    Yeah, during the first beverage service.

13 Q.    Okay.  And they were getting along, right?

14 A.    Yes.

15 Q.    They were talking?

16 A.    Yes.

17 Q.    Laughing?

18 A.    Yes.

19 Q.    Okay.  And you said that my client shared some cookies with

20 them?

21 A.    Yes.

22 Q.    All right.  Now, at this time -- this was during COVID,

23 right?

24 A.    Yes.

25 Q.    So people had to wear masks?

1    A.    Yes.

2    Q.    And this is a silly question, but they certainly didn't

3    have to wear gloves, right?

4    A.    No.

5    Q.    And they were allowed to eat on the plane?

6    A.    Yes.

7    Q.    And during eating, they could bring their mask down?

8    A.    Yes.

9    Q.    And during drinking, they could bring their mask down?

10   A.    Yes.

11   Q.    Do you recall, when they were sharing these cookies and

12   talking and laughing, whether their masks were up or down?

13   A.    I don't recall.

14   Q.    Okay.  But they were eating cookies?

15   A.    He passed a cookie to her.  So I don't know if I was

16   standing there when she opened it, but I remember him asking if

17   she wanted one.

18   Q.    Do you remember him sharing cookies with her mother as

19   well?

20   A.    I believe MV1 just took one when I was standing there,

21   personally.

22   Q.    So you don't know if her mother also had a cookie?

23   A.    No.  It was a brief moment when I was there.

24   Q.    Okay.  All right.

25         And you said you have some training in passenger safety,

1    right?

2    A.    Yes.

3    Q.    And so are you looking out for passengers that might be

4    experiencing some distress?

5    A.    Yes.

6    Q.    And when you're doing your drink service, is that an

7    opportunity to, kind of, check in on the various passengers?

8    A.    Yeah.

9    Q.    Okay.  So you would, kind of, scan -- whether

10   somebody ordered or not, you'd be scanning the rows?

11   A.    If I noticed anything, I'd definitely point it out to my

12   coworkers, yeah.

13   Q.    And you didn't notice anything on this flight?

14   A.    During the first beverage service, when I interacted with

15   that row, no, I didn't notice anything.

16   Q.    Okay.  So you helped with the beverage services on this

17   flight?

18   A.    Yes.

19   Q.    And this was a full flight?

20   A.    Yes.

21   Q.    I believe you said that you don't even know if there were

22   any empty seats on this flight.

23   A.    I don't recall.  I don't think there were any open seats.

24   Q.    Okay.  So that means that the row in front of my client

25   would have been completely full?

1   A.   Yes.

2   Q.   And the row behind my client would have also been

3   completely full?

4   A.   Yes.

5   Q.   Okay.  And there were two services on this flight, right?

6   A.   Yes.  So there's one when we take off, and then one about

7   two hours, an hour and a half before we land.

8   Q.   And you had indicated, on the first service, that my client

9   ordered two bourbons from you?

10  A.   Yes.

11  Q.   Okay.  And when somebody orders bourbon, do they have to

12  pay for that?

13  A.   Yes.  But I remember him saying that he was supposed to be

14  in Delta Comfort and he had gotten moved back, and so I gave

15  them to him.  And he was also a Medallion, so I remember giving

16  them to him.

17  Q.   Did you have to check anyone else out in that row for any

18  alcohol?

19  A.   No.

20  Q.   Did the women next to him order anything at all?

21  A.   I believe -- because this was three years ago, I believe

22  the mother, Wendy, got a cranberry juice, if I remember right,

23  on the first service.

24  Q.   Okay.  Thank you.

25       And do you recall whether you did the second service?

1   A.   I did a second service, but I don't remember serving their

2   row.  So there's two carts out, so my coworkers could have

3   easily served their row, or if everyone is sleeping, they skip

4   past.

5   Q.   Okay.  Is it possible that you just don't recall serving

6   that row?

7   A.   I don't recall serving that row the second service, but I

8   do remember the first.  So I didn't serve that row second

9   service.

10  Q.   But somebody would have?

11  A.   If they were awake, yeah.

12  Q.   Okay.  And they would have similar training to you, right?

13  A.   Yes.

14  Q.   So they would also be looking for passengers in distress?

15  A.   Yes.

16  Q.   Be looking for things that seemed out of place, right?

17  A.   Yes.

18  Q.   And they certainly would take action if they saw something

19  abnormal, wouldn't they?

20  A.   Yeah.

21  Q.   Okay.

22       So you went, and you were, actually, the one who retrieved

23  Gabrielle and Ms. Manumalo from their seats; is that right?

24  A.   Yes.

25  Q.   And you, kind of, offered them snacks as a ruse, right?

1    A.    Yeah.  I did not want to draw attention to a situation, a

2    delicate one, and I didn't know everything that had happened

3    yet, I hadn't talked to them, so I didn't want to talk about it

4    in the aisle.

5    Q.    Totally understand.  And you said you didn't know

6    everything that happened yet?

7    A.    No, just what my coworkers told me.

8    Q.    And just to be clear, you didn't see anything happen?

9    A.    No.

10   Q.    And they didn't immediately jump out of their seats at the

11   opportunity to go get snacks?

12   A.    They were kind of confused, I think, that I was asking

13   that.  Because I think I said, "You asked about our snack

14   options.  Would you like to come back?"  And I think their

15   initial thought was kinda like, What?  So I said, "Can you two

16   ladies come with me, please?"

17   Q.    And during your interactions in the back, you said the

18   young woman was crying?

19   A.    Yes.

20   Q.    And you noted that her mother was not crying, right?

21   A.    No.

22   Q.    I think your words were that she wasn't too riled up?

23   A.    She seemed calm.

24   Q.    Okay.  And Gabrielle and her mother, they spoke to you

25   about the allegations, right?

1  Q.   And you stated on direct that my client said, "She told me

2  what I did"?

3  A.   When I went to get them out of the row, that's the only

4  thing he said to me, yeah, and then he proceeded to get up and

5  let them out.

6  Q.   And while Gabrielle was upset, she also told you that he

7  said, "I wouldn't do that"?

8  A.   I think that's what the mother relayed to us that he said.

9  In the back when we were talking, we asked about the

10 interaction, and I believe the mother confronted him, and that's

11 what he said to her.

12 Q.   Okay.  So somebody conveyed to you that he said that, when

13 he was first confronted, "I wouldn't do that"?

14 A.   That's what the mother told us, yeah, Wendy.

15 Q.   Okay.  Just looking at my notes really quick.  One moment.

16     Did you notice anything when -- when you were first getting

17 the women from their seats, what was Gabrielle's body language?

18 How was she sitting in that seat?

19 A.   I don't recall.

20 Q.   Do you remember whether she was sitting in the center of

21 her seat?

22 A.   Oh, yeah.  The mother was in A, and she was in 25B.  But I

23 couldn't say I remember the position.  It was really quick when

24 I just asked them.

25 Q.   Okay.

1    A.    And they got up quickly and came to the back.

2    Q.    Did you notice that Gabrielle was very far towards her

3    mother when you were interacting with --

4          MR. WYNNE:  Objection, Your Honor; asked and answered.

5          MR. RUSK:  That's a different question.

6          THE COURT:  Overruled.

7    Q.    (By Mr. Rusk)  Did you notice that Gabrielle was very far

8    towards her mother?

9    A.    I don't recall her position.

10   Q.    Okay.  But there was nothing unusual about her position to

11   you?

12   A.    I wasn't personally looking at positions.  I just asked,

13   quickly, if they would get up.

14   Q.    Okay.  But you did observe her in the seat?

15   A.    Yeah.  She was in the seat.  It was brief and quick that

16   they got up and came back with me.

17         MR. RUSK:  Just one moment.

18         No further questions.  Thank you.

19         THE COURT:  Any redirect?

20         MR. WYNNE:  No, Your Honor.  Thank you.

21         THE COURT:  Thank you.  Any objections from the

22   government to excusing this witness?

23         MR. WYNNE:  None from the government.  Thank you.

24         THE COURT:  Any objections from the defense?

25         MR. RUSK:  None from the defense.

1          THE COURT:  Okay.  You may step down.

2          THE WITNESS:  Thanks.

3          MR. WYNNE:  Your Honor, the government next calls

4    Nicole Betson.

5                          NICOLE BETSON,
              having been first duly sworn, testified as follows:
6

7                        DIRECT EXAMINATION

8    BY MR. WYNNE:

9    Q.   Can you state your full name, and spell your last name for

10   the record?

11   A.   Nicole Betson; N-i-c-o-l-e; B-e-t-s-o-n.

12   Q.   And what do you do for a living?

13   A.   I'm a flight attendant with Delta Airlines.

14   Q.   How long have you been a flight attendant with Delta

15   Airlines?

16   A.   Over nine years.

17   Q.   We've heard a little bit about the duties of a flight

18   attendant, so I'm not going to go into all of that, as well as

19   the organization and orientation of the different flight

20   attendants and the flight crew.  Really, I just want to talk to

21   you about a particular day, if I can.

22        November 10th, 2021, do you remember that particular day?

23   A.   I do, yes.

24   Q.   Were you working on that particular day?

25   A.   Yes.

1  Q.    For Delta?

2  A.    Yes.

3  Q.    Were you on a flight from Atlanta to Seattle, Delta Flight

4  No. 339?

5  A.    I was, yes.

6  Q.    And where were you working on this particular flight?

7  A.    I was working in the back.

8  Q.    "Back"?

9  A.    Back of the aircraft.

10  Q.    Could you bring that microphone a little bit closer?  I

11  want to make sure everyone can hear you.

12        You said you were working in the back of the aircraft?

13  A.    Correct, yes.

14  Q.    Do you recall any other flight attendants who were working

15  on that particular day?

16  A.    Yes.  I was working with Jordan in the back, and Mackenzie

17  was in the front, and we had one other person that was in charge

18  in the front as well.

19  Q.    These individuals you've identified, are they individuals

20  that you've worked with previously?

21  A.    I have, yes.

22  Q.    We've heard a little bit about how you can have -- kind of

23  go through your colleagues as a flight attendant.  Is it common

24  to work with the same crew over and over again?

25  A.    Yes and no.  I think we have about 1,500 flight attendants

1  in Seattle.  So these handful, I've worked with them multiple

2  times, but not everyone.  There's still people I haven't seen,

3  ever, or will ever see again.

4  Q.    And is it that you've had interactions with them after this

5  particular flight, you've been on other flights with them, or

6  was it before this flight that you recall working with them?

7  A.    I've worked with them before this flight.

8  Q.    This particular flight, is this a direct flight from

9  Atlanta to Seattle?

10  A.    Yes.

11  Q.    And this flight, when did it leave, roughly?

12  A.    I think it left around 4:00 in the afternoon.

13  Q.    You said that you were working at the back of the airplane.

14  Where were the other individuals that you've identified working?

15  A.    So on the 337, there's two in the front and two in the

16  back.

17  Q.    And do you recall where the people you've identified were

18  actually working?

19  A.    Mackenzie and our flight leader were in the front of the

20  aircraft, and then I was in the back on one side of the plane,

21  and Jordan was on the other side of the plane, in the back as

22  well, across from me.

23  Q.    Did anything occur on this flight towards the end of the

24  flight?

25  A.    Yes.

1    Q.    Tell us about that.

2    A.    So about an hour into landing, I got a call light that went

3    off.  It was nighttime, so the plane was dark.  So this bright,

4    blue light illuminates, and it was around Row 25.  I walked up

5    there, and a passenger against the window was signaling me to

6    lean in.  She wanted to tell me something.

7    Q.    The passenger against the window, do you know the gender of

8    this passenger?

9    A.    A female.

10   Q.    Okay.  And, roughly, the age of this person?

11   A.    Maybe in her 40s.

12   Q.    Were there other people in this row?

13   A.    There were.

14   Q.    Tell us about the other people in this row.

15   A.    So she was in the window seat.  In the middle seat was her

16   daughter, who was, I believe, 15, and then there was a passenger

17   in the aisle seat as well, a male passenger.

18   Q.    When you approached this particular row, did you make any

19   observations of that male passenger?

20   A.    At that time, he had his seat reclined and his arms crossed

21   and his eyes closed.  I wasn't sure if he was asleep or just,

22   kind of, relaxing.  It was COVID time, so everyone had masks on.

23   Q.    You mentioned that it was dark twice now.  So tell us a

24   little more about the lighting conditions on, at this point, I

25   guess, a night flight, because it's coming across -- tell us a

1    little bit more.  What are the lighting conditions on a plane

2    like this?

3    A.    So it kind of changes throughout the duration of the

4    flight.  Obviously, we started in the afternoon so it was light,

5    we didn't need any cabin lighting on at all.

6         And then we do a first service.  After the first service is

7    done --

8    Q.    The court reporter is taking everything down, so just try

9    to slow down as much as you can.

10   A.    Okay.

11        Basically, we go through with carts.  The lights are on

12   bright.  After that service is done, we allow the passengers to,

13   kind of, relax, so we turn the lights off and allow them to

14   sleep for the rest of the flight.  So it's pretty dim in the

15   cabin.  People have their passenger lights on.  That's the only

16   thing that really keeps it bright.

17   Q.    Now, you told us that you saw this call light go off.  You

18   went up to this row.  Do you remember which row it was?

19   A.    Row 25.

20   Q.    Row 25.

21        Had you had any interactions with the individuals in Row 25

22   prior to when you walked up to it when their call light went

23   off?

24   A.    The only thing I recall on the ground, before we take off,

25   we do a safety check.  So we, basically, walk through to make

1    sure everyone has their seat belts fastened, their tray tables

2    up, and their seat backs forward.  And when walking through, I

3    stopped at that row because they had their masks down.  I think

4    they were eating -- like, sharing cookies or something.  And so

5    I just politely reminded them to keep their masks on, and they

6    obliged right away, said sorry.

7    Q.    Because that was the rule with Delta at that time --

8    A.    Yes.

9    Q.    -- during COVID?

10   A.    Yes.

11   Q.    Did you notice the demeanor of the older woman and the

12   younger girl at that time?  Did you notice what their demeanor

13   was?

14   A.    Yeah.  Everyone seemed to be -- in the entire row, all

15   three passengers were speaking together.  I recall something

16   like them sharing cookies out of a plastic bag, like a home --

17   you know, Ziploc bag.  And they were all laughing and chatting

18   with each other.  I didn't know, at that time, know if they knew

19   each other or not.

20   Q.    So returning to that point in time where that call light

21   went off, you said you approached -- did you approach from the

22   back?

23   A.    Yeah.  From the back of the aircraft, I walked forward.

24   The call light was on.  The woman against the window, again,

25   motioned me to come closer to her, and so I tried to lean

1  forward as far as I could, and, again, she motioned me to get

2  closer.  And so I'm leaning from the aisle across two

3  passengers, trying to hear what she has to tell me.  And she had

4  her mask on, again, so it was a little bit of a difficult

5  communication.

6  Q.   Were you leaning over the man at this point?

7  A.   I was.  I was leaning over him, and also over the middle

8  seat as well.

9  Q.   And did the mother -- the older woman say something to you?

10       MR. RUSK:  Objection.

11  A.   She did --

12  Q.   (By Mr. Wynne)  I'm not going to ask you what she said, but

13  I just want to be clear --

14       MR. WYNNE:  Sorry, Your Honor.

15       THE COURT:  Okay.  All right.  Well, with the

16  explanation that you're not going to ask her what she said, I'll

17  overrule it for now.  We'll see how it goes.

18       MR. WYNNE:  Thank you, Your Honor.

19  Q.   (By Mr. Wynne)  I'm not going to ask you what she said at

20  that point, because that would be hearsay, but I just want to

21  ask you, did you, in fact, communicate with the woman at that

22  point in time?

23  A.   I did, yes.

24  Q.   And did she tell you something that caused you to want to

25  engage with your colleagues and maybe take remedial steps?

1   A.   Yes.  She --

2   Q.   Without going into what she said at that point --

3   A.   Yeah.

4   Q.   -- could you describe the look on her face as she told you

5   this?

6   A.   She seemed pretty concerned; alerted me that there was

7   something that needed to be taken care of and addressed.  And so

8   I immediately went to the back and alerted the rest of my flight

9   crew, to let them know what was going on.

10  Q.   So we're going to get to that in just a second, but I want

11  to still spend a little bit more time here.

12       So you're there, leaning over this man, and the older

13  woman, who is against the window, is speaking to you, at this

14  point, and you could understand her; is that right?

15  A.   It took a couple of times, and then she finally pulled down

16  her mask.  She was speaking very quietly, and I was kind of

17  caught off guard.  I didn't understand why.  Usually if you say,

18  "I can't hear you," people will speak up louder.  So I noticed

19  that she was trying to be pretty discreet about something, and

20  then once I finally realized what she was saying, I understood

21  why she was trying to be quiet.

22  Q.   Upon hearing what she had to say to you, did you look at

23  the girl who was in Seat 25B?

24  A.   I did.

25  Q.   And what did you notice there?

1    A.    She was very much just, kind of, staring forward.  She

2    wouldn't make eye contact with me or interact with me at all.

3    Q.    Did she say anything?

4    A.    She didn't say anything to me.

5    Q.    And as the older woman said this, did the man say anything?

6    Did he react in any way?

7    A.    He did not.  My first assumption was that he might have

8    pretended to be sleeping, because if I was leaning over someone

9    so much, I imagine they would --

10             MR. RUSK:  Objection, Your Honor; personal knowledge.

11             THE COURT:  Sustained.  I'm going to strike that.

12   Disregard the last statement the witness made.

13   Q.    (By Mr. Wynne)  So not to your assumptions but what you

14   were able to see, what was it that you were able to see in his

15   body at that point?

16   A.    Again, his seat back was reclined; had his arms crossed

17   like this, with his eyes closed, and didn't make any movement

18   when I was there, when I talked to the woman, or anything.

19   Q.    So after the woman said this to you, what did you do?

20   A.    I said, "Okay, give me one second," and I walked to the

21   back of the aircraft.  Jordan, the male flight attendant and

22   Mackenzie were also in the back as well, and I let them know

23   what the passenger had just informed me, and at that time we,

24   kind of, discussed what to do and how to handle the situation.

25   Q.    And what was decided to handle the situation?

1    A.    I felt that it was important to contact the flight deck and

2    let them know exactly what had been told to me.  Again, we were

3    about an hour out landing in Seattle, so something needed to be

4    done before we landed, so I wanted to keep them informed.

5          At that time, Mackenzie, I believe, decided -- we, kind of,

6    chatted, and she came up with an idea to go up there and talk to

7    them and move the two female passengers.

8    Q.    And what does that mean, "to move the two female

9    passengers"?

10   A.    It was a completely full flight, so we had to identify two

11   passengers that would be able to swap them seats.  So I believe

12   she said something like, Hey, we've got some snack boxes that

13   you were asking about, and wanted to bring them into the back to

14   show them.  And when she brought them back there, then we, kind

15   of, started chatting with them and got a little more of the

16   story.

17   Q.    So let's talk about that part of the story.

18         So the two women did, in fact, come to the back of the

19   plane; is that right?

20   A.    Yes.

21   Q.    While they came to the back of the plane, was that while

22   you were speaking with the flight crew?

23   A.    Yeah.

24   Q.    And to be clear, the flight crew being the pilot,

25   copilot --

1    A.    Yeah --

2    Q.    -- the navigator?

3    A.    Yeah.

4    Q.    Those folks?

5    A.    Yeah.

6    Q.    When the girl came to the back, did you notice her demeanor

7    at the back of the plane?

8    A.    I did.

9          So when they came towards the back, again, I had called the

10   flight deck, so the captain and the first officer are both on

11   the flight deck, they're both on the phone and can hear what I'm

12   relaying to them, and I'm, kind of, just giving them seat

13   numbers and describing -- we're the eyes and ears for the back

14   of the cabin.  They can't see back there, so they don't know

15   what's going on.  So I'm trying to inform them what's going on.

16         The other two flight attendants were talking to the mother

17   and daughter at that time.  And the daughter started crying, and

18   I didn't hear anything that the daughter or mother said at that

19   time because I was on the phone, but her demeanor, she was

20   starting to cry.

21         It also started getting pretty bumpy towards the back, so I

22   believe we had the daughter sit down on the jump seat with us so

23   she was a little bit safer.

24   Q.    So it sounds like you were, kind of, in between what was

25   going on with maybe your colleagues at the back and these two

1    women, "the mother and the daughter," as you've called them --

2    A.    Yep.

3    Q.    -- and then you were also speaking with the flight crew; is

4    that right?

5    A.    Correct, yeah.

6    Q.    And what was being communicated to the flight crew, other

7    than locations of people?

8    A.    Just the situation had arised [sic].  They asked us if we

9    wanted law enforcement to meet the plane on the ground.  I asked

10   the mother and daughter if that's something that they wanted to

11   have happen, and they said, yes, that needs to happen.  So that

12   was being arranged.  And we were kind of discussing a plan as,

13   upon arrival, what would happen, who would be where, that kind

14   of situation.

15   Q.    And was that a plan just amongst the flight attendants, or

16   was that with the flight crew as well?

17   A.    Flight attendants and the flight deck, yeah.

18   Q.    And what was the plan, I guess, at that point?

19   A.    So law enforcement had been called, so the plan,

20   essentially, was to land, keep everyone in their seats.  The

21   mother and daughter had been moved to a different location.

22         And we originally thought that everyone was going to stay

23   in their seats and law enforcement would come on the plane, but

24   that didn't end up happening.  Law enforcement chose to wait and

25   have every passenger deplane.

1   Q.   And we'll talk about that in just a minute, but, at this

2   point, the plan was to communicate with law enforcement and meet

3   the plane; is that right?

4   A.   Correct.

5   Q.   And then have people remain on the plane until law

6   enforcement eventually did what they were going to do?

7   A.   Correct.

8   Q.   So at that point in time, what did you do?  The plane is

9   still in flight.  You're making these arrangements.  What did

10  you do?

11  A.   At that point, everyone has taken their seats.  About 40

12  minutes out is when we get our indication that it's time to

13  prepare the cabin for landing.  So, again, we do a safety check.

14  We walk through and make sure all the trash has been picked up,

15  everyone has their tray tables up and seat backs in their

16  upright position.

17  Q.   And what are the mother and younger girl --

18  A.   I'm, actually, not sure what seat they were moved to.

19  Q.   But they were moved outside of that row?

20  A.   Correct.

21  Q.   Replaced with other passengers?

22  A.   Correct.

23  Q.   Okay.

24       So you're preparing for landing, doing all the things you

25  need to do with respect to safety and all those things; is that

1    correct?

2    A.    Correct.

3    Q.    Was there an announcement made to everyone on the flight?

4    A.    Just our standard announcements, yeah.

5    Q.    But was there an announcement subsequent to that related to

6    this particular incident, or anything along those lines?

7    A.    Not while we were still flying, no.

8    Q.    Fair enough.

9          When did that occur?

10   A.    When we were landed and taxiing to the gate.

11   Q.    Tell us about that.

12   A.    When we arrived at the gate, we stopped.  It's 8:00 p.m.ish

13   at this time.  And we usually make an announcement for everyone

14   to keep their seat belts on until the seat belt light is off.

15   The lights were on full light and bright, and the captain made

16   an announcement that said, "At this time, we need all the

17   passengers to remain in their seats.  We will have law

18   enforcement coming onto the aircraft."

19   Q.    What was the reaction of the passengers to this

20   announcement?

21   A.    For the most part, most people stayed in their seats.

22   Again, the lights are on full bright at this time.  Passengers

23   are waiting to be informed and told what to do, waiting for the

24   law enforcement to come on.

25         At that time, the passenger, the male in 25 Charlie, stood

1    up and started walking back towards the back of the aircraft,

2    where me and Jordan were both at, and he was, kind of, doing a

3    motion with his hands, like just hands up in the air, like,

4    what's going on?  And as he got closer to the back, he said,

5    "What's going on?  Where are those ladies?"  He said it a couple

6    of times.  And my male coworker firmly said, "You need to sit

7    down now."  He turned around at that point and went and took his

8    seat.

9    Q.    Did you observe his demeanor at that time?

10   A.    Just a little frantic; you know, questioning.  Again, his

11   hands, kind of, doing this motion.  Confused.  Yeah.

12   Q.    After the plane eventually made it to the terminal and

13   connected with the jetway, did you eventually speak with law

14   enforcement?

15   A.    So I was in the back of the plane.  Again, the captain made

16   the announcement to have everyone seated until law enforcement

17   came on.  In the front of the plane, they talked to law

18   enforcement, and they decided that they wanted the passengers to

19   just leave the aircraft.  They didn't want to come onto the

20   plane.  It was COVID time, and I don't think they wanted to

21   create more of a scene.  So they let passengers start leaving

22   the aircraft, as they normally would, you know, grabbing their

23   luggage and deplaning.  And then we stayed back a little bit

24   further with the mom and daughter and waited for the entire

25   plane to be empty.  So I'm not sure what was going on in the

1    front of the plane.  And then once we left the aircraft, we saw

2    law enforcement with the passenger in 25C.

3    Q.   So the man in 25C you saw interacting with law enforcement?

4    A.   In the airport, yes.

5    Q.   In the jetway?

6    A.   In the jetway, yeah; not on the plane, yeah.

7    Q.   The man who got up after the announcement, correct?

8    A.   Correct.

9    Q.   The man who you were leaning over when the mother was

10   disclosing what had happened?

11   A.   Correct.

12        MR. WYNNE:  Nothing further, Your Honor.  Thank you.

13                   CROSS-EXAMINATION

14   BY MR. RUSK:

15   Q.   Good morning, Ms. Betson.

16   A.   Good morning.

17   Q.   We've never actually spoken before?

18   A.   No.

19   Q.   How did you prepare to give your testimony today?

20   A.   I read over my notes that I submitted to Delta and the

21   transcript that I had with the FBI.

22   Q.   And when's the last time that you spoke to the government?

23   A.   I had a meeting with them last week.

24   Q.   Okay.

25        And do you have a flight later today?

1    A.    I do not, no.

2    Q.    Whose idea was it for you to wear your uniform?

3    A.    We just discussed it collectively.

4    Q.    Okay.  And they thought it would be a good idea?

5    A.    Yes.

6    Q.    Thank you.

7          So you talked a little bit about the masking policy?

8    A.    Correct.

9    Q.    And you said that, at one point, you saw that the parties

10   were all interacting and sharing cookies?

11   A.    Correct.

12   Q.    Were they all enjoying cookies?

13   A.    It seemed so.

14   Q.    The mother, too?

15   A.    It seemed so, yes.

16   Q.    And the masks were down during that interaction?

17   A.    Correct.

18   Q.    And it was my client that gave them those cookies?

19   A.    I believe so, yes.

20   Q.    And you had to tell them to put their masks on?  I'm sure

21   you had to do that a lot during that time.

22   A.    Yes.

23   Q.    Were people always, kind of, having their masks on and off?

24   A.    Yes.

25   Q.    Were people trying to, kind of, sneak their nose out of

1    that mask; did that happen a lot?

2    A.    Quite often, yes.

3    Q.    Those are uncomfortable, right?

4    A.    Yes.

5    Q.    I believe you said that the flight was very full, right?

6    A.    Completely full, yes.

7    Q.    And there was just no available seats?

8    A.    Not to my recollection, no.

9    Q.    So the rows in front and behind my client, totally full?

10   A.    Correct.

11   Q.    And I think you said the parties were really getting along

12   very well?

13   A.    The one point I saw them, it seemed like they were

14   laughing, yes.

15   Q.    I think the word you used was "jubilant."

16   A.    Yes.

17   Q.    Do you remember that?

18   A.    Yes.

19   Q.    What does "jubilant" mean to you?

20   A.    To me, easygoing demeanor, joking around, laughing, happy.

21   Q.    So it didn't appear that anybody in that row was

22   uncomfortable at all?

23   A.    That was before we were taking off, correct.

24   Q.    Understood.

25         And you thought, actually, that maybe they had been --

1    based on their interactions, that is -- maybe they were even

2    traveling together at that time?

3    A.    That wasn't my assumption.  I didn't know either way.

4    Q.    Okay.  You thought they might be, though?

5    A.    They could have been.

6    Q.    Okay.  And that was based on their interactions?

7    A.    Just that they were talking, yeah.

8    Q.    Okay.

9          Now, at some point, you indicated that you responded to a

10   call light?

11   A.    Correct.

12   Q.    Do you know who pushed that call light?

13   A.    I believe it was the mother.

14   Q.    Okay.  And it was the young girl's mother that informed you

15   of the allegations?

16   A.    Correct.

17   Q.    And I think that you stated in your interview with

18   Ms. Highley that the daughter, she wouldn't make eye contact

19   with you at that time?

20   A.    No.  She was, essentially, staring forward, wouldn't

21   interact with me.

22   Q.    She was just being quiet?

23   A.    Correct.

24   Q.    I don't think you made any mention that she was

25   hyperventilating at that time?

1    A.    In the seat, no, she was very -- just staring ahead in the

2    seat.

3    Q.    Not crying?

4    A.    Not at the time.

5    Q.    Okay.  And how exactly was she seated in her seat at that

6    time?

7    A.    Um, I mean, sitting forward.

8    Q.    Okay.  Did you notice that she was very far to the left,

9    like, up against her mother?

10   A.    I would say maybe her knees were diagonal to her mother,

11   but other than that, no.

12   Q.    Okay.  So her whole body wasn't shifted over to the left?

13   A.    I can't say for certain.

14   Q.    Okay.  But you didn't notice anything unusual enough for it

15   to stick in your mind?

16   A.    No.

17   Q.    Okay.

18         And I believe you noted that, in the back, her daughter did

19   start to cry?

20   A.    Correct.

21   Q.    I think your words were not hysterically or anything like

22   that?

23   A.    Correct.

24   Q.    Just tearing up?

25   A.    She was definitely crying, but she wasn't frantic or

1    anything.  She was definitely crying a heavy cry.

2    Q.    Okay.  And it was the mom who actually told you they wanted

3    to press charges, right?

4    A.    Correct.

5    Q.    And you didn't make any mention in your statement that

6    Gabrielle told you she wanted to press charges?

7    A.    I didn't have much communication with the daughter at all.

8    Q.    Okay.

9          And there was a lot of discussion about the initial report

10   in your direct, right?

11   A.    The initial report?

12   Q.    In your direct examination, when you were receiving the

13   information from the mother --

14   A.    Uh-huh.

15   Q.    -- you noted that you actually leaned all the way across my

16   client; is that correct?

17   A.    Right.

18   Q.    Was that all the way across Gabrielle as well?

19   A.    It was as far as I could physically lean in.

20   Q.    You had to get way down close to her?

21   A.    Correct.

22   Q.    Because it was hard to hear?

23   A.    Correct.

24              MR. RUSK:  Thank you.  No further questions.

25              THE COURT:  Any redirect?

1    MR. WYNNE:  Yes.  Briefly, Your Honor.

2                   REDIRECT EXAMINATION

3  BY MR. WYNNE:

4  Q.   Ms. Betson, regarding your attire, did someone from Delta

5  tell you you were going to be testifying in your official

6  capacity as a Delta employee and, therefore, you could wear your

7  uniform?

8  A.   Um, can you ask that again?

9  Q.   Was there someone from Delta corporate who said that when

10  you came in to testify, you would actually be testifying as an

11  employee and so, therefore, you could wear your uniform?

12  A.   Correct, yes.

13  Q.   Okay.  And you said that no one was uncomfortable at that

14  initial interaction that you had with the people in this Row 25;

15  is that correct?

16  A.   Just an assumption, yes.

17  Q.   They were talking to each other and they were laughing?

18  A.   Correct, yeah.

19  Q.   There was a stark difference later; is that correct?

20  A.   Absolutely, yes.

21  Q.   Someone was upset later; isn't that right?

22  A.   Multiple people, yes.

23                   MS. HARMON:  No further questions.  Thank you.

24                   THE COURT:  Any recross?

25                   MR. RUSK:  No recross.

1          THE COURT:  Any objection to excusing this witness?

2          MR. WYNNE:  No.

3          MR. RUSK:  None from the defense.

4          THE COURT:  Thank you.  You may step down.

5          MS. HARMON:  Your Honor, we will next call Jordan

6     Dimick.

7                         JORDAN DIMICK,
           having been first duly sworn, testified as follows:
8

9                        DIRECT EXAMINATION

10    BY MS. HARMON:

11    Q.   When you've had a chance to settle in, state and spell your

12    name for the record.

13    A.   Yes.  My name is Jordan Robert Dimick; J-o-r-d-a-n; R for

14    the middle initial; D-i-m-i-c-k.

15    Q.   What do you do for a living?

16    A.   I am a flight attendant for Delta Airlines, based out of

17    the Atlanta, Georgia.

18    Q.   How long have you been a flight attendant for your whole

19    career?

20    A.   Whole career is about 12 years in November of this year.

21    Q.   Okay.  And what companies have you been with?

22    A.   I've been with American Eagle, formerly known as American

23    Eagle but now known as Envoy Airlines, and Spirit Airlines,

24    until Delta in 2014.

25    Q.   Okay.  So are you with Delta right now?

1    A.    Correct.

2    Q.    All right.  And if my math is correct, it's about -- it's a

3    little over ten years with Delta?

4    A.    Correct.  Ten and a half, a little over ten and a half.

5    Q.    Okay.  And where are the various cities that you were based

6    out of while working with Delta?

7    A.    I've been based in Atlanta, Georgia, for 14 months, and San

8    Francisco, California, for seven months.  And I have been in

9    Seattle for almost ten years, because I got in there in October

10   2015.

11   Q.    Okay.  And were you working a flight on November 10th,

12   2021?

13   A.    Correct.

14   Q.    What was the city that was to and from?

15   A.    The flight pairing was from Atlanta, Georgia, to Seattle,

16   Washington.

17   Q.    And was that Flight 339?

18   A.    Correct.

19   Q.    What was your role on that flight?

20   A.    I was the flight attendant seated at Door 2 right.  That is

21   the back of the airplane, and I was the cabin safety check

22   flight attendant.

23   Q.    Okay.  And is "right," as you're facing front of the plane,

24   the right side?

25   A.    Yes.  Yeah, if you're facing from the back to the front, it

1   would be the right side.

2   Q.   Okay.  Do you recall, roughly, what part of the day that

3   flight was?

4   A.   I believe it was, like, a later-in-the-afternoon flight.

5   It wasn't necessarily a red-eye flight.

6   Q.   Okay.  Left Atlanta in late afternoon?

7   A.   Yeah.

8   Q.   Okay.  And arrived in Seattle local time around...?

9   A.   Probably, roughly, from what I can remember, it was around

10  8:00 or 9:00 p.m.

11  Q.   Okay.  What was the lighting in the cabin for that type of

12  flight?

13  A.   Um, I don't really recall specific lighting.

14  Q.   Okay.

15  A.   But if it is a night flight, most flight attendants,

16  including myself, would usually keep it -- monitoring outside.

17  So if it is sunset time, it's usually, like, on a dim setting;

18  nighttime, unless we're doing service, it's usually a little

19  darker.

20  Q.   And I know you said you've been in Seattle for a while --

21  A.   Correct.

22  Q.   -- but November, 8:00 p.m., it's going to be dark outside

23  by the time you land?

24  A.   Yes, that's correct.

25  Q.   And is it fair to say the cabin lighting would change over

1  the course of the flight?

2  A.   Yes.

3  Q.   It's not going to be all the way on or all the way off?

4  A.   Correct, that's correct.

5  Q.   Can you describe, in terms of your service, your duties on

6  that flight, the beginning of it, was things normal, the usual

7  process for you, or anything different at the beginning?

8  A.   Sure.  Yeah, it was pretty much a normal flight.  I didn't

9  have any major events that had happened.  It was pretty as

10  usual, business as usual.  As a Delta flight attendant, we were

11  just on an Atlanta to Seattle.  We had two beverage services,

12  and we finished the first one.

13       And later in the flight, about an hour and 40 minutes

14  before landing in our destination, at 1,500 miles or higher, we

15  do the second beverage service.  And we did the second beverage

16  service, and that was that.

17  Q.   Okay.

18  A.   Yeah.

19  Q.   At some point, did something eventful happen?

20  A.   Yes.

21  Q.   When was that?

22  A.   Approximately, after the second beverage service.  The

23  interval of time, I'm unaware, but, however, that is when the

24  event happened.

25  Q.   Okay.  So roughly speaking, sometime in that last hour and

1   three quarters of the flight?

2   A.   Correct.

3   Q.   Okay.  And who was involved in that?

4   A.   Um --

5   Q.   The incident that happened.

6   A.   Correct.

7        Well, there was an older gentleman and a mother and a

8   daughter.

9   Q.   Okay.  And do you recall where they were seated?

10  A.   Yes, I do, I know the row.  The mother was seated in 25

11  Alpha, by the window; the daughter was seated in 25 Bravo, in

12  the middle seat; and the elderly gentleman was in 25 Charlie,

13  which is the aisle seat.

14  Q.   Okay.  And without telling me what someone told you, who

15  was the first person that you learned of this incident from?

16  A.   It was Nicole Betson, on my flight.

17  Q.   Another flight attendant?

18  A.   Another flight attendant that I was working with in the

19  back, yes.

20  Q.   Okay.  And based on what Nicole told you, what action did

21  you take?

22  A.   I decided to get connection with a crew resource we have

23  called Crew Assist, and that allows Delta flight attendants, as

24  well as pilots, to contact with a company resource full of live

25  employees that can help answer questions, comments, or concerns.

1    And I wanted to know the best course of action for the

2    information that was given to me and the crew at large and how

3    to best handle it.

4    Q.    Okay.  And then after utilizing that tool, did you take

5    some additional action?

6    A.    We did.  It was -- you know, it was a very sensitive

7    subject, and we didn't want to make a scene for anybody.

8    Q.    Sorry to interrupt you.  Who is "we" at this point?

9    A.    Oh.  Me and my colleagues, Nicole, as well as Mackenzie,

10   and Jackie, eventually, who was the flight leader on the flight.

11        We -- Mackenzie, Nicole and myself, we decided to -- for

12   more information from the mother and daughter, who had given

13   Nicole the information.  We decided to pull them discreetly into

14   the back of the airplane, the galley, which is the kitchen, if

15   you're unfamiliar with the term.  We decided to covertly asked

16   them to come see the snack options in the back as a way to

17   discuss the event that had happened, or that was said to have

18   happened with the mom -- or the daughter.  Sorry.

19   Q.    And who went up to get them?

20   A.    Flight Attendant Mackenzie.

21   Q.    And you stayed in the back with Nicole?

22   A.    With Nicole, yes, and we were back there.

23   Q.    Did Mackenzie, ultimately, bring them to the back of the

24   plane?

25   A.    Correct, yes.

1    Q.    When they came to the back of the plane -- first of all,

2    had you had any interactions with the mother or daughter prior

3    to that?

4    A.    No, I did not.

5    Q.    Nothing of note to you?

6    A.    Not that I recall.

7    Q.    Okay.  Can you describe to me the daughter's demeanor in

8    the back of the plane?

9    A.    Absolutely.

10         The daughter was visibly shaken up when she got, initially,

11   into the galley.  When we asked her what her situation was and

12   what she reported to Nicole, she began to be in tears, and you

13   could see that she was a little shaken.  We told her to be

14   patient and to take her time to get out the story.  She was very

15   emotional.  She looked very, very sad and just -- yeah.

16   Q.    Okay.  With regard to her voice, could you tell anything

17   about her voice when she was trying to talk?

18   A.    Absolutely.  She was very choked up when she had to recall

19   what she said happened.  And I remember her mother consoling

20   her, having her hand on her back and reassuring her that it was

21   okay to tell us.  And so she had to take breaks from time to

22   time to tell the events that had happened, or that she said

23   happened.  So, yeah.

24   Q.    Okay.  And when you say she's "choked up," were there ever

25   any points where you had difficulty understanding the words she

1    was saying?

2    A.    Yes, absolutely.  There were times where she had to make a

3    pause, you know, through tears and the like, and she had to

4    re-collect herself and continue on with her story.

5    Q.    Okay.  And because crying can span a whole gamut of

6    different types of mannerisms, can you describe, like, how she

7    was crying any more?

8    A.    It was pretty intense.  I don't -- I don't really have

9    another adjective to use that would suffice.  But it was very --

10   it was a lot.

11   Q.    Okay.  And what did she tell you in the back of the plane

12   at that point?

13   A.    She stated that the man in 25 Charlie had put his hand on

14   her thigh while she was sleeping.  And at first she said that

15   she thought it could have been an accident, because we were in,

16   you know, tight quarters in a tight space, so she didn't think

17   anything of it at first.  But then later in the flight, he

18   proceeded to put his hand down her jeans and move his hand up

19   and down her thigh.  And she just started crying, she said, and

20   she was in a state of shock and said she didn't know what to do.

21        And eventually, when it stopped, she told her mother what

22   happened, and her mother confronted him, and she asked him, you

23   know, Hey, did you do this to my daughter?  And he said -- I

24   don't recall the exact words, but it was along the lines of

25   "that is ridiculous."  And that's all I remember from what she

1    was saying, so...

2    Q.    Okay.  Thank you.

3    A.    Yes.

4    Q.    Do you remember -- you just mentioned jeans.  Do you

5    remember what the girl was wearing?

6    A.    Yeah.  Not vividly.

7    Q.    Sure, to the best of your memory.

8    A.    Yes.

9          She had long, brown hair.  She was wearing, like, a pink

10   shirt with, like, a gray jacket, jeans, and that is all I can

11   remember.

12   Q.    Okay.  And you said that the mother had her arm around her

13   daughter.  What else about the mother's demeanor in the back of

14   the plane?

15   A.    The mother was, you know, pulling her hair back, wiping

16   away her tears as her daughter was recounting what had happened,

17   and, you know, reassuring her with words like, "It's okay,

18   honey.  It's okay.  You can slow down if you need to."

19   Q.    And when you say "wiping away tears," does that mean that

20   the mom was wiping away her own tears, or her daughter's tears?

21   A.    I wasn't so focused on the mom, but I did see the mom wipe

22   away some of the daughter's tears for sure, yeah.

23   Q.    Okay.  Thank you for clarifying that.

24   A.    Of course.

25   Q.    So after you get done talking to them in the back of the

1   plane, what was your next course of action?

2   A.   At this time, Crew Assist had gotten back to us, and they

3   asked if -- or they told us to get the pilots involved and to

4   have the authorities greet the aircraft.  They also asked us to

5   ask the daughter and the mother if they would like to press

6   charges on the man.  That was very important for them to know.

7        And Mackenzie, at that time, had also wanted to move the

8   mother and daughter away from the man, and I agreed -- we all

9   agreed, as a crew, that that was probably the best course of

10  action to take within the moment.

11       So we called the cockpit and let them know.  Before the

12  cockpit could call the authorities when we got to Seattle, he

13  did ask us if he wanted -- sorry -- if the daughter wanted to

14  press charges, and we asked the daughter, and she said "yes."

15  And I went ahead and reseated the mother and daughter with two

16  men.

17  Q.   Can you describe that in a little bit more detail?

18  A.   Correct.  Yeah.

19       One man was probably in his mid 30s.  He was a Caucasian

20  man, and he was flying with his girlfriend.  I remember he was

21  seated next to his girlfriend.  He was in the middle seat, and

22  his girlfriend was in the window seat.

23       And it was important that I seat the mother and daughter

24  next to a female, or a female-presenting person.  I didn't want

25  any male-presenting person to sit next to these ladies.  It was

1    very important.  So I chose that row for a reason.  I reached

2    out to him; asked him to move.  That's what he looked like, the

3    first person.  I don't really recall any details about his

4    clothing; just mid 30s, Caucasian.

5          The second gentleman was an Asian man probably in his late

6    40s.  He had black hair, a little gray pepper in his hair as

7    well.  I know that he drank red wine a lot.  I served him red

8    wine quite a bit on that flight, reasonably.  And I asked him to

9    move his well.  At first he was a little perplexed, because we

10   were about to land in Seattle.

11         I'm sure everyone had questions.  But to keep it very

12   professional and discreet, I did say that we have a sensitive

13   situation and I would really appreciate it if he could comply,

14   just because I didn't want to make a scene.

15         And so I had the mother sit in the middle seat, while the

16   daughter sat in the aisle seat, and then I told the gentlemen to

17   sit in 25A and B, and apologized.

18   Q.    Okay.  To make sure I understand all of this correctly, you

19   had those two men you just described go sit in Row 25?

20   A.    Correct.

21   Q.    And then you had the mother and the daughter go sit in a

22   different row with someone who was female-presenting?

23   A.    Correct, that's correct.  And as far as that row goes, I

24   have no idea what row that was.

25   Q.    Sure.  Completely understood.

1    Do you remember if that was that first gentleman's

2    girlfriend, or just a different woman?

3    A.    I'm pretty sure it was the gentleman's girlfriend.

4    Q.    Okay.

5    Okay.  Can you describe, what is initial descent?

6    A.    Initial descent marks the phase of flight for the flight

7    attendant and pilot position, where we are, like, descending

8    into an airport, and it is a mark of letting the passengers know

9    that, hey, we are making our initial descent into this

10   destination.  And we have safety duties, like making sure

11   everyone is seated.  There's seat belt signs on.  We check for

12   seat belts.  And if anyone is up and about the cabin and the

13   seat belt sign is on, we do tell them to go back to their seat.

14   It's also the time where we cannot really talk to the

15   pilots at that time, because they need to focus on landing the

16   aircraft safely.  It's what's called a "sterile cockpit," and

17   you need to let them do their job safely.

18   So that is initial descent.

19   Q.    Okay.  And how did initial descent go on this flight?

20   A.    You know, it seemed, you know, like it was all right, for

21   the most part.  We reseated them, and that was that.  We landed

22   and...

23   Q.    Okay.  Were there any subsequent announcements about seat

24   belts after you landed?

25   A.    Yes, there was.  There was, indeed.  Being that the young

1   lady did want to press charges on this man, the pilots had

2   informed us that everyone would remain seated, and the

3   authorities at the time -- the pilots assumed at the time that

4   he would be taken off individually.  And we made an announcement

5   when we landed in Seattle for everyone to remain seated, so

6   please do not get off the airplane.

7       And at that time, the man came back into the galley with a

8   very perplexed, kind of, anxious look on his face, and --

9   Q.   And who was in the back of the plane with you?

10  A.   It was me and Nicole.

11  Q.   Okay.  And so the announcement comes over you need to stay

12  seated, and he comes to the back of the plane --

13  A.   Correct.

14  Q.   -- looking anxious.

15  A.   Correct.

16  Q.   What else would you use to describe his demeanor at that

17  point?

18  A.   Adjectives:  Anxious, concerned, almost upset.  Bewildered

19  as well.  I would also use the word "bewildered."

20  Q.   Oh, sorry.  Keep going.

21  A.   Oh.  Just -- overall, just anxious.

22  Q.   Okay.  Was there anything that you noticed about his eyes?

23  A.   His eyes were pretty big.

24  Q.   Was he looking anywhere?

25  A.   He was looking at me, then he would look at Nicole, and he

1    just kept asking, like, What's going on?

2    Q.    Did he say anything else to you at that point?

3    A.    I said, "Sir, you need to go back to your seat," once he

4    had asked what's going on, and he goes, "It's handled.  I've

5    already" -- "it's handled."  And we did not say anything to this

6    man about anything.

7    Q.    Okay.  So meaning you had not talked to him directly at

8    all --

9    A.    Correct.

10   Q.    -- until this moment?

11   A.    Correct, correct, that is correct.

12         And, you know, I had already once told him to go to his

13   seat.  The pilots, on the ground, had told all the passengers to

14   remain seated with their seat belt fastened until the

15   authorities entered the aircraft.

16         And I got firm with him, and I said, "Sir, you need to go

17   back to your seat right now."  And I could kind of see that he

18   was getting a little angry in the face, or just, you know,

19   annoyed, and he went back to his seat.

20   Q.    Do you remember him saying anything else to you while you

21   were in the back of the plane at that moment?

22   A.    Not that I recall.

23   Q.    Okay.

24         And then what happened after landing?

25   A.    After landing, we opened the door to the aircraft.  The

1    authorities went to the cockpit, and the pilots called me and

2    Nicole, in the back of the aircraft, and told us that everyone

3    would deplane as normal, and they had the description of the man

4    and that they would pull him aside, away from the jet bridge and

5    into the terminal, and to just let everyone deplane.

6         So everyone started deplaning, and then one of the last

7    passengers that were left on board was the mom and daughter, and

8    they were also pulled aside as well.  They were pulled aside on

9    the jet bridge to talk to the authorities and give a statement.

10        They also asked Mackenzie, Nicole, and Jackie for

11   statements as well, and at that time they did not ask me for a

12   statement.

13   Q.   And did you observe the daughter and mom talking to law

14   enforcement on the jet bridge?

15   A.   Yes, I did.

16   Q.   And did you notice anything about the daughter's demeanor

17   at that point?

18   A.   Yeah.  She just looked very, very sullen and very, very

19   sad.

20   Q.   And did you ever document what you observed in a report

21   with Delta?

22   A.   Yes, I did.

23   Q.   When was that in relation to the flight?

24   A.   Can you rephrase that?  I'm so sorry.

25   Q.   I can.  No.  I absolutely can.

1    A.    Yeah.

2    Q.    So when did you write your report after the flight?

3    A.    I want to say that it was, like, that night or the morning

4    after.

5    Q.    Okay.

6    A.    Somewhere in that time interval --

7    Q.    Okay.

8    A.    -- for sure.

9    Q.    And then you also subsequently gave the interview to the

10   FBI agent?

11   A.    Correct, yeah.  I think it was, like, a week or two later,

12   uh-huh, yeah.

13            MS. HARMON:  Nothing else.  Thank you.

14            THE COURT:  How long do you think your cross will

15   take?

16            MR. RUSK:  I don't think it will be too long, but I

17   think it will probably take us -- I don't know what time it is.

18   I think we'll definitely go passed the lunch hour; maybe 20

19   minutes, depends.

20            THE COURT:  Why don't we go ahead and take a lunch

21   break.  We'll take a lunch break for one hour.  Please return to

22   the jury room a couple minutes before that.

23        Remember, until the trial is over, do not discuss this case

24   with anyone, including your fellow jurors, members of your

25   family, people involved in the trial, or anyone else, and do not

1    allow others to discuss the case with you.

2         If anyone tries to communicate with you about the case,

3    please let me know about it immediately.  Again, don't research

4    or do any investigation on the case on your own, and, finally,

5    keep an open mind until all the evidence has been presented and

6    you've heard the arguments of counsel, the instructions of law,

7    and the views of your fellow jurors.  We'll see you back in the

8    jury room a little bit before one o'clock.

9         Court's in recess.

10              (Court in recess 12:00 p.m. to 1:00 p.m.)

11              MS. HARMON:  Good afternoon, Your Honor.  We just

12   wanted to check one issue with the court.

13        Would it be all right if witnesses who have been released

14   by the court stay and observe?

15              THE COURT:  Yes, of course, once they're released.

16              MS. HARMON:  No sooner.  Thank you.

17              THE COURT:  All right.  Are we ready to bring the jury

18   in?

19                   THE FOLLOWING PROCEEDINGS WERE HELD
                       IN THE PRESENCE OF THE JURY:
20

21              THE COURT:  Mr. Dimick, just a reminder you're still

22   under oath.

23        Mr. Rusk, you may proceed.

24                        CROSS-EXAMINATION

25   BY MR. RUSK:

1    Q.    Good afternoon, Mr. Dimick.  This is the first time you and

2    I have ever spoken, correct?

3    A.    Correct.

4    Q.    In preparing for your testimony today, did you review a

5    transcript of statement you made?

6    A.    Correct, yes.

7    Q.    How long ago, about, did you make that statement?

8    A.    I don't recall the exact date, but the interval of time was

9    either week or two after the event.

10   Q.    Okay.  And when was the last time that you spoke to the

11   United States government about this case?

12   A.    August 26th of this year.

13   Q.    Okay.

14         And are you going to be on a flight later today?

15   A.    No.

16   Q.    Okay.  Why are you wearing your uniform today?

17   A.    It was an option.  They told us business casual or our

18   uniform works, due to the court having a dress code.

19   Q.    And did you check with corporate after that conversation?

20   A.    No, I did not.

21   Q.    Okay.  Thank you.

22         So I, you know -- I don't -- I kind of got rid of some of

23   these things.  I just want to jump right back in to some of the

24   testimony that you were giving when you were back in the kitchen

25   area with Gabrielle.

1          You had mentioned that she was very choked up when you were

2     receiving the information from her?

3     A.    Correct.

4     Q.    And just to be clear, you didn't actually see my client

5     ever put a hand on Gabrielle?

6     A.    No, I did not.

7     Q.    Okay.  You didn't have any interaction with them before

8     this portion of the flight, right?

9     A.    With your client?  No, I did not.

10    Q.    Did you have any interactions with Gabrielle prior to this

11    portion of the flight?

12    A.    No, I did not.

13    Q.    You made some observation of her body language while she

14    was describing the important parts of what happened, to you.  Do

15    you remember that?

16    A.    Yes, I do.

17    Q.    Do you remember that you said that she would be looking

18    down?

19    A.    I don't recall exactly.

20    Q.    Do you think it would help you if you took a look at your

21    statement?  Would that help refresh your recollection as to

22    exactly what you said?

23    A.    If it is available, yes.

24          MR. RUSK:  Would it be possible to hand the witness

25    the book of government exhibits?

 1          Oh, I'm sorry.  I'm not familiar with where everything is.

 2   Q.    (By Mr. Rusk)  I know it's a very big book.  You're going

 3   to want to turn to -- I believe this is going to be Exhibit 36.

 4   A.    Excuse me.  You're talking about from the back galley,

 5   from --

 6   Q.    Yes --

 7   A.    -- which Gabrielle was reciting her story?

 8   Q.    Yes.

 9   A.    In the back galley?  Okay.

10   Q.    That's correct.

11          So when you're on that front page, do you see here, it

12   looks like, in the middle there, it says, "Verbatim report of

13   interview of Jordan Dimick."  Do you see that?

14   A.    Yes.

15   Q.    And you reviewed this prior to your testimony?

16   A.    Correct, last night.

17   Q.    Last night you reviewed it?

18   A.    Correct.

19   Q.    Okay.  If you look on the bottom right-hand corner, you'll

20   see a number, it says "0001585."  Do you see that?

21   A.    Correct, yeah.

22   Q.    Okay.  So what I want you to do is turn to the one that

23   says "0001603."

24   A.    Okay.

25   Q.    Are you there?

1   A.    Correct.

2   Q.    All right.  Now, go ahead and, perhaps, review from line 25

3   and then on the next page through line 3.

4   A.    Okay.

5   Q.    Did that refresh your recollection as to what was said?

6   A.    Yes.

7   Q.    So she told you -- as she was describing the important

8   parts of her statement, you indicated she would cower, right?

9   A.    Yes.

10  Q.    And you said she would just, kind of, look down?

11  A.    From what I read here, I do not see -- oh, yes, correct,

12  that is correct.

13  Q.    She would look down?

14  A.    Correct.

15  Q.    You did say that?

16  A.    Yes, I did say that.

17  Q.    Okay.  And you could tell she was embarrassed, right?

18  A.    Yes.  From her facial expressions and what I saw, yes.

19  Q.    Okay.  And you needed to ask her what happened, right?

20  A.    Yes, we did.

21  Q.    So that you could tell -- sorry.  I forget the phrase that

22  you used with the --

23  A.    Crew Assist.

24  Q.    Crew Assist.  So you could get direction on what to do

25  next?

1    A.    Correct, that is correct.

2    Q.    Okay.  Now, at some point, you resat these two women in

3    different seats?

4    A.    Yes.

5    Q.    And at that point, there was an announcement, at some

6    point, that law enforcement would be boarding the plane?

7    A.    Yes, law enforcement would be meeting the aircraft.

8    Q.    Okay.

9    A.    We made that announcement as we landed into Seattle.  The

10   pilots made the announcement, "Please stay in your seats with

11   your seat belts fastened.  We're going to have law enforcement

12   meet the aircraft," and that was it.

13   Q.    Okay.  And did that happen while the plane was still

14   flying, or --

15   A.    Taxiing into the gate at SeaTac.

16   Q.    Okay.  So that came at the time of the taxiing?

17   A.    Correct.

18   Q.    Okay.  And you indicated that my client had approached you

19   at some point.

20   A.    Yes.

21   Q.    And today, you said he looked angry and annoyed at your

22   responses to him.

23   A.    From what I recall, yes.

24   Q.    Do you recall actually describing his demeanor in your

25   statement when you made it to law enforcement?

1    A.    I don't recall the exact words.

2    Q.    So I would point you to 1619.  So I would direct you to

3    lines 13 to 18, and let me know when you've had a chance to

4    review that.

5    A.    Yes.

6    Q.    And you said he kind of tilted his head when you directed

7    him back to his seat; isn't that right?

8    A.    Yes, that is correct.

9    Q.    And you didn't know if "disappointed" was the right word to

10   use in that scenario; is that correct?

11   A.    Correct; more so defeated.

12   Q.    More like defeated.

13         And you never did hear my client's side of the story, did

14   you?

15   A.    No, I did not.

16   Q.    You didn't talk to him about his perspective on what

17   happened?

18   A.    No.  I didn't feel the need to discuss with your client

19   what had happened.

20   Q.    You weren't interested in hearing his side of the story.

21   A.    For the given circumstances and the information that I had

22   at the time, no, I did not.

23   Q.    Okay.  And he had just kind of said, "I don't understand,"

24   and went back to his seat?

25   A.    Something to the effect -- I cannot recall verbatim -- but

1    it was "I don't understand" or "It's been handled," or something

2    along those lines.

3    Q.    Okay.  So maybe he said "I don't understand"; maybe he said

4    "It's been handled"?

5    A.    Yes, either of those, but I can't recall the exact verbiage

6    that was used that day, because it was three years ago.

7    Q.    He could have just said "I don't understand"?

8          Well, actually, that's a good question.  You gave the

9    statement, you said, about two weeks after the incident

10   happened, right?

11   A.    Approximately.  Again, I don't know if it was a week or two

12   weeks after.

13   Q.    Do you think your memory was better then or better now?

14   A.    Could you rephrase the question?

15   Q.    Do you think your memory of this incident was better three

16   years ago, or better today?

17   A.    I think it would be better three years ago when it

18   happened.

19   Q.    Okay.  And in your statement, you said he said "I don't

20   understand"?

21   A.    Yes, that is what the statement says.

22          MR. RUSK:  Okay.  Thank you.  No further questions.

23          THE COURT:  Redirect?

24          MS. HARMON:  Thank you, Your Honor.

25                        REDIRECT EXAMINATION

1    BY MS. HARMON:

2    Q.    So on the very front of that exhibit, would it refresh your

3    memory of the date that you gave that statement?  And we're

4    still talking about Exhibit 36.

5    A.    Yes.  That was November 29th of 2021.

6    Q.    Okay.  And you just said that your memory was better at the

7    time, and Mr. Rusk asked you the quote, "I don't understand."

8    And that's -- I'm looking at the top page number.  It says "35

9    of 43."

10   A.    Top page number, 35 of 43?

11         Yes.  In fact, what I recall and what the statement says,

12   it says, "And, um, when he's, like, I don't know -- you know,

13   where, you know" -- sorry.  "I don't understand.  I already

14   discussed what happened with them."

15   Q.    That is the full quote of what you recall Mr. Walji saying

16   to you?

17   A.    Correct, that is.

18   Q.    That he said he had already discussed what happened with --

19   A.    Yeah.  I think the events kind of got murky earlier.  So,

20   yeah, that was what was said before the initial -- that was what

21   was said after I told him to go back to his seat, and then I got

22   firm with him after that.

23   Q.    Got it.  He said that, and then you got firm with him?

24   A.    Correct, that is correct.

25   Q.    Thank you for clarifying.

1    A.    Of course.

2    Q.    And your role with Delta, you're not an investigator,

3    correct?

4    A.    No, I'm not an investigator.

5    Q.    It's not your job to take everyone's stories and make a

6    decision about what happens, right?

7    A.    One hundred percent not -- no.

8              MS. HARMON:  Thank you.

9              THE COURT:  Any recross on that?

10         Any objection to releasing this witness?

11             MS. HARMON:  No.  Thank you, Your Honor.

12             THE COURT:  Mr. Rusk, for the record, any objection to

13   excusing the witness?

14             MR. RUSK:  No.

15             THE COURT:  Thank you.  You may step down.

16             THE WITNESS:  Thank you, Your Honor.

17             MS. HARMON:  Your Honor, the government calls Gabby to

18   the stand.

19                            GABRIELLE,
              having been first duly sworn, testified as follows:

20                        DIRECT EXAMINATION

21   BY MS. HARMON:

22   Q.    Gabby, can you state and spell your first name for me,

23   only?

24   A.    Gabrielle; G-a-b-r-i-e-l-l-e.

25   Q.    Thank you.  What's your date of birth?

1    A.    12/23/2005.

2    Q.    What state do you live in right now?

3    A.    Alaska.

4    Q.    Have you always lived there?

5    A.    Yes.

6    Q.    And can you tell me a little bit about what you're doing

7    for work right now?

8    A.    I work at Chili's as a QA.

9    Q.    What's that?

10   A.    It's a quality assurance.  So when the cooks are done

11   cooking, they just pass me the food, I clean it up and let the

12   servers know it's ready.

13   Q.    I want to ask you a little bit about November 10th, 2021.

14   Do you remember that date?

15   A.    Yes.

16   Q.    Okay.  Do you remember taking a flight on that date?

17   A.    Yes.

18   Q.    Were you going from Atlanta to Seattle?

19   A.    Yes.

20   Q.    Okay.  Do you remember what grade you were in that day?

21   A.    I think it was summer going into my freshman year.

22   Q.    In November?

23   A.    It was around that time.  Either I was -- it was COVID

24   time, so it was online.  So I was either in school or on break.

25   But I'm pretty sure it was, like, spring break.  It was spring

1  break of my 8th grade year, I think.

2  Q.    Okay.  And if my math is right, that you were born in 2005,

3  were you 15 at that year?

4  A.    Yes.

5  Q.    Okay.

6  A.    So freshman year.

7  Q.    Freshman year?

8  A.    Yeah.

9  Q.    Okay.  Why were you on the East Coast for that trip?

10  A.    We were visiting family in Maryland.

11  Q.    And who's "we"?

12  A.    Me and my mom.

13  Q.    Okay.  Do you remember what part of the day that flight

14  was?  Was it early in the morning, somewhere in the afternoon?

15  A.    I think it was nighttime.

16  Q.    Night?  And do you remember where in the plane you were?

17  Was it towards the front, the middle, or --

18  A.    I think it was middle.

19  Q.    Middle?  Okay.

20       And then in your row, do you remember where you were

21  seated?

22  A.    I was in the middle.

23  Q.    Middle?

24       And why were you in the middle?

25  A.    Oh, um -- well, I think it was either situated that way

1    or -- I don't know, to be honest.

2    Q.    Well, so who else was seated next to you?

3    A.    My mom.

4    Q.    Okay.  Where was she?

5    A.    She was on the left of me.

6    Q.    Left, and is left the window or the aisle?

7    A.    Window.

8    Q.    Window.  Okay.  And do you and your mom, when you're

9    traveling together, take turns on who takes the aisle and who

10   takes middle?

11   A.    Well, she'll usually let me get a window because I like

12   window, but I think I either just let her that day, or that's

13   the way it was situated.

14   Q.    Okay.  And then so your mom's in the window, you're in the

15   middle.  Who was -- was there anyone else in your aisle?

16   A.    Yes, the man next to us.

17   Q.    Okay.  The man next to you.

18         Do you remember what your interactions were with the man at

19   the beginning?

20   A.    We were just talking at first.  It was just nice

21   conversation.

22   Q.    Okay.  Do you remember anything that he told you at the

23   beginning?

24   A.    I remember he was talking about just his life and, like,

25   what he does for work and how he travels.

1    Q.    Do you remember anything else about that?

2    A.    Nothing specific.

3    Q.    Okay.  And do you remember him talking to your mom as well?

4    A.    Yeah, they were talking, yeah, mostly.

5    Q.    More than you and him?

6    A.    Yeah.

7    Q.    Okay.  Do you remember what they were talking about?

8    A.    Um, he was just talking about his work life and how -- some

9    people he's met, and I think he said he does real estate.  I

10   don't remember.  But, yeah, we were just having simple

11   conversation.

12   Q.    Do you remember there being any discussion about your

13   grades or your education?

14   A.    Yeah.

15   Q.    What was that?

16   A.    He was just talking about how my mom needs to keep me in

17   check and I need to focus on school and how school's important

18   and stuff.

19   Q.    Okay.  Did he say anything else about your future, or

20   anything like that, that you remember?

21   A.    I don't remember.  He was just really insisting that school

22   was important.

23   Q.    Okay.

24   A.    Yeah.

25   Q.    Okay.  I know you were saying that he was talking a little

1    bit more to your mom, but did you stay engaged in that

2    conversation, or did you start to do something else?

3    A.    No.  I was engaged at first, and then I went into my own

4    little bubble.

5    Q.    Okay.  Do you remember what you were doing?

6    A.    Listening to my music.

7    Q.    Okay.  How were you listening to music?

8    A.    I had my headphones in.

9    Q.    Okay.  Was it music from, like, a phone or a computer?

10   A.    Yeah, my phone.

11   Q.    Phone?

12         And in that beginning conversation, was there any physical

13   contact between you and the man?

14   A.    Um, nothing like -- nothing really --

15   Q.    Yeah --

16   A.    -- yeah, nothing --

17   Q.    Do you remember anything at all, even if it was nothing

18   big?

19   A.    Um, he was just -- it was really, like, just -- um, he --

20   it wasn't nothing like -- like intent.  I don't know if it was

21   intentional, but it was just, like, accidental touches, I guess,

22   like, yeah.

23   Q.    Like what?

24   A.    Like just reaching across from me, and, like, his arm would

25   be, like, resting on me.  But like I said, I don't think -- I

1    don't know it was intentional or not, but it was just happening.

2    Like, if he reached across to show my mom something, yeah.

3    Q.    Okay.  Fair to say it doesn't seem you thought much of it?

4    A.    No, I didn't think much of it.

5    Q.    Okay.

6          And do you remember if your mom ever fell asleep on that

7    flight?

8    A.    Uh-huh.

9    Q.    Do you remember falling asleep on that flight?

10   A.    Yeah, I did at one point.

11   Q.    Okay.  Do you remember if you fell asleep first, or your

12   mom fell asleep first?

13   A.    My mom did.

14   Q.    Okay.  At some point in the flight, did something happen to

15   you?

16   A.    Yeah.  Yeah.

17   Q.    Can you tell us what happened?

18   A.    Um, he was touching my leg.

19   Q.    When he was touching your leg, what were you doing?

20   A.    Um, well, I had woke up to it.  And at first it wasn't

21   really all the way, like, full hand on my leg.  It was just his

22   pinky just resting there, but as time went by, it increased.

23   Q.    Okay.  I'm going to back up a little bit.

24         So your were asleep?

25   A.    Uh-huh.

1  Q.    And you woke up to feeling the touch?

2  A.    Well, it was, like -- when I woke up, I could feel his

3  pinky resting there.  But it was tight, to be honest, you know,

4  so I didn't think much of it.

5  Q.    Meaning the flight was tight?

6  A.    Yeah, like, next to us; like, us all together.

7  Q.    How were you sleeping?

8  A.    I was laying on my mom.

9  Q.    Okay.  So to your left?

10  A.    Uh-huh.

11  Q.    And then do you remember, was it just your head against

12  her, was it a little bit more of your body?

13  A.    I -- honestly, I don't know if I was fully laying on her or

14  if our heads were just resting on each other, but I do remember

15  my head was more so slanted that way.

16  Q.    Okay.  Do you remember if you had a blanket?

17  A.    No.  No.  Well, I -- in my head, when I was -- didn't

18  really recall, I thought I did, but when I went over my

19  transcript, it said I didn't, so I guess not.

20  Q.    Okay.  And your transcript was a previous statement that

21  you had given?

22  A.    Yeah.

23  Q.    Okay.  And that refreshed your memory that you did not have

24  a blanket?

25  A.    Yeah.

1    Q.    Okay.  And you gave that close in time to this event?

2    A.    Uh-huh.

3    Q.    Okay.

4              THE COURT:  Can I just remind you to say "yes" or

5    "no"?

6              THE WITNESS:  Oh, yes, of course, yes.

7              THE COURT:  The court reporter can't make that out.

8    Thank you.

9    Q.    (By Ms. Harmon)  So just to be clear, that did refresh your

10   memory, correct?

11   A.    Yes.

12   Q.    Thank you.

13         Can you tell the jury, what were you wearing on this

14   flight?

15   A.    I think I was wearing a zip-up and jeans.  I think I had a

16   tank top on as well.

17   Q.    Okay.  So jeans, a tank top, and then a zip-up, like a

18   sweatshirt?

19   A.    Yeah.

20   Q.    Can you tell me more about the pants?

21   A.    They were jeans.  I don't know what type of specific jeans

22   they were, but I remember I was wearing jeans.

23   Q.    Okay.  Were they, like, made-of-denim jeans or --

24   A.    Yeah.

25   Q.    Okay.  And were they stretchier, or more the -- not

1  stretchy?

2  A.    I can't recall.

3  Q.    Okay.  And at any point in the flight, do you remember your

4  pants being unbuttoned?

5  A.    No.

6  Q.    So you said that you woke up to feeling this hand on your

7  leg, and you didn't think anything of it because it was so

8  crowded?

9  A.    Uh-huh.  Well, it was very light, you know, it wasn't like

10  his full hand on my leg.  It was just his pinky resting, really.

11  Q.    Do you remember which hand of his this was?

12  A.    It was his hand closer to me.  He wasn't reaching over or

13  anything, so his left hand.

14  Q.    Left hand?  Okay.

15        And do you remember during the course of the flight when

16  this happened?  Beginning, middle, end?

17  A.    It was about an hour and 30 minutes before the plane

18  landed, I'd say.

19  Q.    Okay.  So towards the end?

20  A.    Yeah.

21  Q.    Okay.  What happened next?

22  A.    Um, well, like, I said, the more time increased, the more

23  his hand was going on my leg.  And then it was becoming more

24  touchy, and that's when I really started to panic about it, but

25  I didn't really want to cause a scene.  I didn't know what to

1  do, you know.  So I was just thinking, honestly, just wait till

2  the plane ride is over.  Like, I didn't think it was going to go

3  as far as it did, but when his -- I mean, like, part of it, I

4  spoke up.

5  Q.  And you had said it had been just a pinky, and then you

6  were just describing it being more?

7  A.  Like, it -- oh.  Like, it was, um -- like, it was just

8  resting there at first, and then the more time increased, you

9  know, he just got more comfortable, I guess, and was, like,

10  yeah.

11  Q.  So how much of his hand would have been touching your leg?

12  A.  At the time, it was barely anything, but then it increased

13  to the whole hand.

14  Q.  Whole hand.  And was it palm up, palm down?

15  A.  Palm down.

16  Q.  So his palm was touching your leg?

17  A.  Uh-huh.

18  Q.  I'm sorry.  "Yes" or "no"?

19  A.  "Yes."

20  Q.  Thank you.

21      I know you said initially you didn't think anything of it.

22  Had that changed at this point?

23  A.  Uh-huh, yeah.

24  Q.  How?  What was your feeling at that point?

25  A.  Really, I just felt stuck.  I didn't really know what to

1  say or do.  Because it was a quiet plane ride, obviously, so --

2  and I don't like to cause a scene.  I know I probably should

3  have, but I just didn't.  And then...

4  Q.    So what's going through your mind at that point?  Like,

5  what are you thinking?

6  A.    Um, at that time -- at that time, I was really just

7  freaking out.  Like, I didn't -- I was trying to pinch my mom

8  and wake her up, but -- so she could see it, because it was

9  pretty clear, you know?  So -- but she wasn't waking up.  Mind

10  you, she is a deep sleeper, so I wasn't really surprised.  But I

11  was trying my hardest to do what I could to wake her, but she

12  just wasn't waking up.  And then it was just -- it kept going

13  on.

14       But after I felt his hand start to get in my pants, that's

15  when I spoke up.

16  Q.    Okay.  Before I ask you anything more about after his hand

17  went into your pants, can you tell me, do you remember how your

18  breathing was at that point?

19  A.    I was hyperventilating.  It didn't really -- it was a lot,

20  to be honest.

21  Q.    Okay.  And take as much time as you need.  If you need more

22  water up there, just let me know.

23       Do you remember how long or about how long his hand was

24  fully on your leg?

25  A.    Honestly, no.  It was a long time, though, 'cause he didn't

1    get far.  As soon as he started to put his hand in my pants,

2    that's when I stopped it.  But it was going on for a while.

3    Q.    Okay.  Do you remember his hand ever moving on your leg?

4    A.    Yeah, yeah.

5    Q.    Can you describe that?

6    A.    Um, it was just a rubbing at first.  Yeah, just rubbing,

7    like, up and down, you know.

8    Q.    And when you say "up and down," do you mean, like, from

9    your knee up to your hip?

10   A.    Uh-huh, yeah, and, like, then he would, like, circle and,

11   like, inward.

12   Q.    Okay.  When you say he started going inward, do you mean

13   towards your inner thigh?

14   A.    Yeah.  Like, he was just like that instead of up and down.

15   It was kind of back and forth.

16   Q.    Okay.  So he, kind of, went both directions?

17   A.    Yeah.

18   Q.    Okay.  When he was moving his hand towards your inner

19   thigh, was he touching your inner thigh?

20   A.    Yeah.

21   Q.    Okay.  And can you describe how far inner his hand went on

22   the outside of your pants?

23   A.    Excuse me?

24   Q.    Yeah.  I can ask that a much better way.

25         Can you describe how far his hand went inside on the

1    outside of your pants, or how far into the center of your body?

2    A.    Um, it didn't get far.

3    Q.    Okay.

4    A.    It was really just, like, the above surface.

5    Q.    So just inner thigh.  Did he eventually move his hand any

6    further?

7    A.    It was going farther up, yeah.

8    Q.    Tell me about that.

9    A.    Um, well, I think the more he was doing it, he was just

10   getting comfortable with it, so he just started gradually moving

11   his hand higher.  But, yeah.

12   Q.    Okay.  Do you remember anything about a drink service

13   happening around this time?

14   A.    Yeah.

15   Q.    Tell me about that.

16   A.    I remember the lady did came and serve him at one point,

17   but I don't know if she saw anything.  Maybe she did, maybe she

18   didn't.  If she did, then I don't know.  But, yeah, I remember

19   he did get served.  I don't know what he got served, but she did

20   come around.

21   Q.    Do you remember if he got a drink?

22   A.    Uh-huh.  I don't know if it was alcohol beforehand or

23   afterhand [sic], but I do remember he got alcohol at one point.

24   Q.    Okay.  And that, on this drink service, while his hand was

25   on your leg, he got a drink of some type?

1    A.    Yeah.

2    Q.    Okay.  Do you remember his tray table was up or down when

3    he got that drink?

4    A.    It was down at the time.

5    Q.    Okay.  So I know you said it started with just his pinky --

6    A.    Uh-huh --

7    Q.    -- and then it was his whole hand, and then he was moving

8    it up and down and in and out.

9    A.    Uh-huh.

10   Q.    What else happened with his hand?

11   A.    Um, at a certain point, he started to lift up my shirt so

12   that he was able to get into my pants, but when he got into my

13   pants, he just -- he didn't really get any lower to my vaginal

14   area.  He was just in the above surface, and that's when I spoke

15   up.  So it didn't go on too long.

16   Q.    Okay.  Do you remember him ever touching your vagina?

17   A.    No.

18   Q.    Would it refresh your memory if you looked at a prior

19   statement?

20   A.    Yeah.

21   Q.    Okay.  Okay.  If you could just read to yourself.  I'm

22   going to start you at the very bottom of that page, starting at

23   line 24, and let me know when you get to the bottom, and I'll

24   move to the next page.

25          MR. RUSK:  Your Honor, actually, it's improper

1   refreshment.  She said she didn't remember.

2          MS. HARMON:  She said it would refresh her memory if

3   she looked at her statement.

4          THE COURT:  She did say that.  So, overruled.

5   A.   Okay.  Move to the next page.

6        Yeah, I remember it.

7   Q.   (By Ms. Harmon)  Okay.  So does that help refresh your

8   memory about him getting close to your private area?

9   A.   Yeah.  He got close, but he didn't, like -- farther, where

10  he could really touch anything, he didn't touch anything.  He

11  really just got in my pants, and then I spoke up.

12  Q.   Okay.  Fair to say he didn't penetrate your vagina?

13  A.   Yeah.

14  Q.   Okay.  But before he put his hand in your pants, he was

15  touching the exterior of your pants, right?

16  A.   Uh-huh, yes.

17  Q.   And that it had gotten pretty close to your vagina on the

18  outside of your pants?

19  A.   Uh-huh.

20  Q.   "Yes"?

21  A.   Yes.  Sorry.

22  Q.   So sorry to be bothering you with that.

23        And when he did, ultimately, stick his hand in your pants,

24  he touched the exterior of your vagina?

25  A.   Yeah.

1   Q.   Okay.  Thank you for clarifying that.

2        Do you remember seeing anyone's seat screens while this was

3   touching was happening?

4   A.   Yeah.  I was really trying to watch those, just 'cause they

5   were showing the time of the flight.

6   Q.   Why were you trying to do that?

7   A.   Because, like I said in the beginning, I was trying to wait

8   for the flight to be over, so I was really just focused on the

9   flight times.

10  Q.   Okay.  While his hand was on you?

11  A.   Uh-huh.

12  Q.   Okay.  And is that a "yes"?

13  A.   "Yes."  Sorry.

14  Q.   No.  Okay.

15       At any point, was he touching you with a different hand?

16  A.   Yeah.  He had swapped hands at one point, and he was, like,

17  laying on me.

18  Q.   Tell me more about that.

19  A.   Um, he had just swiped -- just started using his right hand

20  instead, and he started laying on me, I guess, because it was,

21  like, more -- I don't know.  He was just laying on me.

22  Q.   Okay.  So he removed his left hand?

23  A.   Yeah.

24  Q.   And started use his right hand?

25  A.   Yeah.

1    Q.   And how was he laying on you?  What part of his body was

2    laying on you?

3    A.   Um, his head and, like, his arm --

4    Q.   Okay.

5    A.   -- he was, like, more slanted on.

6    Q.   The arm that was closer to you?

7    A.   Uh-huh.

8    Q.   Okay.  Is that a "yes"?

9    A.   Yes.

10   Q.   Okay.

11        Were you wearing your seat belt at the time?

12   A.   Yes.

13   Q.   Did anything happen with your seat belt?

14   A.   He had unbuckled it.

15   Q.   Do you remember which hand he unbuckled your seat belt

16   with?

17   A.   No.

18   Q.   Okay.  And then when he put his hands in your pants, was it

19   over your underwear, or under your underwear?

20   A.   I honestly can't recall.  I think -- I can't recall.

21   Q.   Would it be helpful if you looked at your statement on

22   that?

23   A.   Yeah.

24   Q.   Okay.  So I'm showing you Exhibit 21.  I'm going to direct

25   your attention to the question starting at line 5, and your

1  answer at line 9.

2  A.    Yeah.  I was going to say I think it was inside, but I

3  couldn't recall.

4  Q.    Okay.  Was this a statement you gave to the Port of Seattle

5  right after you got off the plane?

6  A.    Yeah.

7  Q.    And does that help refresh your memory about what you said?

8  A.    Yes.

9  Q.    Which was what?

10  A.    That his hand was inside my underwear.

11  Q.    Okay.  And do you remember what his fingers were doing?

12  A.    They were, like, moving in a circular motion at the time,

13  but it wasn't anywhere below.  It was just, like, moving in a

14  circular motion on my skin.

15  Q.    Do you remember if it was all of his fingers or some of his

16  fingers?

17  A.    Uh-huh, like, four of them.

18  Q.    Four of them?  Okay.  So just not the thumb; is that what

19  you mean?

20  A.    Uh-huh.

21  Q.    Sorry?

22  A.    That I can recall.  Sorry.  Yes.

23  Q.    And do you remember what part of your body he was doing

24  that motion on?

25  A.    On my leg and my stomach.

1  Q.    Okay.  Do you remember him touching your vagina like that?

2  A.    Uh-uh.

3  Q.    Would it refresh your memory to look at your statement?

4  A.    I think I -- I honestly know, to be honest.

5  Q.    Okay.  You don't --

6  A.    Yeah, no.

7  Q.    Okay.  Do you remember what the lights were like in the

8  airplane when this was happening?

9  A.    I think they were blue, blue and dim, yeah.

10 Q.    Okay.  It's like those little lights, is what you're

11 talking about, just so people don't trip?

12 A.    Yes.

13 Q.    Okay.  So at this point, I think you said that, previously,

14 that you had said something.

15 A.    Uh-huh.

16 Q.    After he put his hand in your pants?

17 A.    Yes.

18 Q.    Do you remember what you said?

19 A.    No.  To be honest, I remember speaking up.

20 Q.    Okay.  And at that point, did the touching stop?

21 A.    Yeah.  He started to fake sleep after that.

22 Q.    Okay.  And he pulled his hand away?

23 A.    Uh-huh, yes.

24 Q.    At this point, do you remember how you were in terms of

25 your breathing, in terms of your reaction?

1  A.    That's when it all started to become numb, to be honest.

2  Like, I just started crying and breathing heavy, and that's when

3  I woke my mom up.

4  Q.    Okay.  Were you able to wake her up?

5  A.    Uh-huh, yeah.

6  Q.    Do you remember about how much time was left in the flight

7  at that point?

8  A.    Uh-uh.

9  Q.    That's a "no"?

10  A.    "No."

11  Q.    Thank you.  Okay.  You said your mom woke up.  Were you

12  able to tell her what was going on?

13  A.    Yes.

14  Q.    Was it hard to do because of your breathing, or was it

15  easy?

16  A.    It was difficult.  I didn't really have -- I didn't know

17  what to say or, like, how to say it, you know?

18  Q.    Okay.  Without telling me anything your mom said, can you

19  tell me about her demeanor?

20  A.    She was kind of, like, just trying to wake up and process

21  it.  Like, I think it was a lot for her to get thrown at after

22  waking up.  So she was kind of just stuck.  She was, like, what?

23  Just repeating "what," trying to understand.

24  Q.    And do you remember you and your mom having a conversation

25  about whether to tell someone?

1    A.    Uh-huh.  Because I didn't want to speak up because, like I

2    said, I didn't want to cause a scene or anything, especially

3    because the plane ride was about to be over and -- but she was

4    telling me that I needed to say something, and she ended up

5    calling the flight attendant over.

6    Q.    Okay.  Do you remember, in your own seat, were you more in

7    the middle of it, to the right, to the left?

8    A.    At the time, after the fact, I was more so leaning towards

9    her.

10   Q.    Towards her?

11   A.    Uh-huh, yes.

12   Q.    And I know you said she called the flight attendant.  Did a

13   flight attendant come?

14   A.    Uh-huh, yes.

15   Q.    Okay.  What happened when the flight attendant came?

16   A.    Um, they went to go talk to more flight attendants, and

17   then they came back to us and asked if we wanted a seat change.

18   And then we went to talk to them first, and then they put us in

19   a different seat.

20   Q.    Okay.  When they came up to talk to you, do you remember

21   how they asked you to get out of your seats?

22   A.    No.

23   Q.    Okay.  Do you remember anything about snacks?

24   A.    Oh, yes, yes, yes.  Actually, I'm pretty sure they asked us

25   if we either wanted to look at or get some snacks from the back,

1    and they took us back.

2    Q.    Did you know what they meant by "snacks"?

3    A.    Yeah, yeah, I knew what they meant.  I knew it wasn't

4    actual snacks.

5    Q.    Okay.  Okay.  And during this time period, where you told

6    your mom and the flight attendants came up and went back and

7    came back, do you remember the man saying anything?

8    A.    Um, I remember he was just apologizing and saying he would

9    never do anything like that and he's too tired, and some other

10   stuff.

11   Q.    Okay.  Do you remember, when he was apologizing, him

12   touching you?

13   A.    Um, I think he did, like, put -- it was on my arm or -- it

14   was just one of those, like, friendly placements, "I'm sorry, I

15   would never," you know.

16   Q.    Okay.  So he, like, touched your arm or something?

17   A.    Yeah, or something.

18   Q.    And you said that you got put in different seats?

19   A.    Uh-huh.

20   Q.    Is that a "yes"?

21   A.    Yes.

22   Q.    Do you remember, roughly, where those seats were compared

23   to your old seats?

24   A.    I know they were a little farther in the back.

25   Q.    Farther in the back?  And do you remember where in the row

1    your seat was?

2    A.   I think I was either on the outside or in the middle again.

3    Q.   Okay.

4    A.   I know it wasn't a window seat.

5    Q.   Okay.  Do you remember there being any flight announcements

6    over the PA after you got moved to a new seat?

7    A.   I think they were holding people back from getting off the

8    plane right away.

9    Q.   Okay.  Like, they told everyone to stay seated?

10   A.   Uh-huh.

11   Q.   Is that a "yes"?

12   A.   Yes.

13   Q.   Okay.  And do you remember seeing the man do anything?

14   A.   No.

15   Q.   Okay.  Would it refresh your memory if I showed your

16   statement?

17   A.   Do anything?  Like, just leave or...?

18   Q.   Do anything.  Did you notice him at all after that?

19   A.   Oh, no.  We weren't next to each other anymore.  I didn't

20   see him until I got off the plane.

21   Q.   You never saw him get up?

22   A.   No.

23   Q.   Okay.  And I know you said the plane landed; is that right?

24   A.   Yes.

25   Q.   And you later got off the plane, and you talked to law

1   enforcement?

2   A.   Uh-huh, yes.

3   Q.   Okay.  Do you remember doing what they called an

4   "identification"?

5   A.   Where they just check who I am?

6   Q.   Do you remember them asking you to point out who the man

7   was?

8   A.   Oh, yes, yes, yes.

9   Q.   Did you do that?

10  A.   Yes.

11  Q.   Did you want to do that?

12  A.   Yeah, I -- I mean, initially, I didn't want to look at him,

13  but they said I had to point him out, so.

14  Q.   So after they said you had to, you did?

15  A.   Yeah.

16  Q.   Do you remember talking to law enforcement after that?

17  A.   Yes.

18  Q.   Okay.  And then did they take anything from you?

19  A.   They took my underwear, I'm pretty sure.

20  Q.   Do you remember if they took any other clothing from you?

21  A.   I think they took my leggings, too --

22  Q.   Okay.

23  A.   -- or -- they took my pants.  I think -- I don't know,

24  honestly.

25  Q.   That's fine.  Would it refresh your memory if I showed you

1    your statement about that?

2    A.    Yes.

3    Q.    Okay.  I'm going to show you Exhibit 22.  I'm going to draw

4    your attention to lines 6 and 7.

5    A.    Okay.  I said "pants."  Now that I say "leggings," I feel

6    like it was leggings, but now I'm in the middle.  I don't

7    remember.

8    Q.    Okay.  And does that help refresh your memory that it was

9    your pants and your underwear that got taken?

10   A.    Yes.

11   Q.    And that you gave a video statement with that officer?

12   A.    Yes.

13   Q.    Okay.  And did you later get on a flight to go back to

14   Alaska?

15   A.    Yes.

16   Q.    Okay.

17         Gabby, did the man have permission to touch you?

18   A.    No.

19   Q.    To touch your private area?

20   A.    No.

21   Q.    Or to touch your inner thigh?

22   A.    No.

23   Q.    And when I say "private area," I mean vagina, and you're

24   nodding "yes."

25         And fair to say this was over three years ago, or almost

1    three years ago?

2    A.    Yes.

3    Q.    Is this something that you've tried to forget?

4    A.    Not necessarily forget, but, like, just move past.

5    Q.    Okay.

6          MS. HARMON:  Nothing further for this witness.  Thank

7    you.

8                        CROSS-EXAMINATION

9    BY MR. RUSK:

10   Q.    Good afternoon, Gabrielle.  Do you prefer to go by "Gabby"

11   or "Gabrielle"?

12   A.    "Gabby" works.

13   Q.    I'll call you "Gabby," then.  Okay?

14         And this is the first time we've spoken, right?

15   A.    Uh-huh.

16   Q.    Okay.

17   A.    Yes.

18   Q.    And I just want to clarify a few really important things

19   that you talked about on your direct testimony.

20         Now, you said that, at one point, my client tried to put

21   his hand down your pants.  It seems like today you remember

22   pretty clearly that he never touched your vagina.

23   A.    No.

24   Q.    When his hand went in your pants, he never actually touched

25   your vagina; is that accurate?

1    A.    No.  It was more like the above-cervix area.

2    Q.    And when his fingers were moving in a circular motion, that

3    was on your stomach?

4    A.    Uh-huh.

5    Q.    And on your thigh?

6    A.    Uh-huh.

7              THE COURT:  Is that a "yes"?

8              THE WITNESS:  Yes.

9    Q.    (By Mr. Rusk)  Those are "yeses"?

10   A.    Yes.

11   Q.    So when the prosecutor said he didn't have permission to

12   touch your vagina, the reality is he never did touch your

13   vagina, right?

14   A.    It was in my pants, in my vaginal area, but he never,

15   like -- my clitoris and everything, he never touched that.  He

16   never penetrated it.

17   Q.    Okay.  Okay.  And you said his hand was on your thigh at

18   one point, right?

19   A.    Uh-huh, yes.

20   Q.    Now, when his hand was touching your leg, did he ever

21   actually touch your vagina on the outside of the pants?

22   A.    No.

23   Q.    Okay.  So he never actually touched your vagina?

24   A.    No.

25   Q.    Okay.  You mentioned some things about school.  It was

1    COVID times, right?

2    A.    Yes.

3    Q.    School was pretty tough during COVID, right?

4    A.    Yes.

5    Q.    Did you fall behind during that time?

6    A.    Afterwards.

7    Q.    When you say "afterwards," what do you mean?

8    A.    Like, after the situation.  Well, honestly, since it was

9    COVID, I didn't really do good in school during COVID at all.

10   So I might have been behind already, but I can't really recall.

11   Q.    And you gave a couple of interviews about this incident,

12   right?

13   A.    Yes.

14   Q.    And, you know, you had said that the initial conversation,

15   it was pretty pleasant, right?

16   A.    Uh-huh, yes.

17   Q.    Do you remember telling -- especially in the second

18   interview, do you remember telling the interviewer that at some

19   point you became irritated with my client?

20   A.    Yeah, because he was doing too much with my mom.  Not doing

21   too much, but, like, he was telling my mom how she needs to

22   whoop me if I don't do good in school and, like, stuff like

23   that.

24   Q.    And you didn't like that?

25   A.    No, so I just put my headphones in.

1   Q.   You felt like he was gloating?

2   A.   Yeah.

3   Q.   You just kind of, at that point, didn't like him very much?

4   A.   Yeah.  Well, not that I didn't like him, but I was

5   uninterested in the conversation.

6   Q.   You didn't want anything to do with him after that?

7   A.   No.

8   Q.   Okay.  And you had mentioned a couple things.  You said

9   that there was a second drink service while this was happening,

10  right?

11  A.   Yes.

12  Q.   And I think you estimated this was going on for about an

13  hour and a half?

14  A.   Yes.

15  Q.   Now, you were also watching the screens in front of you?

16  A.   Uh-huh, yes.

17  Q.   So your eyes were open while this was happening?

18  A.   They were slightly opened, yes.

19  Q.   Slightly opened?

20  A.   Uh-huh, yes.

21  Q.   And you did observe the drink that he ordered, right?

22  A.   No, I didn't see what drink he ordered.

23  Q.   You don't remember seeing that it was something clear?

24  A.   Oh, yes, it was something clear, from the cup that I was

25  seeing, but I didn't know what drink he ordered specifically.

1   Q.   You're not exactly sure?

2   A.   No.

3   Q.   You thought maybe it could have been a Sprite or a water?

4   A.   Yeah.  I know he ordered a chaser, probably for his

5   alcohol, but I know there was alcohol and a regular drink.

6   Q.   That, actually, makes me think.  So at the beginning of the

7   flight, when you were having that conversation, you-all shared

8   cookies, right?

9   A.   I don't recall.

10  Q.   You don't remember him sharing cookies with you?

11  A.   No.

12  Q.   You don't remember him sharing cookies with your mom?

13  A.   No.

14  Q.   Okay.  Do you remember smelling any alcohol on his breath?

15  A.   No.

16  Q.   Okay.  Did he appear to be intoxicated to you?

17  A.   No.

18  Q.   Did he appear to be drunk at any point on that plane ride?

19  A.   No.

20  Q.   So during that second drink service, you said that he

21  ordered something, right?

22  A.   Yes.

23  Q.   And that he left his hand on your leg during that time?

24  A.   Yes.

25  Q.   Did you look at the stewardess at all?

1    A.    Uh-uh, no.

2    Q.    You didn't try to make eye contact with her?

3    A.    No.

4    Q.    You didn't think about ordering a drink?

5    A.    No.

6    Q.    But I think, if I recall, you told the forensic examiner

7    you don't know how she didn't see it, right?

8    A.    Yeah.

9    Q.    Because you think it would have been really obvious.

10   A.    Yeah.

11   Q.    But she didn't see anything.

12   A.    Yeah.  Well, from what I know.

13   Q.    Okay.  And at some point you did wake your mom up?

14   A.    Yes.

15   Q.    Okay.  And when you woke your mom up, how did you do that?

16   A.    I just started shaking her with both hands.

17   Q.    And do you remember telling the forensic examiner, at some

18   point, that you got up -- I think you said when he was putting

19   his hands in your pants, you snapped out of it?

20   A.    Yes.

21   Q.    And that's when you got up?

22   A.    Yes.

23   Q.    And said something along the lines, "What the F"?

24   A.    Yes.

25   Q.    Now, did you actually get up?

1    A.    No.

2    Q.    Okay.  You just kind of, like, shifted?

3    A.    Shifted, yeah.

4    Q.    Kind of moved and said, "What the F?"

5    A.    Yes.

6    Q.    And did you say that quietly?

7    A.    I didn't scream it, but it was more like a -- so he could

8    hear me.

9    Q.    With a little bit of force?

10   A.    Yes.

11   Q.    You wanted him to know.

12   A.    Yes.

13   Q.    Okay.  And at that point, you shifted yourself way over to

14   the left, next to your mom, right?

15   A.    Yes.

16   Q.    All right.  Now, did you stay shifted way over to the left?

17   A.    Yes.

18   Q.    And did you feel like -- were you kind of almost in your

19   mom's lap at that point, or how far --

20   A.    Not in her lap, but just, like, scooted more towards her.

21   Q.    Okay.  Was your body up against hers?

22   A.    Uh-huh.

23   Q.    Trying to make as much space as you could?

24   A.    Yes.

25   Q.    Would it have been obvious, if someone saw you, that you

1  were trying to make that space?

2  A.    I don't think so, because it was dark, but maybe.

3  Q.    When Mackenzie Thornquist, the flight attendant, came to

4  speak with you, were you still over to the left, next to your

5  mom?

6  A.    I don't recall.  Maybe.  Probably.

7  Q.    What about when Nicole Betson was speaking to you, were you

8  over to the left still?

9  A.    I was close to her until we left, until we got up and

10  started talking to the people in the back.

11  Q.    Okay.

12        And was it hard for you to wake your mom up?

13  A.    After the fact, no.  When it was going on, yes, 'cause I

14  wasn't moving much.  But after the fact, when I could put both

15  hands on her and shake her, she woke up.

16  Q.    Okay.  So once you tried to wake her up, it was pretty easy

17  to wake her up?

18  A.    Yes.

19  Q.    Okay.  And do you have a close relationship with your

20  mother?

21  A.    Yes.

22  Q.    And she would want to know if something like this was

23  happening, right?

24  A.    Yes.

25  Q.    So you don't think she would be mad at all if you woke her

1    up for something like this?

2    A.    No.

3    Q.    But you didn't really want to wake her up?

4    A.    No.  At the time, I was trying to wake her up, but it

5    wasn't nudging her, like, shaking her.  It was more so like

6    trying to pinch her leg and, like, push on it with the hand I

7    had.

8    Q.    Now, after you woke your mom up, did you tell her that you

9    didn't want to tell anybody?

10   A.    Yes.

11   Q.    Okay.  But she said you had to tell somebody?

12   A.    Yes.

13   Q.    And she's the one who called for the stewardess?

14   A.    Yes.

15   Q.    Okay.  Are they the ones who suggested that law enforcement

16   get involved?

17   A.    I think it was my mom.  Or -- no, they automatically had to

18   do it, I think.

19   Q.    But that's not something you asked for?

20   A.    No.

21   Q.    You didn't want that attention?

22   A.    No.  Well, I didn't want it during the flight.  It's not

23   like I didn't want it, but I just didn't want to cause a scene

24   during the flight.

25   Q.    Okay.

1          And I think you testified that when your mom asked him, he

2    said something along the lines of, "I would never do that"?

3    A.    Uh-huh, yes.

4    Q.    He denied it?

5    A.    Yes.

6    Q.    Okay.

7          Sorry.  I've gotten very out of order in the questions I

8    was intending to answer [sic].

9    A.    That's okay.

10   Q.    So give me just a moment to look through my notes, please.

11         MR. RUSK:  No further questions at this time.

12   Thank you, Gabby.

13         THE COURT:  Any redirect?

14         MS. HARMON:  Yes, Your Honor.

15                      REDIRECT EXAMINATION

16   BY MS. HARMON:

17   Q.    So, Gabby, I just wanted to clarify something that you just

18   said on cross, to start.

19         You were just asked about trying to wake up your mom, and

20   you said you were trying to do it with the hand that you had.

21   A.    Well, the hand closer to her.

22   Q.    What was going on with your other hand?

23   A.    It was just laying there.  It wasn't doing anything.

24   Q.    Okay.  And at this point, was he reaching across with his

25   other hand, or with his hand that was closer to you?

1    A.    Well, as soon as I felt it getting out of hand, that's when

2    I started to wake my mom up, or tried.

3    Q.    And you were trying with the hand closer to her?

4    A.    Yes.

5    Q.    Okay.  I really want to make sure I understand where he was

6    touching you.  Okay?

7          So can you tell me about -- when you said that he was

8    moving his hand up and down your thigh.

9    A.    Yes.

10   Q.    First of all, which thigh was that?

11   A.    My right one.

12   Q.    Okay.  The thigh closer to him?

13   A.    Uh-huh.

14   Q.    "Yes"?

15   A.    Yes.

16   Q.    Okay.  And when you said he was rubbing in and out, so

17   towards your inner thigh?

18   A.    Yes.

19   Q.    How far was that?

20   A.    All the way till the tips of his finger could touch the

21   seat.

22   Q.    I'm sorry.  Say that again.

23   A.    Till the tips of his fingers could touch the seat.  Like,

24   it was just, like -- it was -- wasn't really any boundary to it.

25   Q.    Okay.  So he would rub his hand all the way until his

1    fingers hit the seat, and then would come back?

2    A.    Yeah.  It was -- yeah.

3    Q.    Okay.  And when you were seated in that seat, were your

4    inner thighs above the seat?  Could they be touched without

5    going under the seat?

6    A.    No.  I was sitting on the seat.

7    Q.    Okay.  What about the inside of your thighs?

8    A.    Huh?

9    Q.    The part where the inseam of your pants would be.

10   A.    Uh-huh.

11   Q.    Was that part under the seat, or over the seat?

12   A.    I'm kind of confused.

13   Q.    Yeah, yeah.  Let me ask it a different way.

14         I know you said he was touching your inner thigh.

15   A.    Uh-huh.

16   Q.    "Yes"?

17   A.    Yes.

18   Q.    How high up your inner thigh was he touching?

19   A.    Oh, it got, like, towards my vaginal area, but it wasn't

20   touching my vagina.

21   Q.    What area are you referring to when you say "my vagina"?

22   A.    I'm sorry.  I'm kind of confused with that question.

23   Q.    Yeah.  When you say "he got close to my vagina," what area

24   is that?

25   A.    Oh, like, the highest part of my inner thigh.

1    Q.    The highest part of your inner thigh?

2    A.    Yeah.

3    Q.    Okay.  The part where your leg connects to your body?

4    A.    Yeah, yeah.

5    Q.    Or to your torso, I guess?

6    A.    Yeah.

7    Q.    So did he get up to that point and not pass it, or did he

8    not get to that point?

9    A.    He got there, and then he gradually went up.

10   Q.    Okay.

11         At any point was he touching you over the pants on that

12   area that your underwear covers?

13   A.    Can you say that one more time?

14   Q.    Yeah.

15         At any point was he touching you over the pants -- so

16   before he put his hand down your pants -- in a place that your

17   underwear covers?

18   A.    Yeah, yes.

19   Q.    Can you tell me where that spot is?

20   A.    Um, like, like, um, like, center area, I guess, my stomach.

21   Like, it was, like, more so this area.

22   Q.    Okay.  So the part that your underwear covers between, kind

23   of, below your belly button --

24   A.    Yes.

25   Q.    -- and down?

1    A.    Yes.

2    Q.    Okay.  How far down?

3    A.    Um, he just got to the surface area.  He didn't really get

4    lower or anything.  It was just, like, my vaginal area, but not

5    touching anything, yeah.

6    Q.    Do you know what labia are?

7    A.    Yes.

8    Q.    Lips of the vagina?

9    A.    Yes.

10   Q.    Did he touch those?

11   A.    No.

12   Q.    Did he touch above those?

13   A.    Yes.

14   Q.    How far?

15   A.    Um, right before he could get to there.

16   Q.    Okay.  Okay.  And was that over the pants, under the pants,

17   or both?

18   A.    Under the pants.

19   Q.    When he was touching under the pants?

20   A.    Yes.

21   Q.    Tell me about the closest he got to touching that area over

22   the pants.

23   A.    Um, he didn't really touch that area at all.  He just, um,

24   was on my thigh, over the pants, and then went up my shirt, and

25   then --

1    Q.    Okay.  Okay.

2          Do you remember talking about him getting close to your

3    private area?

4    A.    Yes.

5    Q.    And is that what happened?

6    A.    Yes.

7    Q.    Do you remember saying that he rubbed your vagina?

8    A.    I wouldn't -- like, it was --

9    Q.    Do you have a memory of that happening right now?

10   A.    Not, like, rubbing it.

11   Q.    Okay.

12   A.    Like...

13   Q.    Do you remember telling me on direct about his fingers

14   moving in a circular motion?

15   A.    Yes.

16          MR. RUSK:  Objection.  She's been leading this witness

17   for a long time, and I've allowed it, Your Honor.

18          MS. HARMON:  I just asked her a question about what

19   she said on direct to try to narrow her attention.

20          THE COURT:  Yes.  I mean, I think it is, sort of,

21   directing her, so I'm going to overrule it for now.

22   Q.    (By Ms. Harmon)  When you talked about what his fingers

23   were doing in a circular motion, do you remember what part of

24   your body that was on?

25   A.    Um, it was on my thigh and on my stomach, below my belly

1    button area.

2    Q.    Below your belly button area?

3    A.    And he was doing that going down, and that's when I spoke

4    up.

5    Q.    Okay.  Is that the part that you're talking about that was

6    above the labia but below your belly button?

7    A.    Yes.

8    Q.    Okay.

9          MS. HARMON:  Okay.  Nothing further.

10         THE COURT:  Any recross on that?

11                     RECROSS-EXAMINATION

12   BY MR. RUSK:

13   Q.    When the announcement for law enforcement came, you had

14   been moved to a different seat, right?

15   A.    Yes.

16   Q.    And you talked about that with the forensic investigator?

17   A.    Yes.

18   Q.    All right.  And you noticed that quite a stir kind of went

19   through the crowd once they heard that, right?

20   A.    Yes.

21   Q.    Do you remember telling the forensic examiner that made you

22   just laugh to yourself?

23   A.    I don't remember, to be honest.

24   Q.    You don't remember that?

25         MR. RUSK:  Do we think we can bring up Government 22?

1   Q.   (By Mr. Rusk)  Do you think it would help you remember if

2   you took a look at your statement?

3   A.   Yeah.

4   Q.   And why don't you go ahead and just review lines 5 to 11,

5   and let me know when you've had a chance to read that, Gabby.

6   A.   Oh, yeah, that sounds like me, yes, yes.

7   Q.   Okay.  So you did say that?

8   A.   Yes.

9   Q.   All right.  And this was, like, right after all this

10  happened, right?

11  A.   Yes.

12          MR. RUSK:  Okay.  Thank you.  No other questions.

13          THE COURT:  Any further direct?

14                     REDIRECT EXAMINATION

15  BY MS. HARMON:

16  Q.   Did you want any attention from this?

17  A.   What?

18  Q.   Did you want the plane to know about what happened?

19  A.   Oh, no.

20          MS. HARMON:  Nothing else.

21          THE COURT:  Any objection to this witness being

22  excused?

23          MS. HARMON:  No.

24          MR. RUSK:  No objection.

25          THE COURT:  Thank you very much.  You may step down.

1    You're excused.

2            MR. WYNNE:  Your Honor, the government would call

3    Wendy Manumalo.

4                          WENDY MANUMALO,
           having been first duly sworn, testified as follows:
5
                           DIRECT EXAMINATION
6    BY MR. WYNNE:

7    Q.    Good afternoon.

8    A.    Hi.

9    Q.    Can you give the court your full name, and spell your last

10   name for the record, please?

11   A.    Yes.  Wendy Suzette, last name is Manumalo, M-, as in

12   "Mary," a-n-u-, m-, as in "Mary," a-l-o.

13   Q.    What is that you do for a living?

14   A.    What was that?

15   Q.    What is it that you do for a living?

16   A.    Oh.  Certified nurse midwife.

17   Q.    Deliver children?

18   A.    Yes.

19   Q.    How long have you done that?

20   A.    Seven years.

21   Q.    Prior to being a midwife, did you have any experience in

22   health care -- any other experience in health care?

23   A.    Yes.  I was --

24   Q.    Tell us about that.

25   A.    -- a labor and delivery nurse since 2000; I graduated from

1   nursing school.

2   Q.   An RN?

3   A.   Yes.

4   Q.   And that's since 2000, you said?

5   A.   Yes.

6   Q.   How many babies do you think you've helped deliver?

7   A.   Oh, man.  Hundreds, if not a thousand by now, I'm sure.

8   Q.   Lots of different experiences in that?

9   A.   Yes.

10  Q.   Some stressful situations?

11  A.   Very much so.

12  Q.   Is that a skill that you have to develop as the midwife, to

13  be able to handle situations where you're presented with

14  stressful situations?

15  A.   Yes.

16  Q.   I want to talk to you about a particular day, November 10th

17  of 2021.  Do you remember that particular day?

18  A.   I do.

19  Q.   Was that a day where there was an event involving your

20  daughter that was particularly stressful?

21  A.   Yes.

22  Q.   We're going to talk about that in a minute, but I want to

23  ask you to start the day for us.

24       Where were you at the start of the day?

25  A.   We were flying from Maryland.  We were visiting our family

1    in Maryland, and flying from Maryland to Atlanta, and then

2    Atlanta to Seattle on our way to Anchorage.

3    Q.   You said "we were flying."  Who is the "we" we're talking

4    about here?

5    A.   Gabrielle, my daughter.

6    Q.   Gabby, who was just in here?

7    A.   Yes.

8    Q.   Gabby, what's her date of birth?

9    A.   December 23rd, 2005.

10   Q.   So her age on this date would have been 15; is that

11   correct?

12   A.   Yes.

13   Q.   Do you remember which -- well, we'll talk about that in a

14   minute.

15        But you said that you had been in Maryland to start off the

16   day.

17   A.   Yes.

18   Q.   What was the purpose of the trip to Maryland?

19   A.   Visiting my family:  My dad, stepmom, all my brothers,

20   aunties.  The majority of my family is from the East Coast.

21   Q.   How long had you been there?

22   A.   Um, we were there for about two weeks.

23   Q.   And I should have done this, but there's been quite a

24   passage of time between this particular incident and now, but I

25   want to show you something that's been marked as Government's

1    Exhibit 1.  Do you recognize what's up on the screen now as

2    Government's Exhibit 1?

3    A.    Yes.

4    Q.    Is that a photograph?

5    A.    Yes.

6    Q.    Is that Gabby?

7    A.    That is Gabby.

8    Q.    Is that a fair and accurate depiction of Gabby around the

9    time of this flight, November of 2021?

10   A.    Yes.

11          MR. WYNNE:  Your Honor, at this time, the government

12   would offer Government's Exhibit 1.

13          THE COURT:  It's admitted.

14              (Government Exhibit 1 admitted.)

15          MR. WYNNE:  Move to publish, Your Honor.

16          THE COURT:  Granted.

17   Q.    (By Mr. Wynne)  This is about three years ago that this all

18   happened; is that correct?

19   A.    Correct.

20   Q.    So you said that you had been in Maryland.  How long had

21   you been in Maryland at this point in time?

22   A.    Um, for about two weeks.

23   Q.    And you were leaving to return back to Alaska?

24   A.    Yes.

25   Q.    And that's where you were living --

1  A.   Uh-huh.

2  Q.   -- with Gabby?

3  A.   Yes.

4  Q.   And the route you were going to take to get back from

5  Maryland to Alaska, what was the flight route you were taking?

6  A.   We left out of Baltimore airport, flew into Atlanta, and

7  then from Atlanta airport to Seattle, and then from Seattle to

8  Anchorage.

9  Q.   And I want to focus your attention now on that leg between

10  Atlanta and Seattle.

11       On that flight, did you come into contact with anyone who's

12  in the courtroom here today?

13  A.   Yes.

14  Q.   And are you able to identify that person for us?

15  A.   Uh-huh.

16  Q.   Go ahead and do so, his position in the courtroom and maybe

17  an article of clothing.

18  A.   He's wearing a gray suit, sitting on the far right side of

19  the table.

20  Q.   I'm wondering if you can tell us how it was that you came

21  to interact with him, initially, on this flight.

22  A.   I was by the window.  Gabby was in the middle.  He was in

23  the aisle seat.  I noticed Gabby was taking to the person

24  sitting next to her, which was this gentleman at the table to

25  the right.  So I looked over, and he asked -- he recognized me

1    as the mother; asked if I would give him permission to talk to

2    Gabby.  And I felt -- I said it was okay, because Gabby looked

3    comfortable, as well, talking to him.

4    Q.   Did they, in fact -- or did you speak with him, or the

5    three of you-all kind of speak then and there?

6    A.   Yes.

7    Q.   Tell us a little bit more about that.

8    A.   He was, basically, talking to her.  It's like what every

9    parent would hope somebody would say to their teenager:  How to

10   stay focused in school, there's nothing that she couldn't be

11   able to do in life.

12        He shared about his time -- I forget where he was from, but

13   they brought him from this country to, I believe, Canada, and

14   how he came so far to become high in real estate.  And so,

15   basically, he had a hard, hard life, but he came really far, and

16   if he came that far, so can she, and gave her, like, guidance on

17   how to stay on the right track, stay with positive people, away

18   from negative people so she would have a positive life.

19   Q.   If you were to describe the tone of this conversation, what

20   was the tone of this conversation?

21   A.   The tone was encouraging.  Yeah, it was really encouraging

22   and uplifting, because he had come from so far away and made

23   such a success out of his own life, and he was giving her

24   guidance on how she can be just as successful as he was.

25   Q.   How did you feel about -- if you were to describe how you

1   felt in this particular moment because of this conversation.

2   A.   I felt really good, because as parents, we're always, like,

3   saying similar things to encourage our children to be the best

4   they can be.  So it was very encouraging to sit with somebody

5   who had made it through so many obstacles in life and became

6   successful, and kind of laying the groundwork for her, how she

7   can be successful as well, and there's nothing that can get in

8   her way in life, it could happen.

9   Q.   As he talked, did you feel comfortable with him?

10  A.   Yes, very much so.

11  Q.   Other than encouraging her, did he begin to ask her

12  questions about herself in terms of school and things of that

13  sort?

14  A.   Yeah; like, what grade she was in.

15  Q.   Did he, in fact, find out what grade she was in?

16  A.   Uh-huh.

17  Q.   What grade was it?

18  A.   Sophomore.

19  Q.   Did he inquire with her about other details of herself?

20  A.   Since she was a sophomore, you know, he has children

21  himself, so he was able to guesstimate her age at about 15, and

22  I agreed, that, yeah, he was right on the dot.  She was 15.

23  Q.   So after that conversation -- and in that conversation, how

24  long did it last?

25  A.   Oh, um, if I had to -- I'm not sure.  I would say the

1    conversation lasted, at least, 15, 20 minutes.

2    Q.    And was this at the beginning of the flight?

3    A.    Yes.

4    Q.    Even maybe before takeoff?

5    A.    Yes, uh-huh.

6    Q.    So moving forward:  On this flight, do you recall if there

7    were food services?

8    A.    Yes, uh-huh.

9    Q.    And during one of those food services, was there an

10   opportunity to order alcohol?

11   A.    Yes, uh-huh, but they came around with food options, snacks

12   and alcohol.

13   Q.    When they came around, did he invite you to partake in some

14   alcohol with him?

15   A.    He had ordered himself a beverage, and he was being

16   hospitable and asked if I would like some beverage, too.

17   Q.    When you say a "beverage," what kind of beverage?

18   A.    Anything -- anything I wanted, basically.

19   Q.    Do you know if he consumed a beverage himself?

20   A.    Yes.  I believe -- I'm not exactly sure.  It was, 100

21   percent, alcohol.  I think it was, like, a wine, is what I want

22   to think, but I'm not 100 percent sure what type of alcohol it

23   was.

24   Q.    And did you take him up on his offer to --

25   A.    No.

1   Q.    -- order something?

2         Do you recall if he had any food that he offered?

3   A.    Yeah.  Yes.  He offered cookies.  He said he was in the

4   airport lounge -- in the lounge where -- executive lounge.  I

5   guess they set out fresh cookies, and he had brought some

6   cookies from the lounge and he had brought some on the plane,

7   and he offered us some.

8   Q.    And did you take any?

9   A.    Uh-huh.  Gabby and I had a little.

10  Q.    While you were on the flight, what did you do to pass the

11  time as the flight was moving from Atlanta to Seattle?

12  A.    Eventually, after the conversation and we got settled, we

13  went to sleep.

14  Q.    Was that both of you?

15  A.    Yes, Gabby and I.

16  Q.    So I want to ask you, at some point in this flight, were

17  you eventually awoken by your daughter?

18  A.    Yes.

19  Q.    I wonder if you could tell us about that.

20  A.    I was asleep, and, um...

21        Just one moment.

22        I was asleep, and I woke up really quick.  Well, not really

23  quick.  Gabby was just hitting me on the -- not hitting me;

24  just, like, fingering me, pointing at the side of my arm, just

25  trying to nudge me awake.  So I felt her jostling my shoulder to

1   wake up and jostling on my leg to wake up.  And I slowly woke up

2   and looked over at her.

3   Q.   And if you could describe for us where she was when you

4   looked over to look at her.

5   A.   She was sitting, like, very, very close to me, like --

6   there's a divider, and, like, of course, between her seat and my

7   seat, and the divider was up.  We always put it up so we can sit

8   close to each other, and she was over into my seat a little bit,

9   very close, leaning close into my face, kind of

10  hyperventilating.

11  Q.   Tell me a little about that.  Describe her demeanor when

12  you saw her when you woke up.

13  A.   You know, at first I was just, kind of, waking up.  I'm,

14  like, "Gabby, you know I hate it when you're poking at my

15  shoulder to wake up."  And I slowly woke up, and I just looked

16  at her on the side.  And it was COVID, so she had to wear her

17  mask, and her eyes were watered, she had quiet tears, and she

18  was breathing really hard and holding on to my leg.  And she was

19  just -- I realized that she was, kind of, shocked, scared.  So I

20  had to, like -- see, first of all, she wasn't able to talk, so I

21  had to calm her down and tell her to take some deep breaths to

22  calm down so I could find out exactly what was going on.

23  Q.   Did you, in fact, try to calm her down and slow down her

24  breathing?

25  A.   Yeah, I did.  I told her -- I was, like, "Okay, okay, just

1  take a deep breath, take a deep breath," and I had to walk her

2  through, "Take a deep breath in, breathe out," and I to just

3  coach her through to take a couple of deep breaths in and out

4  until I could bring her down some to where she would be able to

5  talk to me.

6  Q.    And did she eventually talk to you?

7  A.    She did, yes.

8  Q.    Before I get into that, I just want to ask:  Her voice, can

9  you describe her voice as she initially talked to you?

10  A.    She wasn't, like -- it wasn't a crying, tearful voice.  She

11  had tears in her eyes, but it was a shaky voice, very nervous,

12  alarmed.

13  Q.    And what did she say at that point?

14  A.    She told me that the man sitting next to her, she had woken

15  up, and he had put his hands up her leg and down her leg pants.

16  Q.    Did she say where down her pants?

17  A.    Yeah.  She said down her pants and under her underwear.

18  Q.    Did she demonstrate to you or make a hand gesture as she

19  did that?

20  A.    I don't remember if she made a hand gesture.

21  Q.    Did she talk to you about her seat belt?

22  A.    She did.  She said her seat belt was buckled and that he

23  had unbuckled her seat belt.

24  Q.    At that point, did you look down at her seat belt?

25  A.    Yes.

1    Q.    What did you see?

2    A.    Her seat belt was unbuckled.

3    Q.    Had she been wearing a seat belt before you fell asleep?

4    A.    Yeah.  The stewardesses are pretty strict about keeping

5    seat belts on; masks, as well.

6    Q.    When she talked about the man putting his hand on her, did

7    she talk about the movement of his hand?

8    A.    Yes.  She said she was sleeping.  She said she could feel

9    his hand going up her pants, and as she was slowly coming up out

10   of her sleep, he had slipped his hands down her pants, under her

11   underwear.

12   Q.    Do you recall what the lighting in the plane was at this

13   point in time?

14   A.    It was a nighttime flight, so all the lights were off.

15   Q.    So when you're in that row and she told you this, how did

16   you react?

17   A.    I was shocked.  Like, I didn't even consider him as a

18   possible person to have done it, although he was the only one

19   that could have, when she was explaining it to me.  I asked her

20   to clarify again what had happened, and she said that she had

21   woken up -- she had explained, just like I had said -- his hands

22   had gone down her pants.

23         And I leaned over and looked at him, who was sleeping, and

24   I said, "He's sleeping," and she said, "He's acting like he's

25   asleep."

1  Q.   What did you do at that point?

2  A.   I leaned forward again.  Because I was really confused,

3  because going to sleep, he was so nice and encouraging to her,

4  so it, like, baffled me that that could possibly be.  You hear

5  about these things, but you just don't think it's going to

6  happen to you, of course.  And I just leaned forward, and I just

7  stared at him for a while to see if he was really asleep.

8  Q.   What happened next?

9  A.   His eyes opened just a little bit, and our eyes locked.  So

10  he could see me looking at him.

11  Q.   What happened next?

12  A.   I asked him -- I told him, "My daughter said that she woke

13  up, and you had placed your hands down her pants."

14  Q.   What was his reaction?

15  A.   Quiet.  He just sat there quietly, staring at me.  I don't

16  know how much time went by.  And it was enough uncomfortable

17  silence to where I could finish the sentence, and I just said,

18  "No?"  And he said, "No, I wouldn't do that."

19  Q.   At that point in time, where you were, what did you think

20  you should be doing?  What did you want to do at that point?

21  A.   Well, I knew the plane -- we were getting close to

22  descending.  We were going to start descending soon, and I knew

23  something had to be done.

24       I didn't want to cause too much of an alarm, because Gabby

25  was already in shock and I didn't want to make the experience

1    any more traumatic for her, and I didn't wanted there to be any

2    type of altercation, which I don't do anyway.  So I immediately

3    pressed the attendant light to come.

4    Q.    The flight attendant light?

5    A.    The flight attendant light, yes, right above my head.

6    Q.    And what were you hoping to accomplish there?

7    A.    To alert the flight attendant of what had happened.

8    Q.    Did a flight attendant come up to your row?

9    A.    She did.

10   Q.    Prior to that flight attendant eventually making it up to

11   the row, was there any conversation that you overheard between

12   this man and your daughter?

13   A.    Yes.

14   Q.    Tell us about that.

15   A.    While I was pressing the light, I didn't hear Gabby say

16   anything.  I could hear him saying, "I wouldn't do that.  I'm

17   sorry.  I wouldn't do that."

18   Q.    Did he say he was sorry on multiple occasions?

19   A.    Yeah.

20   Q.    How many times do you think he said that?

21   A.    I heard the cadence of those words, at least, twice.

22   Q.    And you said Gabby was there.  Was she speaking with him?

23   A.    No, I didn't hear her voice.

24   Q.    Did you hear him say anything else at that point prior to

25   when the flight attendant came up?

1    A.    No.

2    Q.    Did the flight attendant eventually arrive?

3    A.    She did.

4    Q.    Tell us about that.

5    A.    As soon as she came down, she came down to a level to hear

6    me, and I told her what happened:  "My daughter said when she

7    woke up he had his hands down her pants."

8    Q.    You told this to the flight attendant?

9    A.    Yes.

10    Q.    Do you remember --

11    A.    And I believe I motioned to it as well, because I didn't

12    want to be too loud.

13    Q.    You motioned with your own hand?

14    A.    Yeah.  I said it quietly, and then motioned it with my own

15    hand.

16    Q.    On your own body?

17    A.    Yeah.

18    Q.    And you just, kind of, did a motion there with your right

19    hand pointing towards your waistband?

20    A.    So she could hear my words clearly and understand what I

21    was trying to say.

22    Q.    And you were mimicking or repeating what Gabby had just

23    told you?

24    A.    Yes.

25    Q.    What did the flight attendant do at that point?

1    A.    Her eyes opened a little bit bigger, and she just said,

2    "Okay, ma'am.  I want you to wait right here, and I'll be right

3    back."

4    Q.    Did you notice the demeanor of the man in the row at that

5    point in time?

6    A.    No.  I believe he rested his head back down.

7    Q.    And what do you mean by that, "he rested his head back

8    down"?

9    A.    I think he had rested his head back down like he was

10   sleeping, like before.

11   Q.    What happened after that on that flight?

12   A.    The flight attendant came back, and she asked me and Gabby

13   to come with her.

14   Q.    And did you, in fact, go with her?

15   A.    We did.

16   Q.    And where did you go?

17   A.    They took us to the very back of the plane, to their

18   gallery [sic] where the jump seats are.

19   Q.    Who else was there when you walked to the back of the

20   plane?  Was it just the three of you, the flight attendant and

21   you two?

22   A.    No.  It was Gabby and I, and I believe there were, at

23   least, three -- three, if not four, but, at least, three there.

24   Q.    Three who -- three what?

25   A.    Flight attendants.

1    Q.    And what happened in the back there?

2    A.    They showed us where we could sit in the jumper [sic]

3    seats, and then they had asked what had happened.

4    Q.    Did they ask you, or did they ask Gabby at this point?

5    A.    I believe they asked us both.  They asked me, and they

6    asked Gabby.

7    Q.    And when they asked Gabby -- before we get into that -- do

8    you recall what Gabby's demeanor was at that point, prior to her

9    talking to the flight attendants at the back of the plane?

10   A.    Just a calm shock.

11   Q.    There in the back of the plane, did Gabby recount exactly

12   what had happened to her?

13   A.    Yes, she did.

14   Q.    As she talked about it, was she giving additional details

15   that -- more details coming out than what she'd initially

16   disclosed to you?

17   A.    No; same straightforward story.

18   Q.    After she went through that with the flight attendants,

19   what happened next?

20   A.    They listened to her.  They asked me what had happened as

21   well.  And then I believe they already had the ground on -- they

22   had already called the ground already, because after they talked

23   to us, they apologized that we had to go through something

24   like -- they were very compassionate, very empathetic.  And then

25   they let us know that they had the ground -- they had alerted

1    the ground already, and they were going to update them on, I

2    believe, what we had said.

3    Q.    So what you're saying is that the flight attendants had

4    said they had been communicating with, like, the airport?

5    A.    Yes.

6    Q.    Or, at least, that was your impression, that they had

7    communicated with someone else?

8    A.    Yes.

9    Q.    Okay.

10         After they communicated that to you, what happened next?

11   A.    They had asked -- the flight was completely full, so they

12   had asked two people if they wouldn't mind swapping seats.  So

13   after we were done, they escorted us to seats where we could sit

14   down for the rest of the flight.

15   Q.    And did you stay in those seats until the flight came to a

16   landing in SeaTac?

17   A.    We did.  We stayed in those seats, and I believe -- it was

18   one of the attendants told us that they were going to let the

19   whole plane deboard, and they wanted us just to sit there until

20   the whole flight was deboarded.

21   Q.    And did you do that?

22   A.    We did.

23   Q.    After the other passengers on the plane disembarked, did

24   you and/or Gabby end up meeting with any police officers there

25   at the airport?

1   A.   Yes, we did.  I believe one came on the plane.  No.  They

2   were waiting for us when we got off the plane, and just

3   introduced themselves, and they gave us some guidance on what

4   they wanted us to do and what was going to happen next.

5   Q.   Did Gabby end up speaking with one of them to, kind of,

6   cover what had happened, what had transpired on the plane?

7   A.   She didn't go over the details of what had happened.  They

8   told her that when we got off the plane, that they wanted her --

9   all they wanted her to do was identify him so we could confirm

10  that they had the right person with them.

11  Q.   And did she actually identify him?

12  A.   Yes.

13  Q.   And did they have the right person --

14  A.   Yes.

15  Q.   -- who was seated in your row?

16  A.   Uh-huh.

17  Q.   And that's a "yes"?

18  A.   Yes.

19  Q.   Okay.  After that happened -- and was this in the jetway

20  or, kind of, in the terminal?

21  A.   Yes, right outside the exit of the plane.

22  Q.   Did you both eventually go back to the Port of Seattle

23  Police Department's -- some kind of office and speak with an

24  officer a little bit more?

25  A.   Yes, uh-huh.  A female officer took us back to their

1    office.

2    Q.    That female officer, did she end up collecting anything

3    from Gabby?

4    A.    She did.

5    Q.    What did she collect?

6    A.    Her jeans and her underwear.

7    Q.    At that point, did Gabby have access to her clothing, like,

8    maybe something that she had, or any other replacement clothing

9    in her luggage?

10   A.    No, she did not.

11   Q.    So what did she do at that point?

12   A.    The female police officer was going to go to the gym after

13   work, and she let Gabby have her workout shorts.

14   Q.    After meeting with that female officer, did you and Gabby

15   eventually continue on to Anchorage?

16   A.    We did.  We missed the flight we were supposed to take, and

17   they found us another flight back to Anchorage.

18   Q.    After you returned to Anchorage, did you and/or Gabby

19   participate in follow-up steps related to this investigation?

20   A.    After we returned to Anchorage?

21   Q.    Yes.

22   A.    Yes.

23   Q.    Did Gabby end up meeting with a forensic interviewer?

24   A.    She did.

25   Q.    With Alaska Cares?

1    A.    Yes.

2    Q.    And Gabby actually spoke with that interviewer at length?

3    A.    Yes.

4    Q.    And did she have to miss school to go through that process?

5    A.    She did.

6    Q.    Ms. Manumalo -- am I pronouncing it right, *Mon-na-ma-low*?

7    A.    *Man-u-ma-low*.

8    Q.    *Man-u-ma-low*?

9    A.    Uh-huh.

10   Q.    How did you feel when you were going to sleep on that

11   plane?

12   A.    Oh, fine.  Like I do every flight:  Get on the flight, take

13   a nap until we get to our next step.  Completely fine.  We had a

14   great vacation; on the way home.

15   Q.    You felt comfortable in that row?

16   A.    Totally.

17   Q.    You felt comfortable with Gabby being where she was?

18   A.    Totally.

19        MR. WYNNE:  No further questions, Your Honor.  Thank

20   you.

21        THE COURT:  Why don't we take our afternoon break now.

22   It's 2:40, so at 2:55.  Be back in the jury room a couple

23   of minutes before.  Remember not to discuss the case.  Thank

24   you.

25            (Court in recess 2:39 p.m. to 2:55 p.m.)

1          THE COURT:  Please be seated.  Do we have anything

2     before we bring the jury in?

3          MR. RUSK:  Oh.  No.  Sorry.  I was just...

4              THE FOLLOWING PROCEEDINGS WERE HELD
                 IN THE PRESENCE OF THE JURY:
5

6          THE COURT:  As a reminder, you're still under oath.

7                        CROSS-EXAMINATION

8     BY MR. RUSK:

9     Q.    Good afternoon, Ms. Manumalo.

10    A.    Good afternoon.

11    Q.    This will be the first time we've spoken, right?

12    A.    Yes.

13    Q.    Did you prepare to give your testimony today?

14    A.    As best I could.

15    Q.    How did you do that?

16    A.    Um, just all I had.  I've never gone through anything quite

17    like this before.  I was just asking my own lawyer what to

18    expect.

19    Q.    You have your own lawyer?

20    A.    Well, no.  No, no.  The federal lawyers.

21    Q.    Okay.  And did they provide to you a copy of your

22    transcript, for instance?

23    A.    They did.

24    Q.    And you reviewed that before you testified?

25    A.    I did.

1   Q.    Okay.  I just want to touch base about some of the things

2   you said on direct.

3   A.    Okay.

4   Q.    You testified that, in the beginning of the flight, you

5   felt very comfortable with my client?

6   A.    Yes.

7   Q.    And I believe your words in your conversation with the --

8   the conversation between you and my client and your daughter was

9   very uplifting?

10  A.    Yes.

11  Q.    And very encouraging?

12  A.    Yes.

13  Q.    It was a really nice conversation?

14  A.    Yes.

15  Q.    And you felt good about it?

16  A.    Yes.

17  Q.    And you shared cookies, right?

18  A.    Yes.

19  Q.    And did you all enjoy the cookies?

20  A.    Yes.

21  Q.    You had some, too?

22  A.    Yes.

23  Q.    How long do you think it took you to have the cookies?

24  A.    Oh, my goodness.  From the moment we sat down, maybe 20

25  minutes.

1  Q.   Okay.  And so your masks were down while you were doing

2  that?

3  A.   Yeah, between our bites.

4  Q.   Okay.  And there was, like, crosstalk between you and

5  Mr. Walji over Gabby, right?

6  A.   Yes.

7  Q.   Okay.  And he shared cookies with both of you?

8  A.   Yes.

9  Q.   And at some point, the flight attendants told you to put

10  your masks back on.  Do you remember that?

11  A.   Yeah.  We, kind of, had to eat between.

12  Q.   Okay.  And you said -- I think you said you had a drink at

13  the first drink service?

14  A.   No.

15  Q.   You didn't have cranberry juice, or anything like that?

16  A.   I usually bring my own drinks on the plane with me, like

17  soda or water.

18  Q.   Okay.  But you slept for quite awhile, right?

19  A.   Yes.

20  Q.   And you weren't awake for the second drink service?

21  A.   No.

22  Q.   Okay.  So you don't know if they maybe brought the lights

23  up a little bit for that drink service?

24  A.   Yeah.  I couldn't -- I don't know.

25  Q.   Couldn't say?

1   A.   No, couldn't say.

2   Q.   All right.

3        And just to be clear, it doesn't sound like you ever saw my

4   client put his hand on your daughter.

5   A.   No, I did not.

6   Q.   Okay.  You never saw him touch her?

7   A.   No.

8   Q.   Okay.  But you did see Gabrielle's reaction when she [sic]

9   woke up?

10  A.   Yes.

11  Q.   I want to just go back a little to the original

12  conversation.

13  A.   Okay.

14  Q.   You said that Mr. Walji asked for your permission if he

15  could include your daughter in a conversation?

16  A.   Yes, he did.

17  Q.   And were all three of you talking?

18  A.   Yes.

19  Q.   Was there ever a point that Gabrielle, kind of, checked out

20  of that conversation?

21  A.   I don't remember if she checked out.

22  Q.   Did she ever seem irritated at all?

23  A.   Not that I could notice.

24  Q.   Okay.

25  A.   I was listening to him a lot.

1  Q.   Okay.  Did she put her headphones on during the

2  conversation?

3  A.   She may have.

4  Q.   Is it possible that you and Mr. Walji carried on for a

5  while after she was back to her music?

6  A.   It's possible.

7  Q.   Okay.  And you said this was a very positive conversation,

8  right?

9  A.   Uh-huh, yes.

10  Q.   I've reviewed your statements.  It doesn't seem like you

11  said anything about beating Gabrielle about schoolwork.  Did he

12  say anything about that?

13  A.   Beating her about schoolwork?

14  Q.   Whooping her in any way.

15  A.   I don't remember that part of the conversation.

16  Q.   Okay.  You don't think that he said that, you know, if

17  she's not good in school, you should whoop her, or anything like

18  that?

19  A.   I don't remember that conversation.

20  Q.   Okay.  How were her academics at the time of the flight --

21  before the flight, how were her academics at that time?

22          MR. WYNNE:  Your Honor, I object.

23          MR. RUSK:  It goes to bias and credibility, Your

24  Honor.  There's been substantial testimony in Gabrielle's -- in

25  Gabrielle's testimony, we had explored these issues.

1          THE COURT:  I agree.  I'm going to overrule.  I'll

2  allow you some leeway.

3  Q.   (By Mr. Rusk)  How were her academics before this flight?

4  A.   They were okay.  They weren't straight As, they weren't

5  straight Fs.

6  Q.   Okay.

7  A.   Yeah.

8  Q.   What is "okay"?  Are we talking Bs and Cs, Cs and Ds?

9  A.   She might have had a B, A, B, C.  She might have had one D.

10 Q.   Okay.

11 A.   Yeah.  They were kind of like middle of the road.

12 Q.   Was there ever any contention between you and her about her

13 grades and the need to get them up?

14 A.   Not contention --

15         MR. WYNNE:  Your Honor, I'm going to object.

16 Relevance.

17         MR. RUSK:  It goes to motive and bias, Your Honor.

18         MR. WYNNE:  Motive and bias?  Can we have a sidebar,

19 Your Honor?

20         THE COURT:  Actually, at this point, I'm going to

21 sustain.  We talked a little bit about the grades.  I don't see

22 how this is going --

23         MR. RUSK:  Gabrielle said she was irritated about the

24 conversation, Your Honor.

25         THE COURT:  You can ask about that, but going into --

1    irritated with him; not with her mother.  You can explore the

2    irritation.

3    Q.   (By Mr. Rusk)  So at any point, did you observe when

4    Mr. Walji was discussing -- you said that you never did see that

5    Gabrielle was irritated, right?

6    A.   I didn't see it.  I was talking to him, so I didn't look at

7    her.

8    Q.   Mostly focusing in on the conversation?

9    A.   Uh-huh.

10   Q.   But it's possible she was getting quite irritated about

11   that?

12   A.   I don't know.  You know teenagers.

13   Q.   Okay.  Okay.

14   A.   I don't remember any part that would make her irritated,

15   but you never know with teenagers.

16   Q.   You do never know.

17           MR. RUSK:  Thank you.  No further questions.

18           THE COURT:  Redirect?

19           MR. WYNNE:  Your Honor, just one second.

20                    REDIRECT EXAMINATION

21   BY MR. WYNNE:

22   Q.   Just to follow up on one point.

23        The conversation you had with Mr. Walji, that was before

24   the flight even took off?

25   A.   Yes.

1    Q.    And then the flight -- roughly, how long of a flight was

2    this?

3    A.    From Atlanta to Seattle, I would guess at least, I don't

4    know, four, four to five hours.  I'm not sure.  It takes about

5    three and a half hours to get from Anchorage to Seattle.

6    Q.    You're not the pilot, but a cross-country flight; fair to

7    say?

8    A.    Yes, yes.

9    Q.    And when you were awoken, it was towards the end of the

10   flight; is that right?

11   A.    Yes.

12   Q.    Quite some passage of time?

13   A.    Yes.

14           MR. WYNNE:  No further questions.

15           THE COURT:  Any objection to excusing this witness?

16           MS. HARMON:  No.

17           THE COURT:  Mr. Rusk, just for the record?

18           MR. RUSK:  No, Your Honor.

19           THE COURT:  Thank you.

20       You're excused.  You may step down.

21           MS. HARMON:  Your Honor, the government next calls

22   Renee Miner.

23                         RENEE MINER,
            having been first duly sworn, testified as follows:
24

25                      DIRECT EXAMINATION

1   BY MS. HARMON:

2   Q.   When you have a chance to get situated, can you state and

3   spell your name for the record?

4   A.   Renee Miner; R-e-n-e-e; M-i-n-e-r.

5   Q.   What do you do for a living?

6   A.   I work for a grant through Boise State University.  I

7   provide support for teachers in Idaho.

8   Q.   Do you recall being on a flight on November 10th, 2021?

9   A.   Yes.

10  Q.   From where to where?

11  A.   I was going from Atlanta to Seattle, and then from Seattle

12  to Boise.

13  Q.   And was that your final destination?

14  A.   Yes.

15  Q.   Do you remember what part of the day that flight was?

16  A.   It was in the late afternoon and evening.

17  Q.   And do you recall where on the plane you sat?

18  A.   I was near the back.  I can't remember exactly.  I think it

19  was around Row 21ish.

20  Q.   I'm going to show you what's been admitted as Government's

21  Exhibit 2.  Do you see your name on that exhibit?

22  A.   Yes.

23  Q.   And does that help, at all, refresh your memory about where

24  you were seated?

25  A.   Yes.

1    Q.    Okay.  Where was that?

2    A.    That was 26D.

3          MS. HARMON:  Your Honor, is it all right if I publish

4    that again?

5          THE COURT:  Yes.

6    Q.    (By Ms. Harmon)  Do you remember, was that your initially

7    assigned seat?

8    A.    No.  There was a couple that was separated, and I offered

9    to exchange seats with one of them so they could sit together.

10   Q.    Can you scoot your chair closer in to the mike?

11   A.    I get that a lot.

12   Q.    And do you remember, was Row 26 close to the back of the

13   plane, the middle of the plane?

14   A.    It was near the back.

15   Q.    And do you remember that switch with the other passenger,

16   who was switching for who?

17   A.    I don't know.

18   Q.    Okay.

19   A.    I don't remember if it was the woman or the man.

20   Q.    Okay.  But just that you did some switch to end up in 26D?

21   A.    Yes.

22   Q.    Okay.  Thank you.

23         Did you notice anyone on the plane that caught your

24   attention?

25   A.    Yes.  I noticed a gentleman, right off, that seemed to be

1    anxious.  He was sitting a little bit with his feet and his arms

2    out in the aisle.  He continued to be kind of anxious throughout

3    the flight.

4    Q.    Okay.  When you say "feet and arms," I think it was, "out

5    of the aisle"?

6    A.    He would lean into the aisle with his hands over the side

7    of the arm and was looking around.

8    Q.    Okay.  And you said he was appearing a certain way.  Can

9    you go into more detail about that?

10   A.    Just in comparison with the other passengers, he never

11   seemed to really settle in to his seat.  A couple of times he

12   shifted into a different seat, and then he moved back to his

13   seat.

14   Q.    Do you remember where he was looking?

15   A.    He was -- he was looking back in my area, a little bit, in

16   the back.  He was looking to the side.  I don't -- I don't

17   remember a general person or individual he was looking at

18   consistently.

19   Q.    Why was the looking notable or something that stood out to

20   you?

21   A.    Well, it was a long flight, and most people settle in or

22   rest or start doing something, and he didn't seem to ever settle

23   in.  He was anxious, kind of, throughout; seemed to be, I don't

24   know, nervous.

25   Q.    Okay.  What about his mannerisms or his face made him look

1  nervous to you?

2  A.   His eyes would dart around a lot.  He was rubbing his hands

3  a lot.  He was leaning out into the aisle.  He was moving his

4  seat.  He was getting out of his seat, moving into the back

5  and -- you know, I don't remember him moving forward, but he

6  stayed in that area and was very active for such a long flight.

7  Q.   Do you recognize that person in the courtroom today?

8  A.   I'm not sure where to look.

9  Q.   Sure.  Do you recognize anyone from the flight that's

10  currently in the courtroom?

11  A.   In the gray suit.

12  Q.   Okay.  And you're pointing to your right?

13  A.   Uh-huh.

14  Q.   And that's a "yes"?  Sorry.  When you say "uh-huh" --

15  A.   That is a "yes."

16  Q.   Thank you.

17       And who was the person in the courtroom that was on the

18  plane?

19  A.   Who was in the?

20  Q.   You just identified someone in the courtroom.

21  A.   Yes.

22  Q.   What was that person on the plane?  Like, have you

23  discussed that person already, or not?

24  A.   Yes.  His name, I'm not familiar with how to say it.  I'll

25  make a guess.

1  Q.    You don't have to.  Is that the person you were describing

2  looking anxious, or a different person?

3  A.    No.  That is the person I saw looking anxious.

4  Q.    Okay.

5        Can you describe, when did you first notice this person?

6  Like, at one point during the flight?

7  A.    After I got settled into my seat and people were starting

8  to settle into their chairs.

9  Q.    Was it before takeoff?

10  A.    Yes.

11  Q.    Okay.  And you talked about that he was moving around?

12  A.    Uh-huh.

13  Q.    Is that a "yes"?

14  A.    That was a "yes."

15  Q.    Thank you.

16        Do you remember, approximately, how many times that

17  happened?

18  A.    Well, there was one specific time that caught my attention,

19  and that's when the flight had stopped and he moved into the

20  back.  But I would say three or four times, he was actively

21  moving around the flight -- or the area.

22  Q.    All right.  And where was his normal seat compared to where

23  you were seated?

24  A.    He was kind of at an angle from me and ahead of me.

25  Q.    Did you notice anything about this man when the flight got

1  close for descent?

2  A.   He seemed to be more anxious.

3  Q.   Okay.  Was there anything that happened with him moving, at

4  that point?

5  A.   When the plane was taxiing, they asked us to stay in our

6  seat, and he got out of his seat and went into the back area of

7  the plane, and the flight attendant escorted him back to his

8  seat.  And he still got up once, when everybody else was still

9  in their seats, and then sat back down.

10  Q.   Okay.  And you previously stated that he just didn't quite

11  ever settle.  Did that ever change?  Did he ever, kind of, find

12  a point of settling?

13  A.   It was a long flight and I wasn't watching him all the

14  time, so I don't know.

15  Q.   Not that you saw?

16  A.   Not that I noticed.

17  Q.   Did you notice anything about his hands?

18  A.   He was wringing them a lot.  He was rubbing them.  And like

19  I said, he was leaning out into the aisle, leaning over the

20  seat, looking around.

21  Q.   How do you pass the time on this flight?

22  A.   I usually read.  Mostly read.

23  Q.   Okay.  Did you notice what the man was doing to pass his

24  time on the flight?

25  A.   Just other than that anxious mannerisms, I didn't see any

1    other activity that was remarkable.  I didn't see him reading.

2    I didn't see him sleeping.

3    Q.    Do you recall seeing him after everyone had deboarded the

4    plane?

5    A.    He was the first one to deboard plane.

6    Q.    Tell me about that.

7    A.    So after he went into the back and was escorted back to his

8    seat, everyone else was still in their seat belts.  And there

9    was an announcement -- we waited for a little bit, and then

10   there was an announcement that we could release our seat belts,

11   and he immediately got up and hurried to the front of the plane.

12   And it was remarkable to me, because nobody else was getting

13   into the aisle of the plane.  And I fly a lot, and that was

14   unusual.  Most times, the first in the plane leaves first, and

15   the back of the plane is one of the last parts to leave.  And he

16   hurried up.

17        And I was anxious that I would miss my flight to Boise, and

18   so I followed a little bit behind him.  But because he was and

19   had continued to be anxious, I didn't want to be right behind

20   him.

21        And as we left the plane -- as I left the plane, he was

22   stopped at the door, at the exit of the plane, and there were

23   several officers or official-looking people that were talking to

24   him.

25   Q.    At any point, did you hear the man say anything?

1  A.    I did, but I can't remember exactly what he said.

2  Q.    Do you remember the context in which that happened?

3  A.    It was a little bit like, "Are you this person?"  And I

4  didn't hear that word.  "Were you in this seat?"  And then I

5  don't remember the other exchange.

6  Q.    When he was talking to law enforcement?

7  A.    Yes.

8  Q.    I see.

9        Do you remember him saying anything on the flight?

10 A.    No.

11 Q.    Okay.  Is there anything else notable about him that you

12 haven't already mentioned?

13 A.    He was more unkempt than he looks today.

14 Q.    Okay.

15       When you were describing his exit off of the plane, down

16 the aisle, can you describe that with any more detail?

17 A.    Just that he was moving very quickly and people were not

18 following.  I was the first one off the plane after him.

19 Q.    Okay.

20 A.    I don't remember him carrying anything, I think.  I'm

21 trying to think what else.

22 Q.    That's fine --

23 A.    That's it.

24 Q.    -- if you don't remember anything.

25 A.    He was just moving very quickly, very anxious to get off

1    the plane.

2              MS. HARMON:  Nothing else.  Thank you.

3              THE WITNESS:  Okay.

4                          CROSS-EXAMINATION

5    BY MR. RUSK:

6    Q.    Ms. Miner, nice meet you.

7    A.    Nice to meet you, too.

8    Q.    Seat 25, is that behind the wings or in front of the wings;

9    do you recall?

10   A.    I think it's further back from the wings.  I wasn't in a

11   window seat, so I wasn't paying attention to that.  But I was

12   near the back where the bathroom is.  There were just a few more

13   seats behind me.

14   Q.    So all the way in the back, near where the bathroom is?

15   A.    Pretty close to the back of the plane.

16   Q.    Okay.  And there was a first-class section, right?

17   A.    I suppose so.

18   Q.    And everybody exited through the front of the plane?

19   A.    Yes.

20   Q.    And so somehow -- it's your testimony that Mr. Walji was

21   able to get all the way to the front of the plane and exit

22   first, even before a single first-class member?

23   A.    I know.  That was remarkable.

24   Q.    Do you think it's equally remarkable that you were able to

25   be the second person off of the plane?

1    A.    Yes, and that's never happened before.

2    Q.    Did you sprint after him?

3    A.    No, but I walked.  I was probably 15 feet behind him.  And

4    I followed, because there wasn't anybody getting into the aisle,

5    and I thought, I need to make my connection, so I followed.

6    Q.    No other person on that plane got up to deplane?

7    A.    That is my recollection.

8    Q.    Okay.

9    A.    I know.  And I've never seen it before.

10   Q.    So you mentioned that you felt that Mr. Walji was

11   suspicious, basically, from the moment you got on the plane.

12   A.    Yes, from the first time I noticed him.

13   Q.    Okay.  And you gave an interview about -- you provided an

14   interview before this hearing today, right?

15   A.    Can you tell me what you mean by that?

16   Q.    Did you ever speak to Special Agent Highley?

17   A.    Yes.

18   Q.    Okay.  And you told her what you knew that day?

19   A.    Yes.

20   Q.    And you didn't say anything about seeing him laughing with

21   anybody, right?

22   A.    No.

23   Q.    You didn't see him talking to anybody?

24   A.    No.

25   Q.    Didn't see him having a jubilant time with anybody?

1    A.    No.

2    Q.    He wasn't sharing cookies with anybody?

3    A.    I did not see exchanges with any other person with him.

4    Q.    Okay.  You didn't see him interacting with anyone?

5    A.    No, other than the attendant who helped him back to his

6    seat.

7    Q.    And you said you didn't think he had any particular

8    connection with anybody on the plane?

9    A.    That's my recollection.

10   Q.    You just thought his behavior was completely odd?

11   A.    It was different than the other passengers.

12   Q.    Okay.

13         Now, you were seated kind of -- looks like kind of

14   kitty-corner to him, right, just behind?

15   A.    Uh-huh.

16   Q.    Now, you didn't mention anything in your statement about

17   seeing him having a dispute with any passengers, right?

18   A.    No, other than the attendant, that exchange.

19   Q.    When he went to the back of the plane?

20   A.    Right.

21   Q.    You didn't see him touch any other passengers?

22   A.    No.

23   Q.    Or see any women relocate into different seats, did you?

24   A.    No.

25   Q.    Okay.  Did you hear anybody ever say something along the

1  lines of, What the F?

2  A.   No.

3  Q.   Okay.  Ever notice anybody hyperventilating?

4  A.   No.

5  Q.   Crying?

6  A.   No.

7  Q.   Okay.

8       Do you recall making a comment to another passenger on your

9  way off the plane?

10  A.   There was someone that was near me as I got up to leave,

11  and they -- we, together, looked and said, This is unusual, and

12  we exchanged glances, but I don't remember a conversation.

13  Q.   So this would have been before you saw him interact with

14  law enforcement, right?

15  A.   Yes.

16  Q.   And I think you said your comment to the passenger was

17  that, "We weren't surprised that he was stopped"; is that right?

18  A.   I don't remember exactly what I said --

19  Q.   Would it help you --

20  A.   -- but I know I wasn't surprised that he was stopped.

21  Q.   Okay.  You notice my client is not white, right?

22  A.   Correct.

23  Q.   Is that why you're not surprised he was stopped?

24  A.   No.

25  Q.   Okay.  Let's take a look at your statement.  Go ahead and

1    turn to Government's Exhibit 24, please.

2    A.    What am I looking for?

3    Q.    And go ahead and turn to page 8.  Go ahead and review lines

4    between 7 and 10, and go ahead and look up at me when you're

5    done.

6    A.    Okay.

7    Q.    Okay.  And that says, "Well, I was just going to say

8    there -- there was a passenger near me, that when he got up and

9    left, we just commented that we weren't surprised that he was

10   stopped."  Is that correct?

11   A.    Yes.

12   Q.    I read that correctly?

13   A.    Uh-huh.

14           MR. RUSK:  Thank you.  No further questions.

15                     REDIRECT EXAMINATION

16   BY MS. HARMON:

17   Q.    Can you just clarify, why were you not surprised he was the

18   one that was stopped?

19   A.    Well, because of his mannerisms and the way he was

20   responding all the way through the flight, it was noticeable not

21   just to me.

22           MS. HARMON:  Okay.  Nothing else.

23           THE COURT:  Any objection to excusing the witness?

24           MR. RUSK:  No, Your Honor.

25           THE COURT:  Thank you.  You may step down, and you are

1    excused.

2             THE WITNESS:  Thank you.

3             MR. WYNNE:  The government will call Alexa Morales

4    next.

5                         ALEXA MORALES,
           having been first duly sworn, testified as follows:
6

7                        DIRECT EXAMINATION

8    BY MR. WYNNE:

9    Q.    Good afternoon.  Can you give the court your full name,

10   spelling both your first and last names for the record?

11   A.    Alexa Morales; A-l-e-x-a; M-o-r-a-l-e-s.

12   Q.    What is it that you do for a living?

13   A.    Currently, I'm working for Puget Sound Energy on our gas

14   transportation team for natural gas.

15   Q.    What is it you do on the gas transportation team?

16   A.    I schedule all of the gas that King County uses, either

17   coming from Canada or from Colorado.  So I work with our traders

18   who buy and sell the natural gas.

19   Q.    Interesting.

20         How long have you done that?

21   A.    Just about a year and a month.

22   Q.    Prior to this particular role, what were you doing?

23   A.    I was in sales, in, like, a recruiting and staffing company

24   called Insight Global, and I did that for about two and a half

25   years.

1    Q.    And what were you doing before Insight Global?

2    A.    I was in college.

3    Q.    Okay.  You were in college?

4    A.    Yeah.

5    Q.    But when you were working for Insight Global -- that was a

6    poorly worded question.  Can you break that down for us?  What

7    was it that you were actually doing?

8    A.    Yeah.  So for the first seven months, I was a recruiter,

9    just recruiting for different types of technical positions, and

10   then I got promoted into account management.  So that was more

11   of a sales job; talking to hiring managers, seeing who was

12   recruiting, and then passing those positions to recruiters.

13   Q.    Trying to connect employers with employees?

14   A.    Yeah, correct.

15   Q.    Okay.  And how long was it that you worked for Insight

16   Global?

17   A.    About two -- just over two years.

18   Q.    And I want to ask you about a particular day, and I think

19   that, actually, relates to Insight Global as well.  I want to

20   talk to you about November 10th of 2021.  Do you remember that

21   particular date?

22   A.    Yes.

23   Q.    Maybe you don't remember the actual date, but do you

24   remember being on a plane that was going from Atlanta to

25   Seattle --

1    A.    Yeah.

2    Q.    -- in November of 2021?

3    A.    Yeah.

4    Q.    And was that somehow related to Insight Global?

5    A.    Yeah.  Their headquarters are in Atlanta, so I was flying

6    back from sales training, from Atlanta to Seattle.

7    Q.    What kind of sales training?

8    A.    It was, like, a pushing-for-promotion from recruitment to

9    sales, so they hold, kind of like, classroom-like trainings to,

10   kind of, help get you promoted to the next level, I guess.

11   Q.    So the internal, kind of, training to get to the next level

12   of that business?

13   A.    Yeah, correct.

14   Q.    How long had you been in Atlanta?

15   A.    They're typically just for two nights.  It's either two

16   nights or three nights, but I want to say two.

17   Q.    And on this particular day, you were coming back?

18   A.    Yeah.

19   Q.    Do you recall if you were -- well, do you recall where you

20   were seated on this particular plane?

21   A.    I was in a window.

22   Q.    And do you remember where you were in the plane, whether it

23   be the front of the plane or the back of the plane?

24   A.    Closer to the back.  I'd say anywhere from the middle,

25   where the wing is, to the back of the plane.

1   Q.   If I said Row 25, would that sound, roughly, about the

2   right spot?

3   A.   Yes.

4        MR. WYNNE:  Your Honor, permission to publish

5   Government's Exhibit 2.

6        THE COURT:  Granted.

7   Q.   (By Mr. Wynne)  This diagram that we have up on the screen,

8   does this, kind of, help refresh your recollection as to where

9   you were seated on this particular plane?

10  A.   Yes.

11  Q.   So 25F?

12  A.   Correct.

13  Q.   Far right side of the plane?

14  A.   Yeah.

15  Q.   This particular travel that you were doing, were you doing

16  it alone, or with a colleague from work?

17  A.   Yeah, there was a colleague from work, and he was just two

18  rows in front of me.

19  Q.   Not seated in your particular row?

20  A.   No.

21  Q.   Do you recall who you were seated with?

22  A.   There was a couple, a guy and a girl, and they were in the

23  two seats right next to me.

24  Q.   Did you fly a lot at that time?

25  A.   Yeah, I would say so.

1    Q.    And how is it that you typically pass the time on flights?

2    A.    Reading, watching movies.  If I'm on the window, I'll try

3    to sleep.

4    Q.    Are you one of those people who, kind of, focuses on

5    whatever you have available to you and gets into your own little

6    bubble?

7    A.    Yeah, for sure.

8    Q.    In fact, on this particular plane, did you utilize one of

9    those techniques to pass the time?

10   A.    I remember watching a movie for a little bit, and then I

11   remember -- because it was a later flight, that we were leaving

12   Atlanta and getting back to Seattle pretty late -- that I took a

13   nap as well.

14   Q.    Do you sleep on planes very often?

15   A.    Sometimes.  It depends.

16   Q.    What does it depend on?

17   A.    If I'm feeling anxious.  I'm not the best, like, flier by

18   myself.

19   Q.    Flights are not your thing?

20   A.    Typically not.

21   Q.    Kind of necessary, but not your top choice in terms of

22   transportation method, I guess?

23   A.    Totally.

24   Q.    All right.  So on this particular flight, you said you

25   remember watching a movie?

1    A.    Yeah.

2    Q.    Do you remember what movie it even was?

3    A.    No, I don't.

4    Q.    This was a long time ago; is that fair?

5    A.    Yeah.

6    Q.    Almost three years ago?

7    A.    Yeah.

8    Q.    Fair to say the details of this particular date were not as

9    clear now as they once were?

10   A.    Yeah.

11   Q.    Did you, in fact, fall asleep on this particular flight?

12   A.    Yeah.

13   Q.    Do you remember if you fell asleep for a long time?

14   A.    About an hour.

15   Q.    Was there something that woke you up?

16   A.    The drink service.  I remember them coming around, and,

17   like, when they turned the lights on for it.  So I, kind of,

18   woke up when they were turning the lights on to start doing

19   the...

20   Q.    Okay.  So you were awake for the drink service, and you

21   said you were asleep for maybe an hour; is that right?

22   A.    Yes.

23   Q.    Do you recall, did this flight have one drink service or

24   two?

25   A.    I don't recall.

1  Q.   Fair enough.  But you recall being awake for a drink

2  service; is that --

3  A.   Yeah.

4  Q.   Do you also remember whether or not this flight was

5  particularly smooth or particularly bumpy or anything like that

6  with respect to turbulence?

7  A.   I feel like it was particularly bumpy.  I've flown to

8  Atlanta a couple of times for trainings, and they all seem to

9  have been -- or flown from Atlanta back to Seattle, and it

10  seemed like every time it was pretty bumpy.

11  Q.   How do you feel about being asleep when it's turbulent?

12  A.   Not fun.

13  Q.   Do you try to stay awake when you know turbulence is

14  coming?

15  A.   Yeah.

16  Q.   So on this date, you do recall being awake for drink

17  service.  Are you one of those people who, when drink service is

18  coming your way, you pay attention because you don't want it to

19  get past you and you want to make sure you catch their attention

20  so you can get that drink?

21  A.   Yeah.

22  Q.   Maybe I revealed too much about myself.

23       In this case, when the drink service was coming through,

24  were you paying attention to what was going on around you?

25  A.   Yeah, I'd say more than usual, yeah.

1    Q.    In that particular drink service, did you notice other

2    people in your row?

3    A.    Yeah.

4    Q.    And what they were drinking?

5    A.    I just recall someone on the other side of the aisle --

6    because, typically, drink service is pretty quick, it's just,

7    like, a little snack and a drink of some sort, and it seemed

8    like it was taking a long time when they got to us.  So I was

9    kind of waiting around for a while.

10        I remember looking around, and they were serving quite a

11   lot of alcoholic drinks, which takes longer; like, checking IDs,

12   getting payment and stuff.  So I recall that because I was

13   wondering what was taking so long and was checking it out.

14   Q.    Tell me more about that.  Who was it that you saw or who

15   was this individual, as best you recall, that was engaging the

16   flight attendant --

17   A.    Yeah.  It was someone on the other side of the aisle, and I

18   just recall it being a male.  Other than that, I didn't focus

19   too heavily on who was in that other the aisle, if it was other

20   men or other women, but it was someone in the other aisle that

21   was, like, a male.

22   Q.    This particular person, do you know where they were seated

23   in that row, whether they were right against the aisle, or

24   further down?

25   A.    I don't recall.

1   Q.    Okay.  But you know it was a man in your -- and they were

2   on the other side of the aisle, the other side of the plane?

3   A.    Yeah, correct.

4   Q.    So you're on the right side of the plane, and it was

5   definitely a male on the left side of the plane?

6   A.    Yeah.

7   Q.    Okay.  And you said that you noticed that they were getting

8   served alcohol; is that correct?

9   A.    Yeah.

10  Q.    And how did you notice that?

11  A.    Just 'cause, like, checking the ID, and then I think --

12  well, like, it was -- I don't know if it was beer or if it was

13  wine or if it was, like, a shot, but they were definitely

14  reaching into a different part of the cart then just, like, the

15  soda.

16  Q.    And did you get something to drink as well?

17  A.    Yes; probably, like, juice.

18  Q.    Do you recall what you did after you got that drink to kind

19  of help pass the time on this particular flight?

20  A.    No.

21  Q.    You said sometimes you sleep, sometimes you watch movies.

22  Were you watching a movie at this point, or was that before?

23  A.    Before.

24  Q.    And do you recall if you were reading something or

25  listening to a podcast or something like that?

1    A.    No.

2    Q.    Okay.  Prior to landing, did you notice anything that was

3    occurring in your row?

4    A.    Yeah.  There was a male on the other side, and he kept

5    getting up into the aisle and walking up and down the aisle

6    quite a few times.  It just seemed kind of interesting, because

7    it was, like, fasten your seat belt, kind of like turbulence, or

8    we're getting prepared for landing so sit down, and it seemed

9    like someone was always in the aisle, getting up and down.

10   Q.    And this was before you landed?

11   A.    Correct.

12   Q.    And this was the person who was in the same row with you?

13   A.    Yeah.

14   Q.    Did you notice any flight attendants around at that point

15   in time?

16   A.    There was one flight attendant, and she came up a couple of

17   times.

18   Q.    Tell us a little bit more about that.

19   A.    I didn't overhear any conversation.  I just remember her

20   visiting our area.

21   Q.    And was that before the man was getting up?

22   A.    I don't recall.  I don't remember.

23   Q.    Talk to us about the landing.  Do you remember when this

24   particular flight landed?

25   A.    Yeah.

1    Q.    And do you recall if there was an announcement that was

2    given over the PA system?

3    A.    Yeah.

4    Q.    Tell us about that.

5    A.    Yeah.  So as soon as we, like, touched the ground and we

6    were taxiing back to the gate, they came over the intercom and

7    said if everyone could stay in their seats when we get to the

8    gate and that law enforcement would be either at the gate or

9    coming onto the plane to escort someone off, and they would let

10   us know when it was okay for everyone to stand up and start

11   deplaning.

12   Q.    What did you notice happened after that announcement was

13   given over the intercom?

14   A.    That person on the left side -- like, in my row, on the

15   other side of the aisle, had gotten up out of their seat and

16   went to the back of the plane.  And I thought that was weird,

17   again, because they said to stay seated, so that kind of raised

18   a red flag.

19   Q.    And this was the same man who you'd seen get up before?

20   A.    Yeah.

21   Q.    And you said he walked to the back of the plane?

22   A.    Yes.

23   Q.    What did you see at that point?

24   A.    I didn't see anything else after that point.  And I can't

25   remember if we saw them walk back through the front of the

1   plane, or if they had been escorted off the back.

2   Q.   Did you notice anyone else standing up after that

3   announcement was read?

4   A.   No.

5   Q.   That man's demeanor, did you notice his demeanor as he got

6   up after that announcement was read?

7   A.   I would say a little bit anxious.

8   Q.   What do you mean by that?

9   A.   Just kind of fidgety, looking around a lot, kind of pacing

10  back and forth, maybe, a little bit.

11  Q.   What do you mean by "pacing"?  Like, while he was standing

12  there?

13  A.   Yeah.  Kind of looking towards the front, looking towards

14  the back.  I guess making more like small movements.

15  Q.   What do you mean by that, "small movements"?

16  A.   Just turning, like, front to back or, like, looking around.

17  Q.   Did you hear him say anything at that point?

18  A.   No.

19  Q.   Do you find this surprising?

20  A.   A little bit.

21  Q.   Why?

22  A.   I guess I didn't -- nothing at that point had raised too

23  much of a red flag throughout the flight, or I hadn't heard any,

24  like, big commotion of any sort, so I wasn't quite sure what was

25  going on at that point.

1  Q.   Did you eventually -- well, you eventually got off that

2  plane, correct?

3  A.   Yeah.

4  Q.   Did you eventually see that man interacting with any law

5  enforcement?

6  A.   Yeah.  There was quite a handful of, like, police officers,

7  someone, kind of, right after you get through the gate, and they

8  were with that person.

9  Q.   That was the man who stood up after the announcement; is

10  that right?

11  A.   Yeah.

12  Q.   And the man who had been drinking during the drink service?

13  A.   Yeah.

14      MR. WYNNE:  No further questions, Your Honor.  Thank

15  you.

16                        CROSS-EXAMINATION

17  BY MR. RUSK:

18  Q.   Good afternoon, Ms. Morales.

19  A.   Hi.

20  Q.   This will be the first time we've ever spoke, right?

21  A.   Yeah.

22  Q.   But you previously provided a statement to Special Agent

23  Highley?

24  A.   Yeah.

25  Q.   And did you receive a copy of that transcript before

1   testifying today?

2   A.    Yeah.

3   Q.    And you reviewed it carefully?

4   A.    Yeah.

5   Q.    Now, I want to talk to you a little bit about the

6   deplaning.  Ultimately, did everybody deplane normally off that

7   plane?

8   A.    Yeah.

9   Q.    And you didn't notice my client being the first one off of

10  the plane?

11  A.    I noticed someone not in our row not deplaning at the same

12  time as everyone else.

13  Q.    Okay.  But you said you saw him go to the back of the

14  plane, right?

15  A.    Yeah.

16  Q.    You didn't say anything about seeing him go to the front of

17  the plane.

18  A.    From what I recall, just the back.

19  Q.    Okay.  And let's just run through a few things.

20        So you were able to sleep on the plane, right?

21  A.    Yeah.

22  Q.    And you said that you fell asleep after about an hour?

23  A.    Yeah.

24  Q.    And there was, actually, a gentleman sitting next to you,

25  wasn't there?

1    A.    Yeah.

2    Q.    And needless to say, he also fell asleep?

3    A.    Yeah.

4    Q.    His head was kind of swaying?

5          And where were his hands?  Where were his arms?  Do you

6    remember?

7    A.    No.

8    Q.    Okay.  But at some point he, kind of, kept bumping into

9    you?

10   A.    Yeah.

11   Q.    Just kept leaning on you?

12   A.    Yeah.

13   Q.    Because he was, like, falling asleep and sleeping on you?

14   A.    Yeah.

15   Q.    And you thought that was pretty annoying, didn't you?

16   A.    Yeah.

17   Q.    Kind of bugged you?

18   A.    Yeah.

19   Q.    Is that what you said?

20   A.    Yeah.

21   Q.    Do you think it was intentional on his part?

22   A.    No.

23   Q.    He was just passed out, right, so he didn't mean to touch

24   you?

25   A.    Yeah.

1   Q.   This wasn't really triggering, though, for you for any

2   reason?

3   A.   No.

4   Q.   Okay.  And you were awake on part of the trip, right?

5   A.   Yeah.

6   Q.   So you woke up during the drink services?

7   A.   Correct.

8   Q.   And you recall that my client did order drinks at both

9   services, right?

10  A.   Yes.  Is that what the --

11  Q.   I think that's what you just testified to; that --

12  A.   I recall one for sure.

13  Q.   Was it the second service, or the first service?

14  A.   I want to say the second service.

15  Q.   Okay.  And it was taking a while?

16  A.   Taking a while.

17  Q.   So he was having a pretty substantial interaction with that

18  flight attendant in that second service?

19  A.   Yeah.

20  Q.   Right, because she was, like, checking him out for his

21  liquor, right?

22  A.   Yeah.

23  Q.   At least that's what you think he bought?

24  A.   Yeah.

25  Q.   You can't be sure?

1  A.    Yeah.

2  Q.    But it took a while.  And there -- you have to answer out

3  loud.  I'm sorry.

4  A.    Yes.  Sorry.

5  Q.    And they had quite an exchange?

6  A.    Yeah.

7  Q.    And you knew that because you were waiting so that you

8  could get a beverage, right?

9  A.    Yes.

10 Q.    I think you said that you woke up about 30 minutes before

11 the flight ended?

12 A.    Yes.

13 Q.    Could it have been 40 minutes before the flight ended?

14 A.    Potentially.

15 Q.    Could it have been 20 minutes before the flight ended?

16 A.    Potentially.

17 Q.    You're not exactly sure?

18 A.    Yeah.

19 Q.    Just about 30 minutes, right?

20 A.    Yes.

21 Q.    Okay.

22       You didn't mention that you saw any dispute between any

23 passengers, right?

24 A.    No.

25 Q.    And you never said in your statement that you saw my client

1    touching anybody, right?

2    A.    No.

3    Q.    You never said in your statement that you saw him leaning

4    over onto any passenger next to him, right?

5    A.    No.

6    Q.    Okay.  And you didn't mention that you saw anybody crying,

7    right?

8    A.    No.

9    Q.    You didn't see anybody hyperventilating in any way?

10   A.    No.

11   Q.    Did you ever hear somebody say something along the lines

12   of, What the F?

13   A.    No.

14   Q.    And I think that, you know, you said that you noticed my

15   client go to the back of the plane after the announcement for

16   law enforcement, right?

17   A.    Yeah.

18   Q.    And you said that, kind of, everybody was a little bit on

19   edge after that announcement?

20   A.    Yeah.

21   Q.    Because you didn't really know what was going on.

22   A.    Yeah.

23   Q.    And I think your words were you didn't know if maybe he was

24   just one of those anxious passengers, right?

25   A.    Yeah.

1   Q.   But you didn't say anywhere in any statement that you

2   actually saw him do anything wrong?

3   A.   No.

4            MR. RUSK:  No further questions.  Thank you.

5            THE COURT:  Any redirect?

6            MR. WYNNE:  Just briefly.

7                       REDIRECT EXAMINATION

8   BY MR. WYNNE:

9   Q.   Just to be clear, it sounds like you were asleep towards

10  the end of this flight.

11  A.   Yes.

12  Q.   Is that right?  Obviously, weren't paying attention to what

13  was happening outside of your dream world, so to speak?

14  A.   Yeah.

15  Q.   And you woke up, you're not entirely sure, but a short time

16  before you actually landed?

17  A.   Yeah.

18  Q.   And in terms of not hearing other things, you weren't able

19  to hear the conversation that was being had all the way on the

20  other side of the plane, correct?

21  A.   No.

22  Q.   You weren't able to hear the people that were probably even

23  right behind you?

24  A.   No.

25  Q.   Or right in front of you?

1    A.    No.

2    Q.    Maybe even when two people are seated next to each other

3    right next to you, they might be able to have a conversation

4    with themselves, not trying to draw attention, and you wouldn't

5    be able to hear that.

6              MR. RUSK:  Objection; speculation.

7              MS. HARMON:  It's personal knowledge.

8              THE COURT:  Hang on a second.  Can you rephrase the

9    question?  The way it's phrased can go towards speculation.

10   Rephrase.  I'll sustain.

11   Q.    (By Mr. Wynne)  There may be even two people seated right

12   next to you, and they may have had a conversation with each

13   other that you wouldn't have been able to overhear; is that

14   accurate?

15   A.    Yes.

16   Q.    And in terms of what was happening on the other side of the

17   plane, you didn't hear anyone crying out loud at that point,

18   correct?

19   A.    No.

20   Q.    But if someone was crying quietly to themselves or to

21   someone else there, you might not --

22             MR. RUSK:  Objection, Your Honor; speculation.

23             MR. WYNNE:  Exactly.

24             THE COURT:  Sustained.

25   Q.    (By Mr. Wynne)  If someone were crying, quietly, on the

1    other side of the plane --

2           MR. RUSK:  Objection, Your Honor; speculation.  It's

3    the exact same question.

4           MR. WYNNE:  It goes to her personal knowledge, her

5    ability to perceive the circumstances.  It's a direct response

6    to the defense's question, Your Honor.

7           THE COURT:  I'm going to sustain on speculation.  I

8    don't know how she would necessarily know.  But I think you made

9    your point with the other questions as well.

10          MR. WYNNE:  Ms. Morales, I appreciate your testimony.

11   Thank you.

12          THE WITNESS:  Thank you.

13          THE COURT:  Any recross?

14          MR. RUSK:  No recross.

15          THE COURT:  Any objection to excusing this witness?

16          MS. HARMON:  No, Your Honor.

17          MR. RUSK:  No.

18          THE COURT:  You may step down.  You're excused.

19          MS. HARMON:  Your Honor, I'm looking at the time, and

20   we've moved a little quicker through the afternoon witnesses

21   than we expected, so I think that's all we can get done today.

22          THE COURT:  I wasn't sure if she was going to be

23   short --

24          MS. HARMON:  Even if she was, she's frantically

25   driving but not currently here.

 1          THE COURT:  We'll end a little early today.  We'll

 2     start at 9:00 a.m. sharp tomorrow, so please arrive a little bit

 3     before.  Traffic is heavier on Tuesdays, Wednesdays, and

 4     Thursdays downtown than Mondays, so there might have been a

 5     little of a misjudgment, just in terms of traffic this morning.

 6          As I indicated several times, you, as jurors, will decide

 7     this case based solely on the evidence presented here in the

 8     courtroom.  So I want to remind you that, after you leave here

 9     for the night, you must not conduct any independent research

10     about this case, the matters in the case, the legal issues in

11     the case, or the individuals or entities involved in the case.

12          This is important for the same reason that jurors have long

13     been instructed to limit their exposure to traditional forms of

14     media information, such as television and newspapers.  You must

15     also not communicate with anyone in any way about this case, and

16     you must ignore any information about the case that you might

17     see while browsing the Internet or your social media feeds.

18          You-all have a good evening.

19                    THE FOLLOWING PROCEEDINGS WERE HELD
                        OUTSIDE THE PRESENCE OF THE JURY:
20

21          THE COURT:  I want to discuss the schedule for the

22     rest of the trial here.  I wasn't sure, by the email that you

23     sent me yesterday, if that was the full list of witnesses.  So

24     five left?

25               MS. HARMON:  Yeah, Your Honor.  Leavengood, Chartrand,

1  Stromme, Highley, Bakker.  Five witnesses left.

2      THE COURT:  So do you anticipate finishing tomorrow?

3      MS. HARMON:  I do.

4      THE COURT:  And do you anticipate taking the whole day

5  tomorrow?

6      MS. HARMON:  No.  If I had to guess, looking at our

7  estimates, I'd say we'd probably would be able to rest shortly

8  after lunch; maybe two o'clock, is my guess.

9      THE COURT:  Okay.  And then, Mr. Rusk, you'll be

10  putting on two character witnesses, right?

11      MR. RUSK:  Yes.

12      THE COURT:  Do you know if Mr. Walji will be

13  testifying yet, or has he decided?

14      MR. RUSK:  We haven't made that decision yet.

15  Depending on how far we get, I guess, is it going to be possible

16  for us to break after the close of evidence tomorrow, regardless

17  of where we're at?  Because it sounds like if Mr. Walji is going

18  to testify, then we probably could get through it tomorrow.

19  Would we be able to hold off on closing until Friday?

20      THE COURT:  I think that would be fine.  Just given

21  where we are, if you close at 2:00, and things always happen.

22      MS. HARMON:  Sure.  Obviously, things accelerate, and

23  there's time for instructions and closing tomorrow.  Obviously,

24  we'd like to get all that done so we can get it to the jury

25  before Your Honor needs to recess on Thursday.

 1            THE COURT:  Yeah.  I'm being realistic.  It seems like

 2    with five, seven definite and possibly eight witnesses, and jury

 3    instructions, which take a while -- and I assume the jury

 4    instructions that you gave me were the final jury instructions,

 5    no objections, and we're going to finalize those as you-all gave

 6    to us and we discussed in the pretrial conference.

 7            MS. HARMON:  That's correct, Your Honor.  The one

 8    asterisk I'd put on that is a different instruction, depending

 9    on whether Mr. Walji testifies or not.

10            THE COURT:  Yes.  Anything else, counsel, you can

11    think of that we need to discuss?

12            MS. HARMON:  No.

13            THE COURT:  Okay.  I think it's highly unlikely -- I'm

14    so sorry that the Thursday interruption has occurred this week,

15    but I think it's, like, really wishful thinking we'll get

16    through that many witnesses.

17            MS. HARMON:  I understand, but I didn't think that

18    about this afternoon, and then we moved through.  So I will

19    continue to be optimistic.

20            THE COURT:  Okay.

21            MR. RUSK:  Your Honor, I'm only one person, so if I

22    need to prepare a closing tonight, I want to know that.  If

23    we're all comfortable waiting until Friday, then I think that

24    that would give me some more ability to discuss what we've heard

25    today with Mr. Walji, and potentially prepare that testimony.

1    And I also wouldn't want to send the jury out in the last hour

2    of the day anyway.  I don't want them to feel time pressured, I

3    don't want them to feel like they need to try to quickly come to

4    a decision.  That would give them all day Friday.  I think we

5    come in, we close, and they'll have all day to deliberate.

6            THE COURT:  How long do you need for closing

7    arguments?

8            MS. HARMON:  About 20, 25 minutes.

9            MR. RUSK:  That's my estimation.

10           THE COURT:  Given that, let's plan on final jury

11   instructions and closings Friday morning, and then we can get it

12   to the jury for deliberations.

13           MS. HARMON:  And if there's time to do instructions

14   tomorrow, would the court like to do that, or not?

15           THE COURT:  I'd like to do them right before closings.

16   Even though it's written, I think it's good for them to have it

17   in their minds as we go into closings.

18           MS. HARMON:  Okay.

19           THE COURT:  Anything further?

20           MS. HARMON:  No.

21           THE COURT:  I'll see you all at 9:00 a.m.

22

23           (Proceedings adjourned at 3:54 p.m.)

24

25

INDEX OF EXAMINATION

EXAMINATION OF                                              PAGE

MACKENZIE THORNQUIST        DIRECT EXAMINATION BY        17
                           MR. WYNNE

                           CROSS-EXAMINATION BY         46
                           MR. RUSK

NICOLE BETSON              DIRECT EXAMINATION BY        57
                           MR. WYNNE

                           CROSS-EXAMINATION BY         72
                           MR. RUSK

                           REDIRECT EXAMINATION BY      78
                           MR. WYNNE

JORDAN DIMICK             DIRECT EXAMINATION BY        79
                           MS. HARMON

                           CROSS-EXAMINATION BY         95
                           MR. RUSK

                           REDIRECT EXAMINATION BY      102
                           MS. HARMON

GABRIELLE                 DIRECT EXAMINATION BY        104
                           MS. HARMON

                           CROSS-EXAMINATION BY         130
                           MR. RUSK

                           REDIRECT EXAMINATION BY      139
                           MS. HARMON

                           RECROSS-EXAMINATION BY       145
                           MR. RUSK

                           REDIRECT EXAMINATION BY      146
                           MS. HARMON

EXAMINATION OF                                    PAGE

WENDY MANUMALO              DIRECT EXAMINATION BY    147
                           MR. WYNNE

                           CROSS-EXAMINATION BY     168
                           MR. RUSK

                           REDIRECT EXAMINATION BY  174
                           MR. WYNNE

RENEE MINER                DIRECT EXAMINATION BY    175
                           MS. HARMON

                           CROSS-EXAMINATION BY     184
                           MR. RUSK

                           REDIRECT EXAMINATION BY  188
                           MS. HARMON

ALEXA MORALES              DIRECT EXAMINATION BY    189
                           MR. WYNNE

                           CROSS-EXAMINATION BY     201
                           MR. RUSK

                           REDIRECT EXAMINATION BY  207
                           MR. WYNNE

GENERAL INDEX

GOVERNMENT'S OPENING STATEMENT                      4
DEFENDANT'S CLOSING ARGUMENT                        12


INDEX OF EXHIBITS

GOVERNMENT EXHIBITS

| EXHIBIT | ADMITTED | WITHDRAWN |
|---------|----------|-----------|
| 1 | 150 | |
| 2 | 28 | |
| 8 | 45 | |


DEFENSE EXHIBITS

| EXHIBITS | ADMITTED | WITHDRAWN |
|----------|----------|-----------|
| N/A | | |

# C E R T I F I C A T E

I, Nancy L. Bauer, CCR, RPR, Court Reporter for the United States District Court in the Western District of Washington at Seattle, do hereby certify that I was present in court during the foregoing matter and reported said proceedings stenographically.

I further certify that thereafter, I have caused said stenographic notes to be transcribed under my direction and that the foregoing pages are a true and accurate transcription to the best of my ability.

Dated this 24th day of September 2024.

/S/  Nancy L. Bauer

Nancy L. Bauer, CCR, RPR
Official Court Reporter