UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>    Plaintiff,<br>  v.<br><br>MUNIR WALJI,<br><br>    Defendant. | CASE NO. 2:23-cr-00011-TL<br><br>ORDER ON MOTION<br>FOR NEW TRIAL |

Defendant Munir Walji was convicted by a jury of two offenses involving sexual behavior toward a minor, and his sentencing is pending. This matter is before the Court on Mr. Walji's Motion for a New Trial. Dkt. No. 189. Having reviewed the Government's response (Dkt. No. 192), Mr. Walji's reply (Dkt. No. 193), and the relevant record, and finding oral argument unnecessary, *see* CrR 12(b)(12), the Court DENIES the motion.

I. BACKGROUND

Mr. Walji was charged with one count of Sexual Abuse of a Minor in Special Aircraft Jurisdiction and one count of Abusive Sexual Contact in Special Aircraft Jurisdiction. *See* Dkt.

1  No. 125 (superseding indictment). Mr. Walji was accused of engaging in nonconsensual sexual
2  behavior with MV1, a minor female, while on a nonstop flight from Atlanta, Georgia, to Seattle,
3  Washington. *See id.* at 1–2. The alleged behavior included the intentional touching of MV1's
4  inner thigh and vagina. *See id.* at 2.

5  From September 9 to 13, 2024, a jury trial was held in this matter. *See* Dkt. Nos. 160,
6  162, 165, 176 (minute entries of proceedings). Over the course of the trial, the Government
7  called several witnesses, including MV1, the alleged victim; MV1's mother, seated next to her
8  on the flight; multiple flight attendants; Seattle police officers; a child forensic interviewer; and a
9  forensic scientist, who testified to DNA testing results. Dkt. No. 185 (sealed) (transcript of trial
10 day 2) at 17–213; Dkt. No. 186 (sealed) (transcript of trial day 3) at 2–139. Mr. Walji called two
11 character witnesses and testified himself, denying all charges. Dkt. No. 186 at 144–94. At the
12 conclusion of the trial, the jury found Mr. Walji not guilty of the first count but guilty of the
13 attempt of the first count and guilty on the second count. *See* Dkt. No. 177 (sealed) (jury verdict).

14 In his motion, Mr. Walji focuses on certain portions of the trial, which are discussed in
15 greater detail below.

16 **A.    Testimony of Child Forensic Interviewer**

17 Among the Government's witnesses was Michelle Stromme, a child forensic interviewer.
18 *See* Dkt. No. 186 at 75–90. Ms. Stromme stated her job was to be "[a]n unbiased person who
19 listens and obtains information regarding children who have suffered a trauma." *Id.* at 76:9–10.
20 She later repeated that she was "unbiased" in her role. *Id.* at 82:4, 82:12. Ms. Stromme
21 confirmed that all interviews are "audio and video recorded" so they "can be reviewed later by
22 other people." *Id.* at 80:20–24. She stated that she seeks to determine if the child has "the ability
23 to tell fact from fiction" (*id.* at 84:3–4) and if the child is "consistent" such that they can develop
24

a "narrative" (*id.* at 84:8–9). She stated that she "want[ed] to get as much information as possible from [the child's] own words and their own understanding." *Id.* at 84:23–24.

As to the instant matter, Ms. Stromme testified that she interviewed MV1 about the incident in 2021. *Id.* at 87:5–7. She stated again that she aimed to remain "unbiased" (*id.* at 88:5) and that MV1's interview was "audio and video recorded" (*id.* at 89:2–5). She stated that an "FBI agent" watched the interview from an observation room (*id.* at 89:17–20) and that the interview lasted approximately 56 minutes (*id.* at 90:1–3). She testified that she might leave the interview room to check with law enforcement "to make sure that [she'd] asked everything that is humanly possible, because [she is] not an investigator." *Id.* at 86:14–16. Finally, she stated that she reviewed MV1's interview prior to her testimony. *Id.* at 90:4–5.

Mr. Walji did not move to exclude Ms. Stromme's testimony or otherwise object to her testimony. *See generally* Dkt. No. 122 (Mr. Walji's motions *in limine*). On cross examination, Ms. Stromme testified that she might also check in with law enforcement observers "if what [the child] said didn't make a lot of sense." *Id.* at 91:6–9. Defense counsel asked Ms. Stromme whether she "checked in" with other observers of the interview during the interview, and she answered that she did so twice. *See* Dkt. No. 186 at 90:18–91:15. Counsel began to elicit testimony about the content of MV1's forensic interview with regard to her interactions during a drink service on the flight and whether Ms. Stromme "asked [MV1] specifically whether she could hear a flight attendant approaching." *Id.* at 91:21-24. The prosecutor objected, and stated at a sidebar that since defense counsel was not impeaching, if Mr. Walji intended to offer any statements made to Ms. Stromme or continue questioning about the statements, then the Government would seek to offer the entirety of the interview. *Id.* at 92:8–23. Defense counsel then stated he would "stop that line of questioning." *See* Dkt. No. 186 at 91–93. On re-cross examination, defense counsel asked if part of Ms. Stromme's job was to "assess consistencies,"

1  and when she answered in the negative, counsel asked if other observers "might be assessing
2  consistency," to which she answered in the affirmative. *Id.* at 96:19–97:2.

3  **B.    Testimony of MV1**

4  During her forensic interview, MV1 stated that Mr. Walji touched her vagina. *See* Dkt.
5  No. 189 at 6 (excerpt from interview). At trial, MV1's testimony differed: she repeatedly denied
6  that Mr. Walji touched her vagina. *See* Dkt. No. 185 at 118:10–17, 131:23–24, 143:6–11. Rather,
7  she testified that when he was able to get into her pants, she spoke up; it didn't go on too long;
8  his hand was inside her underwear; and he touched the exterior of her vagina (later clarifying that
9  he touched the vaginal area right above or right before the labia). *Id.* at 118:11–15, 119:23–25,
10 121:18–122:10, 142:15–143:20.

11 **C.    Closing Arguments**

12 The prosecutor dedicated a portion of her closing argument to addressing MV1's
13 credibility. One section focused on MV1's various statements about the incident:

> Next, I want to talk to you about credibility. You decide what
> testimony is credible and what testimony is not credible. So first,
> let's talk about [MV1's] credibility in this case.
>
> [MV1] was consistent. She reported to her mother immediately,
> and then she reported to the flight attendants in the back of the
> plane.
>
> And you heard Wendy testify that the story that was told by [MV1]
> in the seat was the exact same words that she used in the back of
> the plane. There were no details different; identical accounts.
>
> You also heard that she went on to talk to the Port of Seattle and
> give a statement after the plane had landed, and then again in a
> child forensic interview at Alaska Cares, and then she came and
> testified before you.

Dkt. No. 187 (transcript of trial day 4) at 19:1–14. Immediately following this statement, the
prosecutor stated, "[MV1] was also corroborated." *Id.* at 19:15. The prosecutor then asserted
"these types of assaults do not occur with an invitation to observe. They happen in privacy" *Id.* at

ORDER ON MOTION FOR NEW TRIAL - 4

15–17. The prosecutor then stated, "[y]ou heard testimony that supports this," pointing to testimony that the lights were off in the cabins and MV1's mother was asleep. *Id.* at 17–20. The prosecutor returned to discussing that the witnesses "clearly corroborate" MV1, referring to those who observed "her genuine state of emotion" on the plane (*i.e.*, MV1's mother and the flight attendants) and the DNA evidence. *Id.* at 20:7–13.

The prosecutor also argued about MV1's motive, stating in part:

> [MV1] has absolutely no motive to lie, embellish, or make this up. She has nothing to gain from this case. In fact, look at all the negative impacts this case has had on her.
>
> She's had to tell strangers about what happened to a personal and private part of her body, repeatedly. She had to miss school to go to a child forensic interview. She had to come to Washington for this trial and be cross-examined and tell another group of strangers, in a packed courtroom, what happened to her.

*Id.* at 20:14–22. In the final moments of her closing argument, the prosecutor returned to MV1's credibility:

> But she came here and testified three years later, nonetheless, because it happened to her. It wasn't a lie or fiction or even a misconception. Mr. Walji rubbed his DNA into the crotch of her pants and shoved his hand inside her underwear. He's guilty of both offenses.

*Id.* at 22:25–23:4. And on rebuttal, the prosecutor addressed MV1's forensic interview:

> Also, I want to highlight, from [defense counsel's] closing, he talked about what was said by [MV1] in her statements in the child forensic interview. You heard no evidence about that because that it is hearsay.
>
> What [MV1] told the flight attendants at the back of the plane and to her mom, she was in a deep, emotional state, and those are statements you are allowed to hear.

*Id.* at 46:20–47:1.

ORDER ON MOTION FOR NEW TRIAL - 5

For his part, defense counsel highlighted the fact that Ms. Stromme checked in twice with the forensic interview observers, saying, "[MV1] talked about a drink service. It doesn't make sense. It's not credible." Dkt. No. 187 at 37:15–19.

### D. The Instant Motion

Mr. Walji argues that a new trial is warranted because the Government improperly bolstered or vouched for MV1's testimony by putting on the testimony of Ms. Stromme and by making inappropriate remarks in its closing argument. *See* Dkt. No. 189 at 10–20; Dkt. No. 193 at 2–12. The Government opposes. *See* Dkt. No. 192 at 3–15.

## II. LEGAL STANDARD

Federal Rule of Criminal Procedure 33(a) provides that a court may, upon the defendant's motion, "vacate any judgment and grant a new trial if the interest of justice so requires." In resolving the motion, a court "need not view the evidence in the light most favorable to the verdict; it may weigh the evidence and in so doing evaluate for itself the credibility of the witnesses." *United States v. Alston*, 974 F.2d 1206, 1211 (9th Cir. 1992) (quoting *United States v. Lincoln*, 630 F.2d 1313, 1319 (8th Cir. 1980)).

When the motion is based on alleged prosecutorial misconduct and the defendant objected to the alleged misconduct at trial, a court employs a "harmless error" standard. *See United States v. Alcantara-Castillo*, 788 F.2d 1186, 1190 (9th Cir. 2015). However, when—as here—a defendant has not objected to the alleged misconduct at trial, a court employs a "plain error" standard. *Id.* Under plain error review, a defendant must show: "(1) there was error; (2) it was plain; (3) it affected the defendant's substantial rights; and (4) 'viewed in the context of the entire trial, the impropriety seriously affected the fairness, integrity, or public reputation of judicial proceedings.'" *Id.* at 1191 (quoting *United States v. Combs*, 379 F.3d 564, 568 (9th Cir.

2004)); *see also United States v. Sanft*, No. CR19-258, 2023 WL 5428065, at *13 (W.D. Wash. Aug. 23, 2023) (on motion for new trial, applying plain-error standard to misconduct claim).

### III.  DISCUSSION

"[T]he prosecutor has a special obligation to avoid 'improper suggestions, insinuations, and especially assertions of personal knowledge.'" *United States v. Roberts*, 618 F.2d 530, 533 (9th Cir. 1980) (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)). "Improper vouching typically occurs in two situations: (1) the prosecutor places the prestige of the government behind a witness by expressing his or her personal belief in the veracity of the witness, or (2) the prosecutor indicates that information not presented to the jury supports the witness's testimony."[1] *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002) (citing *United States v. Edwards*, 154 F.3d 915, 921 (9th Cir. 1998)); *accord United States v. Preston*, 873 F.3d 829, 843 (9th Cir. 2017). "[P]rosecutorial misconduct may occur through the prosecutor's own vouching remarks or when the prosecutor elicits vouching testimony from other witnesses." *United States v. Stinson*, 647 F.3d 1196, 1212 (9th Cir. 2011) (quoting *Cheney v. Washington*, 614 F.3d 987, 996 n.4 (9th Cir. 2010)).

Mr. Walji asserts that the second form of vouching is at issue here. *See* Dkt. No. 189 at 12. The Ninth Circuit has cautioned that this form of vouching "may occur more subtly than personal vouching, and is also more susceptible to abuse." *Roberts*, 618 F.2d at 533. "[S]uch prosecutorial remarks may be fatal if 'the remarks, fairly construed, were based on the [prosecutor's] personal knowledge apart from the evidence in the case and that the jury might

---

[1] Other forms of "improper vouching and related misconduct" include when a prosecutor "express[es] an opinion of the defendant's guilt, denigrate[s] the defense as a sham, implicitly vouch[es] for a witness's credibility, or vouch[es] for his or her own credibility." *United States v. Hermanek*, 289 F.3d 1076, 1098 (9th Cir. 2002) (citations omitted).

have so understood them.'" *Id.* at 533–34 (quoting *Ortiz v. United States*, 293 F.2d 747, 749 (9th Cir. 1961)).

A court first examines the claim of vouching and, if it concludes vouching occurred, then determines if there is plain error requiring reversal where no objection was made. *United States v. Brooks*, 508 F.3d 1205, 1209 (9th Cir. 2007).

**A.     The Government Engaged in Vouching**

In evaluating vouching, courts consider several factors, including:

> the form of vouching; how much the vouching implies that the prosecutor has extra-record knowledge of or the capacity to monitor the witness's truthfulness; any inference that the court is monitoring the witness's veracity; the degree of personal opinion asserted; the timing of the vouching; the extent to which the witness's credibility was attacked; the specificity and timing of a curative instruction; the importance of the witness's testimony and the vouching to the case overall.

*United States v. Ruiz*, 710 F.3d 1077, 1085 (9th Cir. 2013) (quoting *United States v. Necoechea*, 986 F.3d 1273, 1278 (9th Cir. 1993)).

The Court finds that the Government engaged in vouching for MV1. First, in eliciting the testimony of Ms. Stromme, the Government bolstered MV1's credibility and "indicate[d] that information not presented to the jury supports the witness's testimony." *Hermanek*, 289 F.3d at 1098. Ms. Stromme's testimony was almost completely non-probative of Mr. Walji's guilt, while implying that MV1's interview was supportive of the Government's case. The numerous, detailed questions dedicated to Ms. Stromme's typical interview process or the circumstances of MV1's interview were largely irrelevant, particularly considering that MV1's interview was inadmissible hearsay. The Court agrees with Mr. Walji that "[t]he improper insinuation of this procedural testimony was . . . that government officials had conducted a thorough investigation that the jury was not privy to, and the result of that investigation was a shared 'professional

ORDER ON MOTION FOR NEW TRIAL - 8

judgment' that MV1 was credible and Mr. Walji was guilty." Dkt. No. 189 at 15; *see also Brooks*, 508 F.3d at 1211 (holding that the authenticity of wiretap recordings "could have been adequately established without such extensive detail" of the process for obtaining wiretaps, which was improper vouching); *United States v. Cunningham*, 462 F.3d 708, 713 (7th Cir. 1996) ("In short, the government piled on needless, unfairly prejudicial evidence that may have affected the jury's judgment . . . .").

The Government argues that Ms. Stromme's testimony was relevant because "it showed the jury the next steps of the investigation and explained why an in-depth, detail-focused interview was not conducted at the airport" by local police; it "logically tends to rebut express and implied suggestions and arguments about why MV1 would give additional details later" beyond her brief statement to police; and it "show[ed] MV1's experiences after reporting," which assisted "the jury's evaluation of her believability." Dkt. No. 192 at 4–5. The Court agrees—to a point. Testimony that a forensic interview was conducted following both the incident and an initial statement to police does tend to complete the narrative and describe an element of MV1's post-incident experience, which could speak to her motive and credibility. But these purposes could have been accomplished without most, if not all, of Ms. Stromme's testimony, the only purpose for which then appears to be bolstering MV1's credibility.[2]

Second, in closing argument, the prosecutor both compounded the error of Ms. Stromme's testimony and "express[ed] his or her personal belief in the veracity of the witness." *Hermanek*, 289 F.3d at 1098. The prosecutor described MV1 as "consistent" in her allegations, as she provided "no details different" and "identical accounts" (Dkt. No. 187 at 9–

---

[2] The Court finds less convincing the Government's argument that Ms. Stromme's testimony was necessary to show that MV1 had to miss school and discuss what happened with a stranger. *See* Dkt. No. 192 at 5. While relevant, the Government elicited this testimony from MV1's mother (Dkt. No. 185 at 166:23–167:5) and could have elicited this from MV1 herself as well.

10), immediately before referring to the forensic interview in which MV1 was, in fact, notably *inconsistent* with her testimony at trial; immediately after referring to the forensic interview, the prosecutor stated, "[MV1] was also corroborated." *See United States v. Blueford*, 312 F.3d 962, 968 (9th Cir. 2002) ("[I]t is decidedly improper for the government to propound inferences that it knows to be false, or has very strong reason to doubt . . . ."). In reading the cold transcript, it does not appear to the Court that the intent of the prosecutor was to vouch as to these statements (and the prosecutor seemed to be trying to parse out the various evidence), but the parsing was subtle and the unfortunate sequence of statements easily could have been interpreted as vouching. Later, the prosecutor also expressed a personal belief in MV1's credibility when she said "it happened to her" and "[i]t wasn't a lie or fiction or even a misconception." *Id.* at 23:1–2; *see Carriger v. Stewart*, 132 F.3d 463, 480 (9th Cir. 1997) (holding prosecution engaged in vouching where they "argued at length in closing that [witness] was not a liar"); *United States v. Molina-Guevara*, 96 F.3d 698, 704 (3d Cir. 1996) (holding prosecution engaged in vouching where, in part, they "assured the jury that [witness] did not lie to you"). Contrary to the Government's assertion (Dkt. No. 192 at 13), these statements were not simply "summation points" after reviewing the evidence, but assertions (albeit less forceful and less frequent than in *Carriger* and *Molina-Guevara*) that MV1 was telling the truth.

While a close call, the Court finds that the combination of the Government introducing unnecessarily detailed testimony from Ms. Stromme about her interview with MV1 and the statements made in closing by the prosecutor weigh in favor of finding that Government engaged in vouching.

**B.      The Vouching Does Not Merit a New Trial**

However, not all vouching is made equal, and not all vouching merits a new trial.

When a court reviews a vouching case under the plain error standard, "[w]e reverse only if, viewing the error in the context of the entire record, the impropriety 'seriously affects the fairness, integrity or public reputation of judicial proceedings, or where failing to reverse a conviction would amount to a miscarriage of justice.'" *Necoechea*, 986 F.2d at 1276 (quoting *United States v. Molina*, 934 F.2d 1440, 1446 (9th Cir. 1991)); *see also Brooks*, 508 F.3d at 1209. Here, when viewed in "the context of the entire record," *Necoechea*, 986 F.2d at 1276, the Court finds that the vouching did not "seriously affect[ ] the fairness, integrity, or public reputation" of the proceedings such that a new trial is warranted, *Alcantara-Castillo*, 788 F.3d at 1191.

As an initial matter, the Court notes that Mr. Walji did not move in advance of trial to exclude or limit Ms. Stromme's testimony (despite knowing, or having reason to know, that MV1's interview was inadmissible). Nor did Mr. Walji contemporaneously object to or seek to impeach MV1 regarding any of the testimony or remarks he now challenges.[3] Mr. Walji's failure to object or to directly impeach MV1 then undermines his argument now that the Government's misconduct seriously affected his trial.[4]

Further, the Court finds that, in the context of the entire trial and after considering the factors for evaluating vouching, *Ruiz*, 710 F.3d at 1085, the misconduct does not merit a new trial. While Ms. Stromme's testimony concerns the Court, it was among the briefest testimony presented, and it still served some legitimate purposes such as completing the narrative and

---

[3] The Government also points out that on cross examination, defense counsel highlighted some of the contested portions of Ms. Stromme's testimony, despite arguing that the same testimony is a basis for a new trial. *See* Dkt. No. 192 at 7–9. However, the prosecution was the first to elicit the vouching testimony, thus putting Mr. Walji and defense counsel in the position of countering, mitigating, or otherwise addressing that testimony.

[4] In his reply, Mr. Walji asserts for the first time that his counsel was "attempt[ing] to introduce the substance of MV1's statement during the child forensic interview as impeachment." Dkt. No. 193 at 8. But this is belied by both the questions asked and the statements made at sidebar during the cross of Ms. Stromme. First, if defense counsel was trying to impeach MV1 through her statement to the forensic interviewer, he never asked MV1 about the inconsistent statements during her cross-examination. Second, at the sidebar, counsel denied that he was attempting to ask about any specific statement. Dkt. No. 186 at 93:8–9.

describing MV1's post-incident experience. Further, defense counsel elicited that Ms. Stromme had to twice check with law enforcement during MV1's interview. Although the prosecutor mentioned the forensic interview in her closing argument, the references were fleeting, and, on rebuttal, the prosecutor clearly (and correctly) told the jury that it could not consider MV1's forensic interview. Where the prosecutor expressed personal belief in MV1's credibility, the statements were restrained and brief.

This trial was fundamentally a tale of two witnesses (MV1 and Mr. Walji), and under these circumstances, the Government is permitted some leeway to argue in closing about who is telling the truth. *See United States v. Alcantara-Castillo*, 788 F.3d 1186, 1194 (9th Cir. 2015) ("[T]he government must be given reasonable latitude in closing argument, and in 'a case that essentially reduces to which of two conflicting stories is true, it may be reasonable to infer, and hence to argue, that one of [the] two sides is lying.'" (quoting *United States v. Wilkes*, 662 F.3d 524, 541 (9th Cir. 2011))). Further, MV1's credibility was central to the Government's case and unsurprisingly attacked by the defense, as Mr. Walji's testimony (a complete denial of MV1's allegations) was completely irreconcilable with MV1's testimony. Finally, the presentation of DNA evidence (which provided strong support for the presence of Mr. Walji's DNA on the outside of MV1's pants[5]), as well as the corroboration from three flight attendants (who had no relationship to MV1 prior to the flight) of MV1's statements immediately after the incident and her emotional state at that time, reduced the importance of vouching to the case overall. For all these reasons, the vouching does not merit a new trial.

---

[5] In closing, defense counsel argued extensively regarding a lack of DNA inside MV1's pants. However, the FBI forensic examiner testified that collectors may not always swab for DNA in the right place, and they would not necessarily expect to find DNA where a touch was quick. *See* Dkt. No. 186 at 51:5–13, 54:15–55:8, 69:15–23.

## IV. CONCLUSION

Accordingly, Mr. Walji's Motion for a New Trial (Dkt. No. 189) is DENIED.

Dated this 3rd day of December 2024.

Tana Lin
United States District Judge